## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JASON MILLER, on behalf of himself and others similarly situated,** | ) ) ) | |
| | ) | **Case No.: 2:22-cv-12739** |
| **Plaintiff,** | ) | **JURY DEMAND** |
| | ) | |
| **v.** | ) | **FED. R. CIV. P. 23(b)(3)** |
| | ) | **CLASS ACTION** |
| **GENERAL MOTORS, LLC,** | ) | **COMPLAINT** |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Jason Miller ("Plaintiff" or "Miller"), by and through undersigned counsel, brings this consumer class action against Defendant General Motors, LLC (herein "General Motors" or "GM"), individually and on behalf of all others similarly situated, as identified by the below-defined nationwide and statewide classes he seeks to represent (collectively, "Class Members").  Class Members consist of persons who currently own or lease – or formerly owned or leased – a 2016-2019 Chevrolet Volt vehicle (herein "Volt" or "Class Vehicle").  All allegations made in this Complaint are based on information and belief upon the investigation of counsel, except those allegations that directly pertain to Plaintiff Miller, as such allegations are based on personal knowledge and experience.

## A.   NATURE OF THE ACTION

1.   This consumer class action arises from the widespread defect causing an abrupt failure in the electrical systems of model year 2016-2019 Chevrolet Volts. The defect can manifest in various ways – including a complete loss of propulsion while traveling at interstate speeds or entire failure to start.

2.   The defect lies in the Volts' Battery Energy Control Module (the "BECM"), a small but crucial component to the Volt's hybrid propulsion system.

3.   Model years 2016-2019 Chevrolet Volts are plug-in hybrid vehicles. They have an internal combustion (gasoline) engine and an electric motor, both of which are independently capable of powering and propelling the vehicle.  Hybrid vehicles differ with respect to how long (or how far) they can run on the electric motor, which uses energy stored in a rechargeable battery (or battery pack). Generally speaking, the BECM is responsible for keeping the Volt's battery properly charged; maintaining proper battery function; and regulating battery temperature to avoid overheating or freezing.  As part of its function of regulating battery supply and usage, and while the vehicle is turned on, the BECM regularly communicates with the vehicles' other control modules – such as the Hybrid Vehicle (or "HV") control module, which controls the hybrid system and (generally speaking) regulates when the vehicle operates on the gasoline engine and when it operates on the electric

motor. If the BECM cannot adequately perform its function, the vehicle loses its ability to function.

4.    The Class Vehicles contain a defect that prevents the BECM from functioning properly. This defect is understood to relate to internal soldering connections within the BECM and arises from defective materials or workmanship and/or manufacturing. This manufacturing-related defect, present in Class Vehicles, led directly to BECM's failure in Class Vehicles and has resulted in Plaintiff and the Class Members suffering actual and compensable damages.

5.    In the alternative, Plaintiff pleads that the BECM defect present in Class Vehicles is a design defect.[1] Further pleading in the alternative, Plaintiff alleges that the design defect, present in all Class Vehicles, led directly to BECM's failure in Class Vehicles and has resulted in Plaintiff and the Class Members suffering actual and compensable damages.

6.    The BECM defect is present in all model year 2016-2019 Chevrolet Volts, which are manufactured by General Motors, LLC.

---

[1] Plaintiff disclaims certain knowledge with respect to the precise nature and root cause of the defect. That information is within the sole possession of GM, which has concealed and continues to conceal the true nature of the BECM defect. This concealment is made all the more complete in that BECMs are not "plug and play" but, instead, have to be individually programmed and GM possesses superior and exclusive information pertaining to the BECM and its operations and programming.

7.      GM has known about, but failed to disclose or rectify, the defective BECM – which is a necessary and integral component to all Class Vehicles.

8.      The BECM contains a fundamental defect which causes the module to fail.  Upon information and belief, Plaintiff alleges that the Class Vehicle BECM failure manifests in at least two ways: (1) the vehicle fails to start; and (2) the vehicle, while in motion and irrespective of the speed at which it is traveling, loses propulsion, either temporarily or permanently.  The BECM's failure creates significant risk of collision, bodily injury, and property damage – to say nothing of the inconvenience of being stranded on the roadway.

9.      The BECM must be replaced and reprogrammed before the vehicle is operational again.

10.     GM knew, or with the reasonable exercise of caution and diligence should have known, of the BECM defect at the time the first Class Vehicle was sold.  But despite a duty to do so, GM has failed to warn consumers of the unreasonable dangers associated with BECM failure.

11.     In the alternative, Plaintiff alleges that GM became aware, or with the reasonable exercise of caution and diligence should have become aware, of the BECM defect shortly after the first Class Vehicle was sold.  But despite a duty to do so, GM has failed to warn customers of the unreasonable dangers associated with the BECM defect.

12.    At the latest, upon the accretion of relevant manufacturing and designing knowledge, GM knew of the BECM defect by June 2018, when it released Technical Service Bulletin ("TSB") 18-NA-261 – in which GM recognized that model year 2016-2018 Volts were failing due to "an internal issue within the Battery Energy Control Module."  In the June 2018 TSB, GM acknowledged that remedying the defect would require one to "replace and reprogram the Battery Energy Control Module."[2]

13.    After releasing the June 2018 TSB, GM continued to manufacture, market, and sell Chevrolet Volt vehicles.  Despite its knowledge of the defective BECM, GM failed to rectify the problem.  Indeed, in March 2022, GM acknowledged that the BECM issue was present in model year 2016-2019 Volts.[3]

14.    GM has wrongfully and intentionally concealed the true nature of the BECM defect from consumers in pre-purchase/lease as well as post-purchase/lease transactions.  Despite GM's knowledge of the defect, GM continued to market the Class Vehicles as desirable cars and a cost-saving alternative to traditional fuel-

---

[2]  https://www.tsbsearch.com/Chevrolet/18-NA-261 (last accessed November 4, 2022).

[3]  https://static.nhtsa.gov/odi/tsbs/2022/MC-10209256-0001.pdf (last accessed November 4, 2022).  Technical Service Bulletins, sometimes called "secret warranties," are highly technical documents that provide repair instructions to service technicians. *See* https://help.edmunds.com/hc/en-us/articles/206102667 (last accessed November 4, 2022).

powered vehicles.  GM further enticed consumers to purchase its Volts by promoting GM's "Roadside Assistance Program," under the terms of which GM promised customers complimentary transportation or reimbursement of transportation expenses to eliminate inconvenience.

15.     Plaintiff and the Class Members were entitled to the benefits of GM's Roadside Assistance Program while they were waiting on their defective BECMs to be repaired under warranty.  GM failed to adequately provide them with such benefits.

16.     At the same time GM was engaged in an aggressive marketing campaign to promote the Volt and attract customers, it had two fundamental (and growing) problems: (1) it did not have a sufficient supply of parts to timely address the influx of warranty claims due to the BECM issue; and (2) its network of dealers did not have the quantity of Volt-trained service technicians that the ad campaigns led customers to believe.

17.     With its marketing campaign not aligned with its ability to deliver on its promises, GM's problems compounded: without an adequate parts supply and not enough trained technicians, GM could not fulfill its repair warranty obligations. And because it could not fulfill its repair warranty obligations to repair the Volts without unreasonably delay and which would deprive customers of daily transportation, GM's Roadside Assistance warranty obligated it to provide its customers with

courtesy transportation. But GM was unwilling to absorb the cost of temporary transportation for the disproportionate number of customers waiting on a BECM repair. So, it decided to save money by breaking its promise.

18.     GM intentionally concealed its inability to timely or adequately rectify the BECM defect and the attendant significant delays, safety risks, expenses, and inconveniences for Class Members such as, and including, Plaintiff Miller.

19.     Despite GM's knowledge that adequately addressing the BECM defect required BECM replacement, GM chose not to modify its manufacturing process – which would result in a delay in the Volt's release and production – to rectify the defect by implementing improved quality control standards, better workmanship, or higher-quality parts. Instead, GM chose to place what it knew to be defective BECMs in new Volts while it continued to market the Volt nationwide as an industry leader in performance and customer satisfaction.

20.     In the alternative, Plaintiff alleges that the BECM defect was a product of GM's defective design, and GM made no attempt to re-design the BECM or its component parts to rectify the defect. Despite its knowledge that modification to the BECM's design was required, GM chose not to redesign the Volt and continued to market the Volt nationwide as an industry leader in performance and customer satisfaction.

21.     GM made a calculated decision to conceal the BECM defect, and GM's nationwide marketing campaign continued to tout the benefits of driving a Volt. Plaintiff alleges, upon information and belief, that GM thought its decision to conceal – and continue to manufacture, market, and sell, model year 2016-2019 Volts – would result in more Volt sales than if GM disclosed the defect and endured another round of negative publicity.  Upon information and belief, Plaintiff further alleges that GM's decision to conceal the BECM defect did, in fact, result in a financial benefit to GM that it would not have otherwise received.

22.     GM no longer manufactures the Volt vehicle.  However, GM continues to market and sell Volts containing the defective BECM, through its touted dealer network, as "Certified Pre-Owned" vehicles.  Of course, GM is not certifying that the Volts are previously owned but, rather, GM is certifying that the Volts will operate as reasonably expected.  And these "Certified" vehicles come with the same warranties as new Volts, despite GM's undisputed knowledge of its inability to satisfy its warranty obligations with respect to the defective BECM.

23.     That GM no longer manufactures the Volt does not alleviate the problem.  Instead, it appears to have made the problem worse for existing Volt customers because GM lacks an adequate supply of replacement BECMs for the Volts – which GM has already sold and which remain under warranty from GM.

24.     GM's continued efforts at concealing the BECM defect presents an ongoing threat to both Volt owners and those sharing the roadway with them.  Class Members have lost propulsion while driving at interstate speeds.  And other Class Members are unknowingly driving a Volt vehicle whose BECM could fail at any time, causing an unreasonably dangerous situation and a high risk of bodily injury and property damage.

25.     In addition, GM's lack of replacement BECMs for the Volts has caused Plaintiff Miller and Class Members to be without transportation (or to incur costs for alternate transportation) for extended and unreasonable amounts of time.

26.     When the BECM fails on a particular Volt, GM is unable to timely repair or replace the failed component, despite these being relatively new, low-mile vehicles and despite these vehicles still being under GM warranty.  This results in Volt owners – such as, and including, Plaintiff Miller – going many months without their vehicle and being saddled with substantial expenses and inconveniences.

27.     Despite being aware of the BECM defect, and the harm it is causing to Class Members, GM has not recalled the Volts to rectify the BECM defect and has not offered Plaintiff or Class Members a suitable repair or replacement option.  Nor has GM offered to satisfactorily reimburse Plaintiff and Class Members for the expenses they reasonably incurred as a direct result of the BECM defect.

28.     Had Volt customers known of the BECM defect, they would not have purchased/leased the Volt or would have paid considerably less to do so.  GM placed its own potential financial gain ahead of its customers' safety.  As a direct result of GM's conduct, Plaintiff Miller and the Class Members have suffered an ascertainable loss of money, property, and/or loss in value of their Volt.

29.     Plaintiff Miller has been harmed as a result and brings this action seeking monetary damages and injunctive and other equitable relief, on behalf of himself and those similarly situated.

## B.     JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and supplemental jurisdiction over Plaintiff's and Class Members' state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them in one judicial proceeding.  28 U.S.C. § 1367.

31.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d), because the class action matter in controversy exceeds $5,000,000, exclusive of costs and interest; there are more than 100 members of the Classes; and Plaintiff is a citizen of a different state than Defendant General Motors, LLC.

32.     This Court has personal jurisdiction over GM because GM's principal place of business is in Michigan; it has consented to jurisdiction by registering to conduct business in Michigan; it maintains sufficient minimum contacts in Michigan; and it otherwise intentionally avails itself of the laws and markets in Michigan by conducting substantial business in Michigan and in this District through promotion, sale, and distribution of its vehicles.  Additionally, some, or all, of GM's actions giving rise to the instant claims took place in Michigan and in this District.

33.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a)-(c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and/or because GM's principal place of business lies in this District.

## C.     PARTIES

**<u>Plaintiff Jason Miller</u>**

34.     Plaintiff Miller is a citizen of Kansas.

35.     In late 2021, after his prior vehicle was destroyed in a collision, Miller searched for a replacement vehicle.

36.     Miller intentionally sought out a late model vehicle, desiring to avoid costly, inconvenient, and unpredictable repairs.  Reliability was key.

37.     The Volt's environmental benefits as a plug-in hybrid were very important to Miller.  This would allow most of the family's regular commuting miles

to be accomplished utilizing strictly battery power and, thus, significantly reduce gasoline consumption, saving both money and environmental resources.

38. Miller was particularly keen on – and sold by – the Volt's 8-year, 100,000-mile warranty and GM's Roadside Assistance and Courtesy Transportation protections.

39. Eschewing cheaper private-party listings, Miller intentionally sought out a "Certified Pre-Owned" Volt from GM's website because he believed the supplemental GM inspection, certification, and warranty, would help ensure that he obtained a reliable vehicle and further help avoid future hassles and breakdowns.

40. At the time, Miller believed that a newer, "Certified Pre-Owned" Volt would be reliable, would be free of material defects, and would operate as reasonably expected.  Further, Miller believed that if any material issues arose on such a car, they would be timely and conveniently repaired though the vehicle's warranty at no cost to Miller and – moreover – that GM would provide alternate transportation during such repairs.

41. Miller ultimately selected a "Certified Pre-Owned" 2017 Chevy Volt with approximately 50,450 miles from Nick Crivelli Chevrolet of Beaver, Pennsylvania, and he had the vehicle delivered to his home in Kansas for use as a family vehicle.

42.     However, in February 2022, after he had driven it less than 3,000 miles, Miller's Volt began operating strangely and the check engine light illuminated, along with a "limited propulsion" warning.  Miller was alerted to an issue with the charging system through the Chevrolet app on his phone, and he was directed to take the still new-to-him Volt into a GM dealership for service.  The only practical option for service was Eddy's Chevrolet of Wichita, Kansas, because it was the closest GM dealership with a Volt-trained technician.

43.     After surveying the vehicle, Eddy's Chevrolet advised Miller that his Volt's BECM was defective and needed to be replaced, but that the part was on backorder so the necessary repair could not be completed.  Eddy's Chevrolet was unable to provide any estimated timeline for completion of the repair.  The dealership then assured Miller the Volt was fine to drive, even with the defective BECM.  Discouraged, but taking the dealership at its word and lacking alternative transportation, Miller drove his Volt home from the dealership for continued family driving.

44.     The defective BECM caused significant issues, rendering the Volt only marginally operative.  The plug-in hybrid system stopped working, and the car's internal combustion engine would routinely lose power and need to be restarted.  This turned short commutes – when the plug-in hybrid system should shine best –

into lengthy, trouble-ridden ordeals. Through perseverance and necessity due to lack of alternatives, Miller was able to limp the car along after considerable workarounds.

45.    Over the next several weeks, Miller regularly advised Eddy's Chevrolet of his Volt's worsening status and was still told the vehicle remained safe to drive and that there were no "loaner" cars available for him to use while waiting for the repair.

46.    While maintaining communication with the dealership where his Volt was slated for the BECM repair, Miller also corresponded directly with GM customer service representatives, endeavoring to secure more timely relief. None was provided.

47.    More than two (2) months later, Miller was advised the necessary part had arrived and he was able to bring his car back to Eddy's Chevrolet for the needed repair, which Miller did.

48.    After having the car for two days, Eddy's Chevrolet advised Miller the vehicle was not fixed and stated that an additional part was necessary to complete the repair. The dealership told Miller that this additional necessary part was also on backorder, and that there was no estimated timetable for repair available.

49.    Because the dealership had partially dismantled the Volt as part of its ostensible repair efforts, the car was unavailable for Miller's use.

50. Plaintiff was entitled to alternate transportation under GM's Roadside Assistance Program while his Volt's BECM was being repaired. Under GM's Roadside Assistance Program, GM agreed to make the courtesy transportation available through its dealer network. Contrary to those terms, however, Eddy's Chevrolet informed Miller that no alternative transportation was available for his use – despite his request for it. Miller corresponded with GM directly, and further learned that no suitable reimbursement program was available – despite his requests for it. Rather, GM advised Miller that he could rent a vehicle at his own expense, and GM would be "able to provide up to $46 per day" reimbursement **after** his Volt is repaired. GM could not provide even an estimated timetable for the repair of Miller's Volt, and GM recognized that Miller may not be able "to find a [rental] vehicle within this price range." In other words, GM acknowledged that its rental allowance would likely not cover Plaintiff's out-of-pocket expenses – and it told Plaintiff Miller that partial reimbursement could not be paid until Miller's Volt had been repaired (while refusing to provide a timetable for the repair).

51. Unable to justify renting a car indefinitely for a potential partial reimbursement from GM, Miller continued to press both GM and the dealership for a loaner vehicle, as well as updates on his Volt's status. In May of 2022, more than three months after the failed BECM diagnosis, Miller was provided with a loaner.

52.     As of the date of the filing of this Complaint, Miller's Volt is still unavailable for him to use; it remains at the dealership, awaiting the BECM repair with no estimated timeframe for completion – all while Miller continues to pay taxes, interest, and insurance for the vehicle he cannot use.

53.     Prior to Miller's Volt purchase, GM never disclosed to Miller the prevalence of Volt BECM breakdowns; its inability to timely repair or replace failed BECMs; or the additional time and expenses associated with GM's delay.

**Defendant General Motors LLC**

54.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business in Detroit, Michigan.

55.     GM is a motor vehicle manufacturer, including the Chevrolet brand.

56.     Upon information and belief, from its Detroit headquarters, GM designed, manufactured, marketed, and sold – or had designed, manufactured, marked, and sold – more than 60,000 2016-2019 Chevy Volts which all contain the defective BECM.

57.     From its Detroit headquarters, GM also made determinations regarding its "Certified Pre-Owned" program; warranty coverage for the Volt; Roadside Assistance program; and Courtesy Transportation program. Such determinations included, but were not limited to, how such coverage or programs would be

represented to potential consumers and how such coverage or programs would be provided to Volt consumers.

**D.     OPERATIVE FACTS COMMON TO ALL CAUSES OF ACTION**

**GM's Standard Representations Regarding the Volt**

**i.     GM's Public Statements and Marketing**

58.     After sundry issues with the first-generation Chevy Volt (model years 2010-2015), GM released the second-generation Volt in 2016 Chevy Volt to much internal fanfare.  President for GM North America said, "The 2016 Chevrolet Volt provides our owners with a no-compromise electric driving experience," and that "We believe our engineering prowess combined with data from thousands of customers allows [GM] to deliver the most capable plug-in vehicle in the industry."[4]

59.     GM designed the Volt knowing that electric driving was very important to the anticipated customer base, stating: "Volt owners complete more than 80 percent of their trips without using a drop of gasoline and they tell us they love the electric driving experience."[5]

60.     Of the 2016 Volt, GM said "the new Volt offers a General Motors'-estimated total driving range of more than 400 miles and with regular charging,

---

[4] https://media.gm.com/media/us/en/chevrolet/vehicles/volt/2016.html (last accessed November 4, 2022).

[5] *Id.*

owners are expected to travel more than 1,000 miles on average between gas fill-ups."[6]

61.     Recognizing the importance of the Volt's electric drive system, in 2017 GM advertised that owners of first- and second-generation Volts "have driven more than 650 million EV miles, saving 34 million gallons of gas – and they drive all-electric more than 80 percent of the time."[7]

62.     According to GM, the Volt represented the "company's efforts and success in providing customers with an innovative and industry-leading propulsion system."[8]

63.     A GM press release at the time stated, "Chevrolet is all about bringing affordable electrification to our customers, and that is exactly what we did with the Volt."   Further, GM publicized that "Volt owners are the most satisfied in the industry."[9]

---

[6] *Id.*; *see also* https://media.gm.com/media/us/en/chevrolet/vehicles/volt/2017.html ("Chevrolet expects owners to travel 1,000 miles between gasoline fill-ups") (last accessed November 4, 2022).

[7] *Id.*

[8] https://media.gm.com/media/us/en/chevrolet/vehicles/volt/2017.detail.html/content/Pages/news/us/en/2016/dec/1212-wardsauto.html (last accessed November 4, 2022).

[9] https://media.gm.com/media/us/en/chevrolet/vehicles/volt/2017.detail.html/content/Pages/news/us/en/2015/nov/1119-volt.html (last accessed November 4, 2022).

64.    GM's 2019 Volt advertisements – based upon data from 2016-2018 model Volts – represented that "On average, new owners of the Volt travel 1,100 miles between fill-ups with regular charging."[10]

65.    GM recognized that the car's electric capability was an essential component to the Volt's advertised total range, stating: the "Volt's extended-range electric propulsion system, which with a full tank of gas and a full charge, offers an EPA-estimated 53 miles of pure EV range and 106 MPGe, or gasoline equivalent. When the Volt's battery runs low, a gas-powered generator kicks in to extend the driving range to a total of 420 miles (675 km) on a full tank."[11]

66.    GM reported making slight refinements to the Volt in 2019, which GM claimed would equip drivers with even "more information about their efficiencies [. . .] to eke out every EV mile possible," bolstering the Volt's "class-leading EV range."  In anticipation of the 2019 model Volt, GM reported that "Volt owners have driven more than 2.8 billion EV miles, saving more than 108 million gallons of gas."[12]

---

[10] https://media.gm.com/media/us/en/chevrolet/vehicles/volt/2019.html (last accessed November 4, 2022).

[11] https://media.gm.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2018/jun/0628-volt.html (last accessed November 4, 2022).

[12] *Id.*

67.     GM _knew_ that electric capability, avoiding gasoline consumption, efficiency, driving experience, and customer satisfaction were very important to Volt consumers – and GM promoted the Volt accordingly.

ii.     **GM's Class Vehicle Warranties**

68.     Volts came with GM's "bumper-to-bumper" warranty for 3 years, 36,000 miles as well as the "Powertrain" warranty for 5 years, 60,000 miles.

69.     Chevrolet Volts also came with an additional 8-year, 100,000-mile warranty which "covers repairs to Hybrid specific component defect related to materials or workmanship."  This additional hybrid-specific warranty includes coverage for the propulsion battery as well as "Other Electric/Hybrid Components" including but not limited to "High Voltage Wiring, Hybrid Powertrain and Battery Control Modules."[13]

70.     The hybrid-specific warranty protections apply not only to purchasers of new Volts but, importantly, the warranty is fully transferrable to subsequent purchasers.  Additionally, GM marketed and sold used Volts through its dealer

---

[13] The GM-provided warranty for model years 2016-2019 Volts is substantially similar.  For the sake of convenience and uniformity, Plaintiff uses the 2017 warranty as an exemplar.  The warranty is available online at https://www.gmc.com/bypass/pcf/gma-content-api/resources/sites/GMA/content/staging/MANUALS/3000/MA3212/en_US/6.0/2k17chevywm2ndPrint.pdf (last accessed November 4, 2022).

network under its "Certified Pre-Owned" program which would provide buyers additional protection and coverage.

71.     Warranty repairs are performed by GM dealers, whom GM compensates for performing the work.  Upon information and belief, GM network dealers have a portal through which they access technical documents and service manuals that assist them in diagnosing a vehicle problem and then guide them through the repair process.  Automobile manufacturers regularly publish Technical Service Bulletins ("TSBs") to further assist repair technicians through various repairs.  If a manufacturer fails to issue proper guidance on a certain issue, or if it fails to ensure that its dealership service technicians are adequately trained on how to access (and decipher and follow) technical instructions, repairs are likely to be performed incorrectly or not at all.

72.     The reason GM could credibly promise its customers that it had a dealership network of knowledgeable, and properly trained technicians is that GM controls that process.  In other words, GM controls what it communicates to its dealers and what vehicle-specific training dealer service technicians are provided.  If GM fails to offer guidance to its dealers – like here, where GM issued its first BECM-related TSB two years after the problem surfaced – customers like Plaintiff and the Class Members suffer ascertainable harm.

73.     GM's ability to ensure an adequate supply of parts, and its diligence with respect to ensuring dealership technicians receive the most up-to-date training, is critical.  If GM fails at either of these, as it did here, GM loses its ability to live up to its contractual obligations: warranty repairs are not performed timely; work is not performed correctly because technicians lack sufficient know-how; and customer complaints mount rapidly.  If the issue underlying GM's failure is a defective part (like the BECM), the failure of which presents substantial risk of bodily injury and property damage, GM has the added burden of ensuring its customers' safety by rectifying the situation.

74.     Performing BECM repair work requires specialized knowledge, and long after it knew of the defective BECM, GM continued to tout its dealer network as knowledgeable and capable of performing repairs on Volts.  In GM's own words, it told its customers that "Chevrolet [had] a network of certified dealers who are trained to perform repairs on Volt[s]."[14]

---

[14] *Id*. at 14.

### iii.      GM's Certified Pre-Owned Program

75.     GM billed – and still bills – "Certified Pre-Owned" as something other and better than "used."  GM attracted buyers by advertising that its "Certified Pre-Owned" vehicles, unlike "basic used" cars, carry GM's stamp of approval.  In fact, GM promised "Certified Pre-Owned" buyers "happiness at every turn":



[15]

---

76.     But happiness is not the only thing GM promised its customers they could expect when they purchased a "Certified Pre-Owed" vehicle – which are only available at GM dealerships.  GM went further, promising buyers that they could count on GM to provide extensive benefits to owners of "Certified Pre-Owned" vehicles, including "Roadside Assistance" and "Courtesy Transportation" programs:

| BENEFIT | | CERTIFIED | | USED |
|---|---|---|---|---|
| Factory-Backed 6-Year/100,000-Mile Powertrain Limited Warranty! | ✓ | Yep | ⊗ | Nope |
| Factory-Backed 12-month/12,000-Mile Bumper-to-Bumper Limited Warranty! | ✓ | Yep | ⊗ | Nope |
| Roadside Assistance! | ✓ | Yep | ⊗ | Nope |
| Courtesy Transportation! | ✓ | Yep | ⊗ | Nope |
| 3-Day/150-Mile Exchange Policy! | ✓ | Yep | ⊗ | Nope |
| Scheduled Maintenance Program! | ✓ | Yep | ⊗ | Nope |
| Limited OnStar* Trial! | ✓ | Yep | ⊗ | Nope |
| SiriusXM* 3-Month Trial Subscription! | ✓ | Yep | ⊗ | Nope |
| Free Vehicle History Report | ✓ | Yep | ⊗ | Nope |
| 172-Point Inspection | ✓ | Yep | ⊗ | Nope |

[16]

### iv.      GM's Roadside Assistance Program

77.     GM understands that customers are concerned about unexpected breakdowns and the inconvenience and expenses that may result and, for that reason, GM promotes its "Roadside Assistance" and "Courtesy Transportation" to resonate

---

[16] https://www.gmcertified.com/certified-vs-used  (November 4, 2022).

with – and build upon – consumers' apprehension.   Stark examples of GM's promotion can be seen online:

> No one enjoys being stuck on the side of the road. That's why our Certified Pre-Owned vehicles come with the security and convenience of our 24-hour Roadside Assistance Program†.
>
> And you'll never be without a ride, even if your vehicle requires warranty repairs. We'll provide Courtesy Transportation and/or reimbursement of your transportation expenses. No hassles. No waiting. Just the satisfaction of knowing that we've got your back. [17]

78.     Through these representations and others, GM marketed the Volt based upon its purported: customer satisfaction, "no-compromise" design and engineering prowess, extensive warranty protections, service during warranted repairs, coverage after purchase, and superior driving capabilities.   GM intended potential customers to rely on such representations.   And, consumers like Plaintiff Miller and the Class Members did just that.

79.     Throughout the Class Vehicle's 8-year, 100-000-mile hybrid-specific warranty, the vehicle would be covered by GM/Chevrolet's "Roadside Assistance

---

[17] https://www.gmcertified.com/benefits-after-purchase (last accessed November 4, 2022).   Elsewhere in the same warranty manual, GM tells customers that, with respect to covered repairs, "a part not being available within 10 days, or a repair not being completed within 30 days constitutes a significant inconvenience." https://www.gmc.com/bypass/pcf/gma-content-api/resources/sites/GMA/content/staging/MANUALS/3000/MA3212/en_US/6.0/2k17chevywm2ndPrint.pdf, at 29 (last accessed November 4, 2022).

Program" and therefore included in GM/Chevrolet's "Courtesy Transportation Program." GM used these programs to promote the ease and convenience of warranty repairs:

> If your vehicle requires warranty repairs during the course of your vehicle's Bumper-to-Bumper Warranty, Limited Powertrain, and/or hybrid-specific warranty, alternate transportation and/or reimbursement of certain transportation expenses may be available under the Courtesy Transportation Program. Several transportation options are available. Consult your dealer or refer to the owner manual for details.[18]

### v.  GM's Knowledge of the Defect

80.  If and when the Volt operates as it was promoted by GM, drivers are able to accomplish the majority of their driving miles utilizing solely or mostly EV (i.e., battery) power.  This driving is: inexpensive (electricity power is markedly cheaper than gasoline and routine maintenance is lesser); quick and responsive (acceleration of EV systems is superior to most gasoline vehicles); quiet (combustion is avoided entirely); and "greener" (by avoiding fossil fuel combustion, emissions – including particulate matter, carbon, and nitrous oxides – are avoided).

81.  The Volt's Battery Energy Control Module controls vital functions integral to the Volts' performance – such as acceleration and proper functioning of the electrical and propulsion systems.  But the BECM allows for no customer

---

[18] *Id*. at 39.

maintenance and should have been a durable, reliable component of the Class Vehicles.

82.     However, due to the BECM defect the Volt's BECM fails unexpectedly, through no fault of the driver/owner.  Indeed, Plaintiff Miller is far from the only Volt owner who has experienced a failure of the vehicle's BECM.

83.     GM has superior knowledge of the BECM defect and is aware of the true nature of the defect from sources not available to Volt owners including, but not limited to: pre-production testing quality control checks; manufacturing controls; manufacturing / production failure; part/component failure;  direct consumer complaints to GM or GM's dealer network; testing conducted by GM in response to consumer complaints, and repair and warranty data received by GM from its network of dealers and/or suppliers.

84.     In the alternative, GM is aware of the BECM defect through research and development; pre-production engineering and design, from GM and its suppliers; pre-production design testing, by GM and its suppliers; demonstrated design inadequacy and failure; direct consumer complaints to GM or GM's dealer network; testing conducted by GM in response to consumer complaints; and repair and warranty data received by GM from its network of dealers and/or suppliers.

### vi.   National Highway Traffic Safety Administration ("NHTSA") Complaints

85.     With full knowledge of the BECM defect, GM chose profits and savings over providing its customers with the quality product and services GM promised to deliver.

86.     GM could have remedied the BECM defect but, upon information and belief, it would have delayed introduction of the Volt in the marketplace and hurt sales.  Likewise, GM could have honored the terms of its Roadside Assistance Program but decided not to do so.

87.     At the very latest, GM knew, or should have known, of the BECM defect shortly after it introduced the Volt into the marketplace.

88.     A review of Volt consumer safety complaints to the National Highway Traffic Safety Administration ("NHTSA") shows that Volt owners have been reporting BECM failures for years.[19]

───────────────

[19] GM is aware of its customers' complaints made to the NHTSA.  By federal law, automakers like GM are required to maintain close contact with NHTSA regarding potential auto defects and disclose defects and related data through submission of field reports, customer complaints, and warranty data, enforceable through criminal penalties.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).  Automakers like GM are also legally obligated to identify and report emerging safety-related defects to NHTSA in accordance with the Early Warning Reporting Requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing legal obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, GM knew or should have known of the many complaints about the BECM failures

89.    The details and specifics within the multitude of complaints vary but – what is clear – the BECM failed on many vehicles, causing a loss of propulsion and rendering the car inoperative.

90.    Attached to this Complaint as Exhibit A is a sampling of the hundreds of complaints concerning the Class Vehicles' electrical and propulsion defects available through NHTSA's website, www.safercar.gov.  While Volt drivers did not pin the problem directly to the BECM initially, consumers began filing complaints with NHTSA shortly after the 2016 Volt was released, which reveal that GM, through its network of dealers and repair technicians, was made aware of many failures in the Volt, including: spontaneous loss of power; being stranded; electrical system failure; and/or propulsion system failure.

91.    NHTSA complaints describe the safety risks associated with BECM defect, with many Volt owners recounting the hazards of losing power on a busy highway or dodging traffic while trying to get their car to the shoulder:

> • The contact owns a 2016 Chevrolet Volt.  While driving 55 mph, the vehicle lost power without warning.[20]
>
> • On the highway on her way home from work, my wife experienced a large loss of power and the car started shuddering and switching between the electric

logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the BECM failures.

[20] https://www.nhtsa.gov/vehicle/2016/CHEVROLET/VOLT (last visited November 4, 2022).

and gas powertrain as well as slowing down quite a bit. The *[sic]* dash showed a notification of "propulsion power reduced." the *[sic]* car also lost power to many of its accessories.[21]

• There were no warning lamps, messages or other symptoms prior to this. All of the lights on the dash came on, the power steering went out, the brakes would not work properly, and I could not accelerate. I had my child in the car, and we narrowly avoided being hit by other cars both times since I couldn't control the vehicle.[22]

• [A] sign said "service soon." My car then COMPLETELY STOPPED WORKING. My speed fell from 75 mph or so to 0 in a matter of a minute, I had no idea what was happening….[23]

• I called my husband who drove to me while I stood on the side of the highway for an hour and a half in 30 degree weather. I called the police who were eventually able to put up flares and mark me as a hazard on the road. If there was a car traveling behind me, I would have been killed or seriously injured because I slowed so suddenly and had no way of knowing that this was an absolute emergency.  The worst part is that this is my second BECM failure in my volt *[sic]* and I have driven less than 1,000 miles since it was repaired the first time (which took > 5 months).[24]

92.     Others claim that they are afraid to drive the Volt, and that the BECM

defect is putting peoples' lives in danger:

---

[21] *Id*.

[22] *Id*.

[23] *Id*.

[24] *Id.*

- I was driving 65 miles per hour on the freeway and suddenly my car lost propulsion…. I'm now afraid to drive this car and no one seems to know how to fix the problem![25]

- Traveling from Mexico ,we just got into yuma *[sic]* Arizona heading towards the 8 freeway when my volt displayed reduced propulsion and the engine light came on and the car lost power …. [A] 3 hour ride home was turned into a nightmare … My dealer says that they are not sure what caused it and that we may have to pay for repairs….This problem is a safety hazard to all Volt owners and it has been known and reported to happen countless of times *[sic]* so why is there no recall of these vehicles for this problem, people's lives are in danger….[26]

93.    NHTSA received a disproportionate number of complaints about model years 2016-2019 Chevrolet Volts.  In all, the Class Vehicles were the subject of over five hundred (500) complaints.  The majority of those complaints relate to vehicle functions affected by the BECM: the electrical system, powertrain, fuel or hybrid propulsion system, and speed control.

94.    NHTSA received 143 complaints about the 2017 Volt's electrical system alone.[27] By way of comparison, NHTSA received 10 complaints about the 2017 Toyota Prius' electrical system, and it received 6 complaints about the 2017

---

[25] *Id*.

[26] *Id*.

[27] https://www.nhtsa.gov/vehicle/2017/CHEVROLET/VOLT (last accessed November 4, 2022).

Kia Niro Hybrid's electrical system.  The disproportionate number of Volt complaints is clearer when considered in proper context: Chevrolet sold 20,349 model year 2017 Volts[28]; Toyota sold 108,661 model year 2017 Prius vehicles[29]; and Kia sold 27,237 model year 2017 Niros.[30]  The Volt is remarkable for the BECM defect-related problems it experienced, and GM continues to take no action to protect its customers.

95.  GM is aware of the NHTSA complaints database and regularly reviews consumer concerns and communicates directly with NHTSA regarding the same.

96.  GM was also aware of the serious problems, and the disproportionate number of complaints, associated with the BECM defect and customers bringing their Volts to GM dealerships for repair or replacement.  Because the BECM is a component covered by the Volt's 8-year, 100,000-mile warranty, these repairs were all subject to warranty determinations by GM, upon submission by the individual dealerships.

97.  Despite clear evidence that the BECM was defective, GM has apparently done nothing to address the BECM problems apart from addressing each Volt as it fails on a case-by-case basis.  In other words, GM has chosen to let sleeping

---

[28] https://carsalesbase.com/us-chevrolet-volt/ (last accessed November 4, 2022).

[29]  https://carsalesbase.com/us-toyota-prius/ (last accessed November 4, 2022).

[30]  https://carsalesbase.com/us-kia-niro/ (last visited November 4, 2022).

dogs lie, even when that means subjecting their customers to extreme safety risk and significant inconvenience and concealing the widespread defect from potential Volt customers.

98.     GM had – and continues to have – a duty to fully disclose the true nature of the BECM defect to potential Volt customers and to current Volt owners because, among other reasons: the BECM defect poses an unreasonable safety hazard; because GM had and has exclusive knowledge of or access to material facts about the Volt's propulsion system and the BECM's functioning and such knowledge and facts are not known to or reasonably discoverable by Volt owners; and because GM has actively concealed the BECM defect from its customers at the time of purchase or repair or thereafter.

### vii.     GM's Response to Individual BECM Failures

99.     Upon information and belief, thousands – perhaps tens of thousands – of BECMs have failed on 2016-2019 Chevrolet Volts.   Class Members have experienced a myriad of problems related to the BECM including roadside breakdowns and vehicles that will not start.

100.   All 2016-2019 Volts which have not yet failed are still subject to failure, at any time and without warning, due to the BECM defect.

101.   GM has tacitly accepted that the BECM contains a design and/or manufacturing defect that causes the modules' failure and renders the Volt

inoperative, presenting unreasonable risk of serious bodily injury, significant property damage, and the expenditure of material (and unexpected) additional time and money.

102.    It is not apparent that GM has redesigned or remanufactured the BECM to correct the defect.

103.    The BECM is a component within the scope of the Volt's 8-year, 100,000-mile hybrid specific warranty.  Thus, the BECM repair/replacement is covered by – and subject to and provided for – GM warranty.

104.    Given the extended wait times, BECM repairs are all covered by GM's Roadside Assistance Program and Plaintiff and Class Members were entitled to what they were promised but did not receive: courtesy transportation or "reimbursement of their transportation expenses."

105.    Through the Volt's warranty, GM affirms that its individual dealers "ha[ve] invested in the proper tools, training, and parts inventory to ensure that any necessary warranty repairs can be made to your GM vehicle."  GM directs customers to contact GM's Customer Assistance Offices "in the event the dealer is not able to perform the repair due to the special tool and training requirements,"[31] further

---

[31] https://www.gmc.com/bypass/pcf/gma-content-api/resources/sites/GMA/content/staging/MANUALS/3000/MA3212/en_US/6.0/2k17chevywm2ndPrint.pdf (last accessed November 4, 2022).

assuring customers that GM – or GM's network of service centers – will adequately complete any necessary warranty repair work.

106.   However, GM has failed to ensure that there is an adequate supply of replacement parts and a sufficient network of dealerships or service centers trained to diagnose and repair the failures GM knew would arise because of the faulty BECM.

107.   Indeed, Class Members – such as, and including, Plaintiff Miller, wait months before any repair can be attempted because the necessary replacement parts are on backorder.  Many GM mechanics are unfamiliar and undertrained with the Volt or the BECM component, leading to misdiagnoses of the BECM defect and failure.  As a result, when the backordered parts do arrive, customers are often informed that the first diagnosis was incorrect and another part is necessary. Moreover, many GM dealerships purport to not have a "Volt-trained technician," which means that customers are unable to have their Volt repaired at those facilities. This often requires that the Volt be towed to a far-off dealership (where it often sits for months) for the BECM repair, causing the consumer to incur additional expense, inconvenience, and delay.

108.   Perhaps because of the high volume of BECM repairs, and the attendant frustrations associated with the warranty-covered repair, many dealerships in GM's warranty repair network are disenchanted with undertaking the scope of work –

either outright refusing to perform the necessary repair or agreeing to do the repair but then making a less-than-diligent and less-than-competent attempt. The situation GM has created by continuing to conceal the BECM defect has left Class Members – such as, and including, Plaintiff Miller – with even fewer transportation options and has caused them to incur needless expense, inconvenience, and delay.

109.    However, the apparent root of the ongoing BECM logjam appears to be the BECM itself. When Volt owners need their BECM replaced, GM – along with its agents and dealers – has represented that there is a "backorder" on the BECM, meaning that GM does not have parts to complete the warranty repairs.

110.    Alternatively, and additionally, GM – along with its agents and dealers – tells other customers needing BECM repair that the BECM is under what GM calls "National Control" – meaning that GM has the part available, though quantities are limited, and GM directly controls when and where the part goes. In other words, GM has parts available to perform certain of the BECM warranty repairs at issue in this Complaint, and it is simply refusing to do so. With its refusal to repair, GM also fails to provide Volt owners reasonable estimates as to when the part may be "available" for them or when the repair may be completed. And – importantly – GM does not apprise potential customers of the BECM's "backorder" or "National Control" status prior to purchase; nor does GM advise current Volt owners until they present a failed BECM for replacement.

111.    Lacking reliable, actionable insight from GM, Volt owners are unable to make informed decisions as to how they will handle being without their vehicle. Indeed, one would likely make different choices if they were to be out of a car for one day, one week, or – like Plaintiff Miller – the better part of a year.

112.    Frustrating this untenable situation even further, GM fails to provide its "Roadside Assistance" and "Courtesy Transportation" services to Volt owners.

113.    GM advises Volt owners – such as, and including, Plaintiff Miller – that loaner car availability is determined at the individual dealership level.  Meaning, if the dealership says it has no loaner vehicle to provide, the customer will not be provided with a loaner because GM does not itself provide alternate transportation. This is inconsistent with the promises GM makes in its Roadside Assistance advertisements: "[W]e'll provide courtesy transportation. . . ."[32]  Having attracted customers to the Volt through its promise of ease and convenience, GM outright refuses to honor its promise when its customers look to exercise their warranty right to "courtesy transportation."

114.    Instead, when customers look to exercise their rights to alternate transportation, GM intimates that through the Roadside Assistance program it can reimburse some rental expenses when the warranty repair work is completed.  (Of

---

[32] https://www.gmcertified.com/benefits-after-purchase (last accessed on October 31, 2022).

course, GM refuses to say when the warranty work might be completed.)  But this after-the-fact proposal falls short of GM's prior promise that, through its Roadside Assistance program, it will "provide Courtesy Transportation and/or reimbursement of your transportation expenses. No hassles. No waiting."[33]

115.    Despite GM's written representations otherwise, a customer has the "hassle" of securing a rental car for an indefinite period of time – thus, likely unable to take advantage of lower weekly or monthly rates and instead relegated to the higher daily rate – and paying for the full cost upfront and then "waiting" for some reimbursement from GM after the necessary repairs are completed.  This creates significant inconvenience and expense for Volt owners.

116.    When Volt owners turn to the dealership for insight or relief, they receive nothing of the sort.

117.    When Volt owners turn to GM customer service for insight or relief, they are funneled to what is believed to be a third-party customer service agency which reiterates canned language and is aimed not to assist the customer but, rather, to protect and deflect for GM.

118.    Regarding the BECM, GM has not recalled the vehicles, has not initiated a customer service campaign to address the BECM defect, has not offered Plaintiff or other Volt owners a suitable repair or replacement option, and has not

---

[33] *Id.* (emphasis added).

reimbursed Plaintiff and other Volt owners for their expenses reasonably incurred relating to the BECM defect.

119.    Plaintiff Miller and other Class Members have not received the value for which they bargained when they purchased or leased their Volt.

120.    GM has deprived Plaintiff Miller and Class Members of the benefit of their bargain, exposed them all to a dangerous safety defect without any notice, and failed to repair or otherwise remedy the BECM defect.  As a result of the BECM defect and GM's lackluster response, the value of the Volts has diminished including, without limitation, the resale value.  Reasonable consumers, such as and including Plaintiff Miller, expect and assume their plug-in hybrid car's hybrid system – and all its components – to not be defective and that it will not malfunction while it is being operated as intended.  Thus, Class Members did not receive the benefit of their bargain, i.e., the price premium of their plug-in hybrid Volt.

121.    Plaintiff Miller and the Class Members further expect and assume that vehicle manufacturers like GM will not sell or lease vehicles with known safety defects, such as the BECM defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable, non-defective, repair.

122.    Additionally, GM has failed to repair or replace the defective BECM as GM had obligated itself to do through its manufacturer's warranties.  Specifically, when the BECM defect manifested for Plaintiff Miller and Class Members, they

were often compelled to travel to far-away dealerships who – purportedly – were the only ones equipped to handle the issue yet still could not complete the repair in a timely manner.  Contrary to GM's representations in the written warranty, the "GM network of dealerships" responsible for carrying out GM's warranty repairs is, in fact, ill-equipped for the job.  GM has failed to provide its dealerships with the proper tools, training, and parts inventory to properly diagnose and complete the BECM-related repairs necessary in the Class Vehicles.

123.   Then, often after traveling quite a distance to reach one of the limited dealerships purportedly equipped to service the Volt, Plaintiff Miller and Class Members have been advised to continue driving the vehicle, despite GM knowing of the grave safety hazards associated with driving a Volt with a manifested-defective BECM.

124.   Further, when their Volt with a manifested-defective BECM needed warranty-covered repairs, Plaintiff Miller and Class Members were not timely provided with alternate transportation, in contravention of GM's obligations under its Roadside Assistance and Courtesy Transportation programs.   This caused Plaintiff Miller and Class Members to incur the hassle, expense, and inconvenience of securing alternative transportation, despite GM's obligations regarding the same.

125.   Yet for many Volt owners – such as, and including, Plaintiff Miller – it is entirely uncertain if their vehicle will ever be repaired.  This despite the car's

warranty manual providing that "warranted repairs should be completed in a reasonable amount of time, not to exceed 30 days" and "A part not being available within 10 days or a repair not being completed within 30 days constitutes a significant inconvenience."  Irrespective of whether GM completes the repair and irrespective of whether such repair is durable, the defective BECM has been – and continues to be – a significant inconvenience for Volt owners – including Plaintiff Miller and the Class Members.

126.   GM's actions and inactions are unfair and unconscionable and have placed Plaintiff and members of the Classes at elevated risk of injury or death and under significant inconvenience.

127.   Pre-suit demands – including written notice – to GM from Plaintiff Miller and members of the Classes for corrective action have gone unfulfilled.  Class members – such as, and including, Plaintiff Miller – spend weeks and months corresponding with their respective GM service center and with GM directly in an attempt to find a solution – any solution – to their plight including, without limitation: establishing an estimated timeline to repair, obtaining a loner, requesting rental assistance, vehicle buyback options, new car credit, or utilizing a salvaged BECM.  Throughout such correspondence, GM represents it is in touch with the respective dealer/service center regarding the matter and – conversely – GM's agent-dealers represent that such matters must go through GM directly.  Accordingly, GM

is on notice of the mountain of outstanding BECM warranty repairs which it is unable and/or unwilling to complete.

128.   Additionally, given GM's extensive and exclusive knowledge as to the BECM defect, its latency, and GM's demonstrated inability to repair the defect, any further demands or notices from consumers would be futile.

### E.   TOLLING OF THE STATUTES OF LIMITATIONS

#### Discovery Rule

129.   Neither Plaintiff nor the Class Members could have discovered through the exercise of reasonable diligence that their Class Vehicles were defective within the time period of any applicable statutes of limitation.

130.   Neither Plaintiff nor the Class Members could have discovered through the exercise of reasonable diligence that their vehicle – indeed, every Class Vehicle – contained a defective BECM that placed them in unreasonable danger of bodily injury and damage to their property.

131.   Neither Plaintiff nor the Class Members could have discovered through the exercise of reasonable diligence the true nature of the BECM.

132.   Plaintiff and the Class Members were unaware, and they could not have through the exercise of reasonable diligence learn, that driving their Class Vehicle posed an unreasonably dangerous situation and placed them at unnecessary risk of bodily injury and property damage. Plaintiff and the Class Members were also

unaware, and they could not have through the exercise of reasonable diligence learn, that GM would knowingly refuse to honor the terms of its contractual obligations, including but not limited to the applicable vehicle warranties and the GM Roadside Assistance Program.

133.   The applicable statute(s) of limitation is tolled, by operation of the discovery rule, with respect to any claims asserted by Plaintiff and the Class Members.

### **Fraudulent Concealment**

134.   Through the time period relevant to this action, GM intentionally concealed the true nature of the BECM defect from Plaintiff and the Class Members.

135.   Plaintiff and the Class Members were unaware of essential elements of their claims.

136.   Plaintiff and the Class Members were unaware of essential elements of their claims as a direct result of GM's wrongful and deceitful conduct whereby it intentionally concealed and continues to conceal the true nature of the BECM defect.

137.   Eddy's Chevrolet told Plaintiff Miller his Volt was safe to drive **even after** Miller brought the car in for repair.  GM acknowledges it trains its technicians, so that they are technically knowledgeable and able to perform Volt repairs.  Upon

information and belief, GM informed its network of dealerships that the Volt was safe to drive with the defective BECM.  In the alternative, Plaintiff alleges that GM had knowledge that its network of dealerships was encouraging customers to drive their Volts without replacing the BECM.

138.   GM chose to conceal, and to continue to conceal, the true nature of the BECM defect because it wanted to sell more Class Vehicles and increase profits.

139.   Plaintiff and the Class Members justifiably relied on GM to disclose the true nature of the BECM – including the unreasonably dangerous situation in which it placed them – because the defect was hidden and was not discoverable through reasonable efforts by Plaintiff and the Class Members.

140.   Plaintiff and the Class Members reasonably and justifiably relied on GM to disclose its intention not to honor its contractual obligations, because such intention was hidden and not discoverable through reasonable efforts by Plaintiff and the Class Members.

141.   The applicable statute(s) of limitation is tolled, by operation of the fraudulent concealment doctrine, with respect to any claims asserted by Plaintiff and the Class Members.

### Estoppel

142. GM was and remains under a duty to disclose the true nature of the BECM defect, and that it would not honor the terms of its contractual obligations to Plaintiff and the Class Members.

143. Plaintiff and the Class Members reasonably and justifiably relied on GM to comply with its duty to disclose the true nature of the BECM defect and its intention not to honor its contractual obligations.

144. GM did not comply with its duty to disclose and, instead, chose to conceal the foregoing from Plaintiff and the Class.

145. GM is estopped from asserting, or relying upon, any statute of limitation in this action.

### F. CLASS ACTION ALLEGATIONS

146. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) or, alternatively, FED. R. CIV. P. 23(b)(1) and 23(b)(2), on behalf of the following Nationwide Class and state-specific Sub-classes (collectively, the "Class" or "Classes"):

    a. <u>Nationwide Class</u>: All persons or entities who, in the United States, purchased, lease, leased, own, or owned a 2016-2019 Chevrolet Volt;

    b. <u>Kansas Subclass</u>: All persons or entities who, in the state of Kansas, purchased, leased, own, or owned a 2016-2019 Chevrolet Volt;

c. <u>Pennsylvania Subclass</u>: All persons or entities who, in the state of Pennsylvania, purchased, lease, leased, own, or owned a 2016-2019 Chevrolet Volt.[34]

147. Specifically excluded from the Classes are Defendant; Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors; the judge assigned to this action and any member of the judge's immediate family.

148. **Numerosity**: The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates there are tens of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members is unknown to Plaintiff Miller, the true number of members of the Classes is known to Defendant GM. More specifically, GM and its network of agent-dealers maintain databases that contain the following information: (i) the name of each Class member that leased or

---

[34] Members of the Classes, collectively, are referred to herein as "Class Members." Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be amended as allowed by applicable law.

purchased a vehicle; and (ii) the address of each Class member.  Thus, members of

the proposed Classes may be identified and notified of the pendency of this action

by first class mail, electronic mail, and/or published notice, as is customarily done

in consumer class actions.

149.   **Typicality**: Plaintiff Miller's claims are typical of the claims of the

Class Members – all of whom unknowingly paid for a 2016-2019 Volt afflicted by

the BECM defect.  Plaintiff Miller, like other Class Members, has been damaged by

Defendant's misconduct in that he has incurred or will incur the cost of repairing or

replacing the malfunctioning or defective BECM.  Further, the factual bases of

Defendant's misconduct are common to all members of the Classes and represent a

common thread of fraudulent, deliberate, and/or grossly negligent misconduct

resulting in injury to all members of the Classes.

150.   **Commonality**: Common questions of law and fact exist as to all

members of the Classes and predominate over any questions affecting only

individual members of the Classes.  These common legal and factual questions

include, but are not limited to, the following:

    a.  Whether the 2016-2019 Volt suffers from a BECM defect;

    b.  Whether the BECM in 2016-2019 Volts contains a design defect and/or
        defect in material, manufacturing, and/or workmanship;

    c.  Whether the BECM defect constitutes an unreasonable safety hazard;

d.  Whether Defendant knew or should have known about the BECM defect and, if so, how long Defendant has known of the BECM defect;

e.  Whether Defendant had a duty to disclose that the 2016-2019 Volts suffer from the BECM defect;

f.  Whether Defendant intentionally and knowingly falsely misrepresented, concealed, suppressed, and/or omitted material facts including the fact that the 2016-2019 Volts suffer from the BECM defect;

g.  Whether Defendant negligently and falsely misrepresented or omitted material facts including the fact that the 2016-2019 Volts suffer from the BECM defect;

h.  Whether Defendant made material misrepresentations and/or omissions concerning the standard, quality, or grade of the 2016-2019 Volt and the BECM defect;

i.  Whether members of the Classes would have paid less for the Volt if Defendant, at the time of purchase or lease, disclosed that the vehicles suffered from the BECM defect;

j.  Whether Defendant failed to perform any warranty obligations relating to the BECM;

k.  Whether Defendant is liable to Plaintiff and the Classes for breaching express and/or implied warranty obligations;

l.  Whether Defendant is liable to Plaintiff and the Classes for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301 *et seq*. and/or any other statutory duties under state laws;

m.  Whether Defendant violated applicable consumer protection statutes;

n.  Whether Defendant has been unjustly enriched; and

o.  Whether Plaintiff and the Classes are entitled to damages, restitution, equitable, injunctive, compulsory, or other relief.

151.  **Adequacy of Representation**: Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation and Plaintiff intends to vigorously prosecute this action on behalf of the Classes.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Classes.

152.  **Predominance and Superiority**: A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes is relatively small compared to the burden and expense of individual litigation of their claims against Defendant GM.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed

against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

153.    In the alternative, the Classes may also be certified under Fed. R. Civ. P. 23(b)(1) because:

a.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

b.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.  Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

## F.  CLAIMS FOR RELIEF
### COUNT ONE:
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. §§ 2301, et seq.**

155.  Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

156.  Plaintiff brings this claim on behalf of himself and the Nationwide Class.

157.  Plaintiff satisfies the Magnuson-Moss Warranty Act ("MMWA") jurisdictional requirements by alleging diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d).

158.  Plaintiff and members of the Classes are consumers within the meaning of the MMWA.

159.  Defendant is a supplier and warrantor within the meaning of the MMWA.

160.  The Chevrolet Volts at issue in this Complaint are consumer products within the meaning of the MMWA.

161.   The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

162.   Defendant provided Plaintiff and members of the Classes with one or more standardized express warranties which are covered under the MMWA including, but not limited to, the 8-year, 100,000-mile hybrid-specific warranty.

163.   Under warranties provided to Plaintiff and members of the Classes, Defendant promised to repair or replace defective hybrid-specific components arising out of defects in materials and/or workmanship, such as the BECM defect, at no cost to Volt owners or lessees and to provide alternate transportation while doing so.  However, Defendant has failed to provide owners and lessees with a remedy to the BECM defect.

164.   The Volt's implied warranties are covered by the MMWA.

165.   Defendant breached these warranties by misrepresenting the standard, quality, or grade of the Volt and by failing to disclose and fraudulently concealing the existence of the BECM defect.  Without limitation, the Volt contains a common defect in design, material, manufacturing, and/or workmanship as to the BECM.

166.   Plaintiff and members of the Classes have had sufficient direct dealings with Defendant GM and its dealer-agents to establish privity of contract with Defendant GM.  This privity is further established through the Volt's expressly transferable 8-year, 100,000-mile hybrid-specific warranty.  Plaintiff and members

of the Classes are intended beneficiaries (including third-party beneficiaries) of contracts between Defendant GM and its agent-dealers.

167.   Affording Defendant time to cure its breach of written warranties would be unnecessary and futile.  At the time of sale or lease of the Volts and at all relevant times thereafter, Defendant knew of the material misrepresentations and omissions concerning the standard, quality, or grade of the Volts and the existence of the BECM defect.  Notwithstanding the foregoing, Plaintiff Miller has provided notice to GM and has provided GM with more than reasonable time to remedy his defective and failed BECM – including a written demand for repair and by delivering the vehicle to a GM dealership for repair.

168.   In any event, and under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff or members of the Classes resort to an informal dispute resolution procedure and/or afford Defendant additional opportunity to cure its breach of warranties should be excused.

169.   As a direct and proximate cause of GM's breach of express and implied warranties, Plaintiff and the Class Members have sustained damages.

170.   As a direct and proximate cause of GM's violations of the MMWA, Plaintiff and the Class Members have sustained damages.

171.   The amount in controversy of Plaintiff's individual claims exceeds MMWA minimum thresholds.  Further the amount in controversy in this action exceeds MMWA minimum thresholds, exclusive of interest and costs.

## COUNT TWO:
### Negligence *Per Se*
Mich. Comp. Laws §§445.1561 et seq.

172.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

173.   Plaintiff brings this claim on behalf of himself and the Nationwide Class.

174.   Defendant GM has conducted all or nearly all its business relating to the Volt from within Michigan.  Without limitation, such business activity includes establishing the express warranties for the Volt; processing warranty claims; interacting with GM's agent-dealers to arrange completion of warranty repairs; directing where and when parts are provided to GM's agent-dealers to complete warranty repairs; and arranging for "Roadside Assistance" and/or "Courtesy Transportation" for Volt owners or lessees during warranty-covered repairs.

175.   Plaintiff and members of the Classes reasonably expected – and still expect – GM to timely and meaningfully perform its warranty obligations pertaining to the Volt.

176. However, GM has failed to perform its warranty obligations by, without limitation: failing to disclose and actively concealing the BECM defect; failing to adequate train, equip, or provision its network of dealers to diagnose or repair the BECM defect; and failing to provide "Roadside Assistance" and/or "Courtesy Transportation" to Volt owners during warranty-covered repairs.

177. By failing to perform its warranty obligations to Plaintiff and members of the Classes, GM has violated – and continues to violate – Michigan's Motor Vehicle Franchise Act.  Mich. Comp. Laws §§445.1561 *et seq*.

178. The Motor Vehicle Franchise Act is intended to, among other things, "regulate dealings between manufacturers, distributors, wholesalers, dealers, and consumers, to prohibit unfair practices; [and] to provide remedies and penalties. . . ."  M.C.L.A. Ch. 445.  Accordingly, as Volt owners and lessees, Plaintiff and members of the Classes are consumers intended to fall within the scope of – and be protected by – the Act.

179. Defendant GM's violations of the Act include, but are not necessarily limited to, GM's "fail[ure] to perform any recall or warranty obligation."  M.C.L.A. §445.1577(2)(a).

180. Defendant's violations of the Act constitute negligence *per se* and, as such, make GM liable to Plaintiff and members of the Classes.

181.   Plaintiff and members of the Classes are entitled to all relief just and applicable as provided for within the Act.

## COUNT THREE:
**Common Law Fraud: Concealment of the BECM Defect**

182.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

183.   Plaintiff brings this claim on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Kansas and Pennsylvania Subclasses.

184.   Defendant General Motors, LLC knew, or should have known, at the time the Class Vehicles were manufactured that each one contained a defective BECM.

185.   In the alternative, GM knew, or should have known, post-manufacture that Class Vehicles each contained a defective BECM.

186.   Neither Plaintiff nor the Class Members knew, and they could not have discovered by the exercise of reasonable diligence, that the Class Vehicles contained defective BECMs.

187.   That the Class Vehicles contained defective BECMs was a material fact, and GM's failure to communicate that fact rendered the Class Vehicles unreasonably dangerous and was the direct and proximate cause of ascertainable damages suffered by Plaintiff and the Class Members.

188.   The possibility of the Volt losing power, and stranding its driver and passengers, is a material fact of which GM had knowledge and failed to disclose.

189.   GM's knowledge of the defective BECM gave rise to a duty to warn customers of the defect and of the dangers of operating a 2016-2019 Chevy Volt with a defective BECM.

190.   GM intentionally failed to inform its customers of the BECM, or the risks associated with the defect, even though it had knowledge of the defect and the risks.  Instead, GM continues to conceal the true nature of the BECM defect – with knowledge that tens of thousands of its customers are driving Class Vehicle with a defective and unreasonably dangerous BECM that causes reduced operability and could cause serious bodily injury, death, property damage, and will cost Volt customers additional and uncompensated time and money for what should be covered warranty repairs.

191.  Plaintiff and the Class Members justifiably relied on GM to communicate the existence of the defective BECM and, but for GM's failure to communicate the defect, Plaintiff and the Class Members would not have bought Chevrolet Volts or would have paid a materially lower amount of money in the purchase.

192.   GM intentionally and knowingly falsely concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the 2016-2019

Chevy Volt and the fact that the BECM was – and remains – defective, thereby exposing drivers, occupants, and members of the public to safety risks with the intent that Plaintiff and Class Members rely on Defendant's omissions.  GM failed to disclose the defective BECM to improperly retain certain benefits for itself – including saving the time, money, negative publicity, and decreased sales associated with rectifying the problem.

193.   As a result of Defendant's failure to disclose to Plaintiff and Class Members the material fact that the BECM is defective, owners and lessees incur unanticipated breakdowns, inconvenience, and expense in order to address the BECM defect.

194.   The fact that the BECM is defective is material because no reasonable consumer expects that they will experience vehicle breakdown – especially on such new, low-mile vehicles and especially a breakdown that cannot be readily remedied.

195.   The fact that the BECM is defective is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. Because of the BECM defect, Volts may suddenly lose propulsion power while driving in traffic.  Volt drivers and occupants and members of the public are at risk for collisions and other accidents caused by the BECM defect

196.   Irrespective of warranty coverage, no reasonable consumer would buy a new or nearly new vehicle that is functionally obsolete – or they would pay

significantly less to do so.  Owners of Volts which have surpassed the warranty coverage period are unable to procure replacement BECMs, rendering their Volt useless.

197.   GM knew it would sell more Volts, for higher prices, if it concealed the true nature of the BECM defect from its customers. Had Plaintiff Miller and the Class Members known the truth about the Volt's BECM, they would not have chosen to drive a Chevrolet Volt.

198.   As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and members of the Classes have suffered actual damages.

## COUNT FOUR:
### Common Law Fraud: Fraudulent Representation

199.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

200.   Plaintiff brings this claim on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Kansas and Pennsylvania Subclasses.

201.   Defendant General Motors, LLC, knew, or should have known, at the time the Class Vehicles were manufactured that each one contained a defective BECM.

202.   In the alternative, GM knew, or should have known, post-manufacture that Class Vehicles each contained a defective BECM.

203.   Defendant General Motors, LLC, marketed the Volt as a safe, reliable, plug-in hybrid.   As part of its advertising, GM made specific representations regarding the Volt's electric driving capabilities including that the Volt was the most capable plug-in hybrid in the industry; that the Volt's propulsion system led the industry; and that Volt's customers were the most satisfied in the industry.   GM made these representations despite knowing that the Volt's plug-in hybrid system was defective; that the BECM defect was a direct cause of the Class Vehicles' propensity to lose power suddenly, and that its competitors did not suffer from the same propensities; and that Volt customers were increasingly dissatisfied with the Volt and GM's refusal to properly address and correct the BECM defect.

204.   GM further misrepresented to Plaintiff and members of the Classes through standard and uniform written materials that the Volt had no significant defects and would perform and operate properly – despite knowing that the BECM defect prevents Volts from operating as such.

205.   In sales transactions with at least some Class Members including with Plaintiff Miller, GM – by and through its authorized dealers – misrepresented that the specific Volt being purchased or leased had a BECM which meets all applicable standards and/or is otherwise non-defective.

206.   The Volts purchased or leased by Plaintiff and members of the Classes were, in fact, defective, unsafe, and unreliable due to the poorly designed and/or manufactured BECM.

207.   GM knew its representations were not true at the time it made them.

208.   GM has, in fact, known that its representations regarding the Volt's propulsion system including, specifically, the EV driving capabilities were false.

209.   Additionally, GM made knowingly false representations regarding GM's and GM's dealer network's capability to make warranty repairs.  Through its written consumer warranties, GM represented to Plaintiff and members of the Classes that the Volt would be supported by adequately trained and equipped technicians possessing the necessary skills and parts to complete needed repairs. GM knew these representations were false when made and/or has done nothing to correct such representations since learning about their falsity.

210.   Further, through standardized written materials, GM made knowingly false representations regarding GM's "Roadside Assistance" and "Courtesy Transportation" coverage.

211.   Plaintiff and members of the Classes relied on GM's affirmative misrepresentations regarding the Volt's safety, durability, and performance.

212.   In addition, Defendant intentionally and knowingly fraudulently misrepresented its Roadside Assistance Program, under the terms of which GM

represented to customers that it would provide courtesy (free) transportation or reimburse transportation expenses for certain repairs.

213.   Plaintiff and the Class Members qualified for the Roadside Assistance Program's courtesy transportation / reimbursement benefit because of the delay associated with the repair of their Chevrolet Volt vehicles.

214.   Despite qualifying, neither Plaintiff nor the Class Members have received from GM the benefit to which they are entitled.

215.   At the time it presented the Roadside Assistance Program to potential customers, GM had no intention of honoring its terms with respect to BECM defect-related delays in repair work.  Despite having no intention of honoring the terms of the Roadside Assistance Program, GM marketed it to Plaintiff and the Class Members as a benefit of buying or leasing a Class Vehicle.

216.   GM made these knowingly false statements with the intent that Plaintiff and the Class Members rely on them – and Plaintiff and the Class Members did in fact rely on them, and such reliance was reasonable.  Plaintiff and the Class Members trusted GM to provide a quality product and services; and instead, GM affirmatively and fraudulently misrepresented the nature and quality of the Class Vehicles and GM's support thereof.

217.   GM has not provided Plaintiff, or the Class Members, the benefits to which they are entitled under the Roadside Protection Program.

218.   Plaintiff and the Class Members justifiably trusted, and relied upon, GM to honor the terms of its Roadside Assistance Program.  GM intentionally failed to do so, thereby withholding a benefit deserved from Plaintiff and the Class Members with the fraudulent aim of creating an ill-gotten benefit for itself – including the avoidance of incurring the time, expense, and negative publicity, of telling the truth and rectifying the BECM defect.

219.   Plaintiff and the Class Members justifiably relied on GM's affirmative misrepresentations regarding GM's ability – by and through GM's dealer network – to complete necessary repairs to the Volt.

220.   Plaintiff and Class Members justifiably relied on GM's affirmative misrepresentations regarding GM's ability or willingness to extend "Roadside Assistance" and "Courtesy Transportation" coverage to Volt owners, and the scope of such coverage.

221.   Had Plaintiff Miller and the Class Members known the truth about the Volt's BECM, and that GM would refuse to honor the terms of its warranty, they would not have chosen to drive a Chevrolet Volt.

222.   But for GM's affirmative misrepresentations, Plaintiff and members of the Classes would not have purchased or leased the Volt or would have paid considerably less to do so.  Plaintiff and members of the Classes were fraudulently induced to purchase or lease the Volt and have been harmed as a result.

## COUNT FIVE:
**Unjust Enrichment**

223.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

224.   Plaintiff brings this claim on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Kansas and Pennsylvania Sub-classes.

225.   Plaintiff and Class Members conferred a benefit on GM by leasing or purchasing their Volt.  Defendant reasonably expected the necessity of providing Volts free from material defects, including the BECM defect, and it failed to do so.

226.   Defendant unjustly profited from the lease and sale of the Volt at inflated prices as a result of its false and material representations, omissions, and concealment concerning the Volt's plug-in hybrid system, including the BECM defect.  As a proximate result of Defendant's false representations, omissions, and concealment, Defendant has been unjustly enriched with ill-gotten gains at the expense of Plaintiff and Class Members and should be disgorged of these wrongful profits.

227.   Despite Defendant representing that the plug-in hybrid Volt consisted of an industry-leading propulsion system, was premised upon sophisticated engineering prowess, encompassed a no-compromise electric driving platform, and was the most capable plug-in vehicle in the industry, Defendant failed to invest or allocate sufficient resources to design or manufacture the Volt accordingly, leading

to the BECM defect.  Defendant wrongly saved money at the expense of Plaintiff and Class Members in doing so.

228.  Further, Defendant invested or allocated insufficient resources to adequately train, equip, and provide its agent-dealers to service the Volt's plug-in hybrid system, including repair of the BECM defect.  Defendant wrongly saved money at the expense of Plaintiff and Class Members in doing so.

229.  Further, Defendant failed to provide "Roadside Assistance" or "Courtesy Transportation" to Plaintiff and Class Members when requested while their Volt was having warranty-covered repairs completed.  Defendant wrongly saved money at the expense of Plaintiff and Class Members in doing so.

230.  As a direct and proximate result of Defendant's false representations, omissions, and concealment, Defendant has been unjustly enriched with ill-gotten savings at the expense of Plaintiff and Class Members and should be disgorged of these wrongful profits.

231.  GM has adequate resources to rectify the situation for Plaintiff and Class Members, but GM has chosen to not do so, leaving warranty obligations pertaining to the Volt unmet and outstanding.  Instead, GM is deliberately choosing to marshal its resources – human capital, engineering prowess, material components, manufacturing facilities, and others – to design and manufacture new cars in order to maximize its profits, as opposed to performing its Volt warranty obligations.

Defendant has been and is being unjustly enriched by doing so at the expense of Plaintiff and Class Members and should be disgorged of its wrongful enrichment.

232.   Additionally, Plaintiff seeks injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed.  Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

### COUNT SIX:
### Breach of Implied Warranty of Merchantability
### K.S.A. 84-2-314

233.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

234.   Plaintiff brings this claim on behalf of the Kansas Sub-class.

235.   Plaintiff and members of the Kansas Subclass purchased or leased their Volt from Defendant GM by and through Defendant's network of agent-dealers for

retail sales or were otherwise expected to be the eventual purchasers of the Volt from a third party.

236.   Defendant is and at all relevant times has been a merchant and seller of motor vehicles as defined under the Uniform Commercial Code, as adopted by the state of Kansas (the "Kansas Uniform Commercial Code" or the "Kansas UCC"). K.S.A. 84-1-101, *et seq*.

237.   Defendant is and at all relevant times has been a lessor of motor vehicles as defined under the Kansas Uniform Commercial Code.

238.   The Chevrolet Volts at issue in this Complaint are and were and at all relevant times goods within the meaning of the Kansas UCC.

239.   Defendant impliedly warranted that the Volts were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

240.   However, the Volts contained a defective BECM, and as such they were not fit for the ordinary purposes for which vehicles are used – i.e., providing safe and reliable transportation.  Rather, the Volts contain the BECM defect and present an undisclosed safety risk to drivers and occupants.  Thus, GM breached its implied warranty of merchantability.

241.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and members of the Kansas Subclass have suffered actual and compensable damages.

**COUNT SEVEN:**
**Breach of Express Warranty**
**K.S.A. 84-2-313**

242.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

243.   Plaintiff brings this claim on behalf of the Kansas sub-class.

244.   Defendant marketed the Volt as a safe, reliable plug-in hybrid.  Further, Defendant marketed the Volt as having a robust network of dealers – supported by GM – for any repair work which may become necessary.  Further, Defendant marketed the Volt as being covered by GM's Roadside Assistance and Courtesy Transportation programs.  Such representations formed the basis of the bargain for Plaintiff's and members of the Kansas Subclass's decision to purchase or lease a Volt.

245.   Defendant is and at all relevant times has been a merchant and seller of motor vehicles as defined under the Kansas Uniform Commercial Code.

246.   Defendant is and at all relevant times has been a lessor of motor vehicles as defined under the Kansas Uniform Commercial Code.

247.   The Chevrolet Volts at issue in this Complaint are and were and at all relevant times goods within the meaning of the Kansas UCC.

248.   In connection with the purchase or lease of a 2016-2019 Volt, GM provides warranty coverage under one or more manufacturer's warranties including,

but not limited to, the 8-year, 100,000-mile hybrid-specific warranty to cover any needed repairs to the hybrid system.  Under warranties provided to Plaintiff and members of the Kansas Subclass, Defendant promised to repair or replace defective BECM components arising out of defects in materials and/or workmanship, such as the BECM defect, at no cost to Volt owners or lessees.

249.   GM's 8-year, 100,000-mile hybrid-specific warranty constitutes an express warranty under Kansas law.

250.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiff and members of the Kansas Subclass purchased or leased their Volt.

251.   Plaintiff and the Class Members are eligible for warranty repair of their BECM under the 8-year, 100,000-mile hybrid-specific warranty, and they have requested a warranty repair of the BECM from GM.

252.   GM has not provided to Plaintiff or the Class Members the warranty repairs in accordance with the terms of the express warranty.

253.   In some instances, GM has charged Class Members for BECM repair work that should be covered under GM's express warranty.

254.   GM breached its express warranty when it failed to repair Plaintiff's and the Kansas Subclass members' Chevrolet Volts in accordance with the terms of its 8-year, 100,000-mile, hybrid-specific express warranty.

255.   Defendant has failed to provide Plaintiff and members of the Kansas Subclass with a meaningful remedy for the BECM defect, in clear breach of the express warranties, promising to repair and correct a design and/or manufacturing defect in materials or workmanship of the relevant components, including the BECM.

256.   Further, Defendant has failed to provide Plaintiff and members of the Kansas Subclass with meaningful "Roadside Assistance" or "Courtesy Transportation" when requested during warranty-covered repairs, in clear breach of the express warranties.

257.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Kansas Subclass have been damaged.

**COUNT EIGHT:**
**Violation of Kansas Consumer Protection Act**
**K.S.A. 50-623, *et seq*.**

258.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

259.   Plaintiff brings this claim on behalf of himself and the Kansas Subclass.

260.   Defendant is a supplier under the Kansas Consumer Protection Act ("KCPA").

261.   Plaintiff and members of the Kansas Subclass are consumers, under the KCPA, who purchased or leased a 2016-2019 Volt.

262.   GM engaged in consumer transactions, within the meaning of the KCPA, with Plaintiff and members of the Kansas Subclass.

263.   In dealing with Plaintiff and members of the Kansas Class, GM has violated the KCPA by, without limitation, engaging in deceptive acts or practices and by misrepresenting or concealing material facts concerning: the nature of the Volt, the BECM defect, GM's ability to perform warranty work including BECM replacement, and application of the "Roadside Assistance" and "Courtesy Transportation" coverage.

264.   GM's violations of the KCPA entail both property and services, the Volt and the BECM being the property and the warranty repairs and Roadside Assistance and Courtesy Transportation being the services.

265.   GM's deceptive acts and practices – in contravention of K.S.A. 50-626 – include, though are not necessarily limited to: representations made knowingly or with reason to know that property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have; representations made knowingly or with reason to know that property or services are of particular standard, quality, grade, style or model; representations made knowingly or with reason to know that property or services has uses, benefits or characteristics; willful failure to state a material fact, or the willful concealment,

suppression or omission of a material fact; and offering property or services without the intent to supply.

266.   GM's unconscionable acts and practices – in contravention of Kan. Stat. §50-627 – include, though are not necessarily limited to: Plaintiff and members of the Kansas Subclass being unable to receive a material benefit from the subject of the transaction; and GM and/or its agents making a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

267.   GM's violations of the KCPA present a continuing risk and detriment to Plaintiff, members of the Kansas Subclass, and members of the public at large. Defendant's unlawful acts and practices harm the public interest.

268.   Plaintiff and members of the Kansas Subclass have been harmed by Defendant's violations of the KCPA and no adequate remedy has yet been provided.

269.   For GM's violations of the KCPA, Plaintiff and members of the Kansas Subclass seek compensatory damages; exemplary damages; an order enjoining GM's unfair, unlawful, deceptive, and unconscionable acts and practices; attorney fees; costs; restitution; disgorgement of funds; and any other just and appropriate relief available under the KCPA.

## COUNT NINE:

**Violation of The Pennsylvania Unfair Trade Practices and Consumer Protection Act
73 P.S. § 201-1, *et seq.***

270.    Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

271.    Plaintiff brings this claim on behalf of himself and the Pennsylvania Subclass.

272.    In conducting trade and commerce with Plaintiff and the Pennsylvania Subclass, GM has violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") by, without limitation, engaging in unfair or deceptive acts or practices by: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities; representing that goods or services are of a particular standard, quality or grade; advertising goods or services with intent not to supply; failing to comply with the terms of any written guarantee or warranty; and engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding. Such acts and practices are in contravention of 73 P.S. §201-2.

273.    GM's unfair and deceptive acts and practices include misrepresenting or concealing material facts concerning: the nature of the Volt, the BECM defect,

GM's ability to perform warranty work including BECM replacement, and application of the "Roadside Assistance" and "Courtesy Transportation" coverage.

274.   GM's violations of the UTPCPL entail both goods and services, the Volt and the BECM being the goods and the warranty repairs and Roadside Assistance and Courtesy Transportation being the services.

275.   But for GM's unfair and deceptive acts, Plaintiff and members of the Pennsylvania Subclass would not have purchased or leased their Volt or would have paid less to do so.

276.   Because of GM's unfair and deceptive acts, Plaintiff and members of the Pennsylvania Subclass have been unable to receive a material benefit from their trade and commerce with GM.

277.   GM's violations of the UTPCPL present a continuing risk and detriment to Plaintiff, members of the Pennsylvania Subclass, and members of the public at large.  Defendant's unlawful acts and practices harm the public interest.

278.   Plaintiff and members of the Pennsylvania Subclass have been harmed by Defendant's violations of the UTPCPL and no adequate remedy has yet been provided.

279.   For GM's violations of the UTPCPL, Plaintiff and members of the Pennsylvania Subclass seek damages; exemplary damages; an order enjoining GM's unfair, unlawful, deceptive, and unconscionable acts and practices; attorney fees,

costs, restitution, disgorgement of funds, and any other just and appropriate relief available under the UTPCPL.

**COUNT TEN:**
**Breach of Implied Warranty of Merchantability**
**13 Pa. C.S.A. § 2101, *et seq*.**

280.    Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

281.    Plaintiff brings this claim on behalf of the Pennsylvania Subclass.

282.    Plaintiff and members of the Pennsylvania Subclass purchased or leased their Volt from Defendant GM by and through Defendant's agents for retail sales or were otherwise expected to be the eventual purchasers of the Volt from a third party.

283.    Defendant is and at all relevant times has been a merchant and seller of motor vehicles as defined under the Uniform Commercial Code, as adopted by the state of Pennsylvania (the "Pennsylvania Uniform Commercial Code" or the "Pennsylvania UCC").  13 Pa. C.S.A. § 2101, *et seq*.

284.    Defendant is and at all relevant times has been a lessor of motor vehicles as defined under the Pennsylvania Uniform Commercial Code.

285.    The Chevrolet Volts at issue in this Complaint are and were and at all relevant times goods within the meaning of the Pennsylvania UCC.

286.   Defendant impliedly warranted that the Volts were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

287.   However, the Volts contained a defective BECM, and as such they were not fit for the ordinary purposes for which vehicles are used – i.e., providing safe and reliable transportation.  Rather, the Volts contain the BECM defect and present an undisclosed safety risk to drivers and occupants.  Thus, GM breached its implied warranty of merchantability.

288.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and members of the Pennsylvania Subclass have suffered actual and compensable damages.

## COUNT ELEVEN:
**Breach of Express Warranty**
**13 Pa. C.S.A. § 2313**

289.   Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

289.   Plaintiff brings this claim on behalf of himself and the Pennsylvania Subclass.

290.   Defendant marketed the Volt as a safe, reliable plug-in hybrid.  Further, Defendant marketed the Volt as having a robust network of dealers – supported by GM – for any repair work which may become necessary.  Further, Defendant marketed the Volt as being covered by GM's Roadside Assistance and Courtesy

Transportation programs.  Such representations formed the basis of the bargain for Plaintiff's and members of the Pennsylvania Subclass's decision to purchase or lease a Volt.

291.   Defendant is and at all relevant times has been a merchant and seller of motor vehicles as defined under the Uniform Commercial Code, as adopted by the state of Pennsylvania (the "Pennsylvania Uniform Commercial Code" or the "Pennsylvania UCC").  13 Pa. C.S.A. § 2101, *et seq*.

292.  Defendant is and at all relevant times has been a lessor of motor vehicles as defined under the Pennsylvania Uniform Commercial Code.

293.   The Chevrolet Volts at issue in this Complaint are and were and at all relevant times goods within the meaning of the Uniform Commercial Code.

294.   In connection with the purchase or lease of a 2016-2019 Volt, GM provides warranty coverage under one or more manufacturer's warranties including, but not limited to, the 8-year, 100,000-mile hybrid-specific warranty to cover any needed repairs to the hybrid system.  Under warranties provided to Plaintiff and members of the Pennsylvania Subclass, Defendant promised to repair or replace defective BECM components arising out of defects in materials and/or workmanship, such as the BECM defect, at no cost to Volt owners or lessees.

295.   GM's 8-year, 100,000-mile hybrid-specific warranty constitutes an express warranty under Pennsylvania law.

296.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiff and members of the Pennsylvania Subclass purchased or leased their Volt.

297.   Plaintiff and the Pennsylvania Subclass members are eligible for warranty repair of their BECM under the 8-year, 100,000-mile hybrid-specific warranty, and they have requested a warranty repair of the BECM from GM.

298.   GM has not provided to Plaintiff or the members of the Pennsylvania Subclass the warranty repairs in accordance with the terms of the express warranty.

299.   In some instances, GM has charged members of the Pennsylvania Subclass for BECM repair work that should be covered under GM's express warranty.

300.   GM breached its express warranty when it failed to repair Plaintiff's and the Class Members' Chevrolet Volts in accordance with the terms of its 8-year, 100,000-mile, hybrid-specific express warranty.

301.   Defendant has failed to provide Plaintiff and members of the Pennsylvania Subclass with a meaningful remedy for the BECM defect, in clear breach of the express warranties, promising to repair and correct a design and/or manufacturing defect in materials or workmanship of the relevant components, including the BECM.

302.   Further, Defendant has failed to provide Plaintiff and members of the Pennsylvania Subclass with meaningful "Roadside Assistance" or "Courtesy Transportation" when requested during warranty-covered repairs, in clear breach of the express warranties.

303.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Pennsylvania Subclass have been damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of members of the Classes seeks the following:

a.   An Order (1) certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; (2) naming Plaintiff as Class Representative; and (3) naming Plaintiff's attorneys as Class Counsel representing the Class Members;

b.   A declaration that Defendant GM is financially responsible for notifying the Class Members about the defective nature of the BECM;

c.   An Order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective BECMs with suitable alternative

product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

d.  An Order finding in favor of Plaintiff and Class Members on all counts asserted herein;

e.  An Order awarding statutory, compensatory, exemplary, and punitive damages in amounts to be determined at trial;

f.  An Order awarding Plaintiff and the Class Members their attorney fees, including all such fees allowed under K.S.A. 50-623, *et seq*. and 73 P.S. § 201-1, *et seq*.;

g.  An Order awarding Plaintiff and the Class Members costs, and the expenses associated with bringing and maintaining this action;

h.  Imposition of civil penalties as allowed under applicable laws;

i.  Injunctive relief enjoining the illegal acts detailed herein;

j.  Injunctive relief ameliorating the harms to Plaintiff and Class Members resulting from Defendant's illegal acts detailed herein;

k.  Prejudgment interest on all amounts awarded;

l.  Restitution and all other forms of equitable monetary relief;

m. Disgorgement of ill-gotten profits;

n.  Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: November 11, 2022.         Respectfully submitted,

By: /s/ *Tiffany R. Ellis*
Tiffany R. Ellis
Paul F. Novak
WEITZ & LUXENBERG, P.C.
24th Floor, The Fisher Building
3011 W. Grand Boulevard
Detroit, Michigan 48202
Tel: (313) 800-4170
tellis@weitzlux.com
pnovak@weitzlux.com

Joe P. Leniski, Jr. (TN Bar. No. 22891)*
Tricia Herzfeld (TN Bar No. 26014)*
Anthony Orlandi (TN Bar No. 33988)*
Daniel P. Hull (TN Bar No. 24511)*
BRANSTETTER, STRANCH &
JENNINGS, PLLC
The Freedom Center
223 Rosa Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Email: joeyl@bsjfirm.com
        triciah@bsjfirm.com
        aorlandi@bsjfirm.com
        danielh@bsjfirm.com

and,

Matthew D. Alison (OBA No. 32723)*
Jason B. Aamodt (OBA No. 16974)*
INDIAN AND ENVIRONMENTAL LAW
GROUP, PLLC
406 S. Boulder Ave. Suite 830
Tulsa, OK 74103
Telephone: (918) 347-6169
Email: matthew@iaelaw.com

jason@iaelaw.com
*Motion for PHV admission forthcoming

*Attorneys for Plaintiff*