## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Jason Miller et al., on behalf of himself
and all others similarly situated,

      Plaintiffs,

v.

General Motors, LLC,

      Defendant.

_____/

Case No. 22-12739

Hon. Jonathan J.C. Grey

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT (ECF No. 26)

## I.    INTRODUCTION

Plaintiff Jason Miller and 19 other named plaintiffs[1], on behalf of themselves and others similarly situated, filed a complaint against Defendant General Motors, LLC ("General Motors" or "GM") for allegedly selling and failing to repair a defective vehicle: the second-generation Chevrolet Volt, Model Years 2016–2019 ("Class Vehicles"). (ECF No. 1.) Plaintiffs amended their complaint twice. (ECF Nos. 15, 24.) General Motors now moves to dismiss the second amended

_____

[1] Plaintiffs Jeffrey Pedersen and David Weber voluntarily dismissed their claims. (ECF Nos. 25, 28.) Accordingly, this opinion and order does not address their claims.

complaint, claiming that the Court lacks subject-matter jurisdiction over some of plaintiffs' claims and that plaintiffs fail to state a claim upon which relief can be granted. (ECF No. 26.) For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** GM's motion.

## II.   BACKGROUND

### A.   Pre-Release Marketing

The Chevrolet Volt, or Chevy Volt, is a hybrid vehicle that runs on both gasoline and battery power. Leading up to the release of the 2016 Chevy Volt, the first model year of the Class Vehicles, GM marketed the second-generation Volt as an upgrade from the first generation. (ECF No. 24-2, PageID.1004.) GM claimed that the new Volt would feature a new extended range electric vehicle propulsion system and would be "more efficient and offer greater EV range and fuel economy" compared to its predecessor. (*Id.*) GM estimated that the new Volt possessed a driving range exceeding 400 miles, 50 of which could be achieved using the Volt's all-electric mode. (*Id.*) GM touted its battery technology and active thermal control system as industry leading. (*Id.* at PageID.1004–1005.)

**B.    The Alleged Defect**

General Motors manufactured 72,924 Class Vehicles for sale or lease in the United States. (ECF No. 38-1, PageID.2038.) Each vehicle includes a battery engine control module ("BECM") which contains a subcomponent supplied by one of GM's former Tier 3 suppliers. (*Id.* at PageID.2036, 2044.) The BECM in the Class Vehicles can malfunction due to a failure mechanism on the subcomponent. (*Id.* at PageID.2044.) If the BECM fails while the vehicle is in motion, the Volt may enter a reduced propulsion state, a malfunction indicator lamp may turn on, and the driver may see a message indicating that the Volt has entered a reduced propulsion state. (*Id.* at PageID.2036.) Subsequently, the Volt will not restart nor charge while the fault is present. (*Id.* at PageID.2037.) If the BECM fails while the car is charging or in a key off state, charging may stop, the Volt may not start, and both a malfunction indicator lamp may illuminate and a reduced propulsion message may display once the car enters a key on state. (*Id.*)

**C.    Complaints about the Alleged Defect**

Many Class Vehicle owners, including plaintiffs, experienced symptoms of the alleged BECM defect. According to General Motors'

conservative estimates, there are 15,134 warranty claims for the Class Vehicles that may relate to the alleged defect. (*Id.* at PageID.2042.) Additionally, GM is aware of 1,909 unique claims—consisting of consumer reports, field reports, and lawsuits—which relate to or may relate to the alleged defect in the Class Vehicles. (*Id.* at PageID.2039.) The National Highway Traffic Safety Administration's ("NHTSA") Office of Defects Investigation "received 61 complaints and multiple Transportation Recall Enhancement, Accountability, and Documentation ('TREAD') field reports alleging a loss of motive power, including a stall, reduced power state, and/or a no-start condition" due to the BECM in the Class Vehicles. (*See* ECF No. 38, PageID.2025 n.69.) Class Vehicle owners have voiced their complaints about their Volts and/or the alleged defect in various online forums. (*Id.* at PageID.1788–1789; ECF No. 24-1, PageID.1000–1001.)

### D.   GM's Investigation and Its Response to the Alleged Defect

In December 2015, GM released a Preliminary Information Service Bulletin ("PISB") that placed the High Voltage Battery Disconnect Relay in the 2016 Chevy Volt on a restricted parts list. (ECF No. 24-2, PageID.1008.) The PISB also placed the BECM on restriction.

4

(*Id.*) The PISB outlined the details of a drive motor battery exchange program for the 2016 Volt. (*See id.*) The purpose of the exchange program was to allow GM to collect information for engineering improvements and gain feedback on the drive motor battery assembly. (*Id.*) GM subsequently released updates to the PISB to include the 2017 Chevy Volt and to place more internal battery components on restriction. (*Id.* at PageID.1009–1010.)

On June 24, 2018, GM released a Technical Service Bulletin ("TSB") addressing the no start condition and illuminated malfunction indicator lamp in 2016–2018 Chevy Volts. (*Id.* at PageID.1011.) The TSB noted that the no start condition and illuminated malfunction indicator lamp may be due to an internal issue with the BECM. (*See id.*) The TSB instructed professional technicians to address the issue by replacing and reprograming the BECM. (*Id.*) On March 9, 2022, General Motors modified the TSB to add the 2019 Volt. (*Id.*)

Both the PISB and the TSB include a disclaimer at the bottom indicating that the bulletins are intended for use by professional technicians. (*See id.* at PageID.1008, 1011.) The disclaimer also explains that GM writes the bulletins to inform professional technicians

5

of conditions that may occur on some vehicles or to provide information that could assist in the proper service of a vehicle. (*See id.*)

### E.    The New Vehicle Limited Warranty

Each Class Vehicle shipped with Chevrolet's New Vehicle Limited Warranty. General Motors warranted certain components in the Class Vehicles for 8 years or 100,000 miles, whichever came first, against warrantable repairs to the specific electric propulsion components of the vehicles. (*Id.* at PageID.1008–1012.) The warranty period runs from the original in-service date of the vehicle. (*See id.*) The warranty outlines two offerings for customer convenience: a Roadside Assistance Program and a Courtesy Transportation program. Under the Courtesy Transportation Program, if a vehicle requires warranty repairs during the duration of the powertrain warranty, alternate transportation and/or reimbursement of certain transportation expenses may be available. (*Id.*) The warranty instructs customers to consult their Chevrolet dealer or refer to the owner's manual for more details. (*Id.*) However, the warranty specifies that neither program is part of or included in the coverage provided by the New Vehicle Limited

Warranty and that GM may change or discontinue the programs without notice. (*Id.*)

## F.   Plaintiffs' Experiences with the Class Vehicles

Because the fate of most claims is fact-dependent, this section summarizes each plaintiff's alleged experiences with one of the Class Vehicles.

### 1.   Jason Miller

Plaintiff Jason Miller, a Kansas citizen, purchased a "Certified Pre-Owned" 2017 Chevy Volt from a GM dealership in Pennsylvania in November 2021. (ECF No. 38, PageID.1694–1696, ¶¶ 37, 44.) Three months later, Miller's Volt displayed a check engine light and reduced propulsion warnings. (*Id.* at PageID.1696 ¶ 45.) Miller took his Volt to a GM dealership in Kansas. (*Id.* at ¶ 46.) The dealership advised Miller that his Volt's BECM was defective and needed to be replaced. (*Id.*) The dealership told Miller that it could not complete the repair because the part was on backorder with no timetable for availability. (*Id.*) The dealership informed Miller that the car was still safe to drive even with the defect. (*Id.*) Miller continued to drive the Volt, but the hybrid drive system stopped working, and the car's engine would routinely lose

power. (*Id.* at PageID.1697 ¶ 47.) Over two months later, the dealership informed Miller that the BECM part had arrived. (*Id.* at ¶ 49.) Miller took his car back in for repair, but the dealership could not complete the repair because the dealership needed another part which was also on backorder. (*Id.* at PageID.1697–1698 ¶¶ 49–50.) Approximately one year later, the dealership completed the repair. (*Id.* at PageID.1699 ¶ 55.) Since his repair, Miller's car has displayed a low propulsion warning. (*Id.* at ¶ 57.)

### 2.   **Jason Willhite**

Plaintiff Jason Willhite, an Arkansas citizen, purchased a preowned 2018 Chevy Volt from Carvana in May 2021. (*Id.* at PageID.1700–1701, ¶¶ 62–63.) In late 2022, Willhite's Volt had charging issues, it failed to start reliably, and it displayed numerous error messages on the dashboard. (*Id.* at PageID.1701 ¶ 67.) Willhite took his Volt to a GM dealership, and the dealership informed him that his BECM had failed. (*Id.*) The dealership indicated that it could not complete the repair because the part was on backorder, and it told Willhite to not drive his car until the dealership repaired it. (*Id.* at PageID.1702 ¶ 68.) As of the date of filing the second amended

complaint, the dealership has advised Willhite that it has repaired his Volt. (*Id.* at ¶ 70.)

### 3. Govindarajulu Varadarajan

Plaintiff Govindarajulu Varadarajan, a California citizen, purchased a new 2017 Chevy Volt from a GM dealership in California in August 2016. (*Id.* at PageID.1703 ¶¶ 74–75.) In March 2020, the malfunction indictor lamp in Varadarajan's Volt came on, and he experienced reduced propulsion. (*Id.* at PageID.1704 ¶ 81.) Varadarajan took his Volt to a GM dealership, and the dealership informed him that his BECM had failed and needed to be replaced. (*Id.* at ¶¶ 81–82.) Varadarajan's Volt has since undergone five different BECM replacements, none of which have worked (*Id.* at ¶ 83.) After the most recent repair attempt, Varadarajan sent his Volt back to the dealership. (*Id.*) As of the date of filing the second amended complaint, the dealership still possesses the Volt. (*Id.* at PageID.1705 ¶ 83.)

### 4. Urs Zuger and Laurie Zuger

Plaintiffs Urs and Laurie Zuger, Colorado citizens, purchased a new 2016 Chevy Volt from a GM dealership in Colorado in September 2016. (*Id.* at PageID.1706 ¶¶ 89–90.) Around November 2022, the

Zugers began experiencing reduced propulsion. (*Id.* at PageID.1707 ¶ 94.) The Zugers took their Volt to a third-party hybrid facility for assessment, and the facility determined that the BECM had failed. (*Id.* at ¶ 96.) The Zugers then took their car to a GM dealership for repair, but the dealership refused to accept their third-party diagnosis without charging them a fee. (*Id.* at PageID.1708 ¶ 97.) In May 2023, the Zugers had their Volt towed to the GM dealership, and the dealership informed them that the Volt needed software updates. (*Id.* at ¶ 98.) The dealership charged the Zugers for the updates. (*Id.*) On the way home from the dealership, the Volt failed again and displayed a low propulsion warning. (*Id.*) The Zugers took the Volt back to the dealership, and as of the date of filing the second amended complaint, the dealership still possesses the Volt. (*Id.* at ¶ 99.)

### 5. Ray Gustafson

Plaintiff Ray Gustafson, a Florida citizen, purchased a preowned 2016 Chevy Volt in Florida in August 2021. (*Id.* at PageID.1709 ¶¶ 103–104.) In late 2022, Gustafson's Volt began experiencing issues: it failed to enter electric vehicle mode and failed to start. (*Id.* at PageID.1710 ¶ 108.) Gustafson took his Volt to an auto shop in Florida, and the shop

informed him that his BECM had failed. (*Id.* at ¶ 109.) Gustafson then took his Volt to a GM dealership, which concurred in the diagnosis and recommended that Gustafson not drive the Volt until it was repaired. (*Id.* ¶¶ 109–110.) The dealership could not immediately complete the repair because the BECM part was on back order. (*Id.* at ¶ 110.) After two months, the dealership completed the repair of Gustafson's Volt. (*Id.* at PageID.1710–1711 ¶ 110.)

### 6. Clare Mansell

Plaintiff Clare Mansell, a Georgia citizen, purchased a new 2017 Chevy Volt from a Chevrolet dealership in Georgia in December 2017. (*Id.* at PageID.1711 ¶¶ 114–115.) In April 2022, Mansell's Volt displayed a reduced propulsion warning. (*Id.* at PageID.1712 ¶ 119.) Mansell took her Volt to a GM dealership, which informed Mansell that the BECM had failed and recommended that she not drive the Volt until the BECM was repaired (*Id.* ¶¶ 119–120.) The dealership informed Mansell that it could not immediately complete the repair because the BECM part was on backorder. (*Id.* at ¶ 120.) After five months, the dealership completed the repair on Mansell's Volt. (*Id.* at PageID.1713 ¶ 123.)

### 7.   Gabriel Hogan

Plaintiff Gabriel Hogan, a Michigan resident, purchased a preowned 2017 Chevy Volt from a Carvana in Michigan in April 2021. (*Id.* at PageID.1716 ¶¶ 138–139.) Hogan's Volt underwent a BECM replacement before he purchased it. (*Id.* at PageID.1717 ¶ 144.) Months after his purchase, Hogan began experiencing reduced propulsion, which caused his Volt to stop suddenly while he was driving on the interstate. (*Id.* at ¶ 143.) Hogan took his car to a GM dealership, which informed him that the BECM had failed. (*Id.* at ¶ 144.) The BECM failed another three times. (*Id.*) Each time the BECM failed, Hogan took his vehicle to the dealership for repair. (*Id.* at PageID.1717–1718 ¶ 144.) The dealership replaced the BECM at least once, but Hogan continued to experience a forced reduced propulsion state. (*Id.* at PageID.1717–1718 ¶¶ 144–145.) Hogan alleges that despite the warnings lights on his Volt's dashboard, the dealership claims that there is nothing wrong with the vehicle. (*Id.* at PageID.1718 ¶ 145.) Hogan claims that as of the date of filing the second amended complaint, the dealership refuses to diagnose or repair the BECM. (*Id.* at ¶ 146.)

### 8.   Daniel Blanke

Plaintiff Daniel Blanke, a Missouri citizen, purchased a 2019 Chevy Volt in Missouri in July 2022. (*Id.* at PageID.1719 ¶¶ 152–153.) Prior to Blanke's purchase, GM repurchased the Volt due to safety concerns, and the dealer who sold Blanke his Volt assured customers that the safety defect had been repaired. (*Id.* at PageID.1720 ¶ 157.) In October 2022, Blanke experienced reduced propulsion in his Volt, and took it to a GM dealership. (*Id.* at ¶ 158.) The dealership informed Blanke that the Volt's BECM had failed, that the part necessary for repair was on backorder, and that Blanke should not drive the Volt until it was repaired. (*Id.* at ¶ 159.) The dealership later replaced the BECM, but Blanke's Volt failed after the replacement. (*Id.* at PageID.1721 ¶ 161.) Blanke returned his Volt to the dealership, and the dealership completed a repair. (*Id.* at ¶ 162.)

### 9.   Felicity Broennan

Plaintiff Felicity Broennan, a New Mexico citizen, purchased a new 2017 Chevy Volt from a GM dealership in Illinois in July 2016. (*Id.* at PageID.1722 ¶¶ 166–167.) In April 2022, Broennan's Volt began to lose propulsion and fail to start. (*Id.* at PageID.1723 ¶ 171.) Broennan

13

took the vehicle to a GM dealership for service. (*Id.*) The dealership examined the car and made several repair attempts. (*Id.* at ¶¶ 172, 174.) The dealership replaced the Volt's engine harness and changed the 12-volt battery, at Broennan's expense, but the BECM-related symptoms persisted. (*Id.* at ¶ 174.) The dealership eventually diagnosed the BECM failure and repaired the Volt. (*Id.* at PageID.1724 ¶¶ 175–176.)

### 10. Alisa Colley

Plaintiff Alisa Colley, a New York citizen, purchased a new 2017 Chevy Volt from a Chevy dealership in New York in March 2017 (*Id.* at PageID.1725 ¶¶ 180–181.) In July 2022, Colley's Volt began experiencing BECM-related symptoms, so Colley took it to a GM dealership. (*Id.* at PageID.1726 ¶ 185.) The dealership informed Colley that her Volt's BECM failed and that the repair part was on backorder. (*Id.* at ¶ 186.) The dealership completed the repair in December 2022, but Colley has since experienced issues affecting the operability of her Volt. (*Id.* at ¶ 188.)

### 11.   James Ewer

Plaintiff James Ewer, a North Carolina citizen, purchased a used 2017 Chevy Volt from a Mazda dealership in North Carolina in September 2021. (*Id.* at PageID.1727 ¶¶ 192–193.) The following month, Ewer's Volt broke down on the highway. (*Id.* at PageID.1728 ¶ 197.) Ewer took his Volt to a Chevrolet, Buick, and Cadillac dealership, and it informed Ewer that his Volt's BECM had failed and that there was a shortage of the part necessary for repair. (*Id.* at ¶¶ 197–198.) The dealership completed the repair around January 2022. (*Id.* at PageID.1729 ¶ 200.)

### 12.   Dwayne Graham

Plaintiff Dwayne Graham, a South Carolina citizen, purchased a "Certified Pre-Owned" 2018 Chevy Volt from a GM dealership in 2018. (*Id.* at PageID.1730 ¶¶ 204–205.) In August 2022, Graham's Volt entered an abrupt reduced propulsion mode, and he took it to a Chevrolet dealership for service. (*Id.* at PageID.1731 ¶ 209.) The dealership informed Graham that his Volt's BECM had failed, that the part necessary for repair was on backorder, and that Graham should

not drive the car until repaired. (*Id.* at ¶ 210.) The dealership eventually completed the repair. (*Id.* at ¶ 212.)

### 13.   Thomas Campanis

Plaintiff Thomas Campanis, a Tennessee citizen, purchased a preowned 2017 Chevy Volt from a Carmax in Tennessee in April 2021. (*Id.* at PageID.1732 ¶¶ 216–217.) In February 2022, Campanis noticed a warning light indicating that his Volt was not working properly, so he took his Volt to a Chevy dealership for repair. (*Id.* at PageID.1733 ¶ 221.) The dealership informed Campanis that his Volt's BECM had failed. (*Id.* at ¶ 222.) However, a vehicle struck Campanis' Volt while the dealership awaited the necessary part for repair. (*Id.* at ¶ 224) Thus, the dealership never repaired the BECM in Campanis' Volt. (*Id.* at PageID.1734 ¶ 226.)

### 14.   Amy Stewart

Plaintiff Amy Stewart is a Tennessee resident, but she purchased a new 2018 Chevy Volt from a GM dealership in Michigan in December 2017 while living in Michigan. (*Id.* at ¶¶ 228–229.) In May 2021, Amy Stewart transferred ownership of the Volt to her daughter Plaintiff Halee Stewart, an Alabama resident. (*Id.* at PageID.1734–1735 ¶¶ 228,

16

234.) In July 2022, the Volt failed to start, so Halee took the vehicle to a GM dealership. (*Id.* at PageID.1736 ¶ 235.) The dealership informed Halee that her Volt's BECM had failed and that the necessary part for repair was on backorder. (*Id.* at ¶ 236.) The dealership eventually repaired the Volt. (*Id.* at ¶ 238.)

### 15.   Robert Barnes

Plaintiff Robert Barnes, an Oklahoma resident, purchased a preowned 2017 Chevy Volt from a Toyota dealership in Arkansas in May 2022. (*Id.* at PageID.1737 ¶¶ 243–244.) Around one year later, Barnes' Volt failed to start and experienced propulsion loss. (*Id.* at PageID.1738 ¶ 248.) Barnes took the Volt to a GM dealership, which informed Barnes that the Volt's BECM had failed and that Barnes could not drive the Volt pending repair. (*Id.* at ¶¶ 248–249.) In June 2023, the dealership completed a repair of the Volt. (*Id.* at PageID.1739 ¶ 251.)

### 16.   Suzanne O'Neill

Plaintiff Suzanne O'Neill, a Maryland citizen, purchased a new 2017 Chevy Volt from a GM dealership in Maryland in 2016. (*Id.* at PageID.1739 ¶¶ 254–255.) In March 2023, O'Neill's Volt failed to start, so she took it to the GM dealership from which she bought it. (*Id.* at

PageID.1740 ¶ 259.) The dealership replaced the vehicle's 12-volt battery and changed the spark plugs. (*Id.* at ¶ 260.) The Volt continued to struggle to start, so O'Neill took it back to the dealership. (*Id.* at PageID.1741 ¶ 261.) The dealership informed O'Neill that the Volt's BECM had failed, but it completed another repair of the vehicle and returned the vehicle to O'Neill in May 2023. (*Id.* at ¶¶ 261, 265.)

### 17. David Collins

Plaintiff David Collins, a Connecticut citizen, purchased a new 2016 Chevy Volt from a GM dealership in Connecticut in late 2015 or early 2016. (*Id.* at PageID.1744 ¶¶ 277–278.) Collins' Volt experienced signs of BECM failure early on. (*Id.* at PageID.1745 ¶ 282.) The dealership reprogrammed the Volt's engine control module in February 2016. (*Id.*) The Volt also experienced intermittent loss of propulsion while driving. (*Id.*) In June 2023, Collins towed the Volt to the GM dealership, which informed Collins that his Volt's BECM had failed, that the BECM needed to be replaced, but that the dealership would not replace the BECM under warranty. (*Id.* at ¶¶ 282, 284.) The dealership completed a repair in June 2023 at Collins' expense. (*Id.* at ¶ 284.) On his way home from the dealership, the Volt failed again. (*Id.* at

18

PageID.1746 ¶ 285.) As of the date of filing the second amended complaint, the Volt is at the dealership awaiting service. (*Id.* at ¶ 286.)

### 18.   Holly Wood

Plaintiff Holly Wood, a Utah resident, purchased a preowned 2017 Chevy Volt from a car dealership in Utah in June 2022. (*Id.* at PageID.1747 ¶¶ 290–291.) The car had about 98,000 miles on it. (*Id.* at ¶ 291.) Before purchasing, Wood took the car to a GM dealership and paid the dealership to perform GM's 150-point inspection on the vehicle. (*Id.*) The dealership found no issues with the vehicle. (*Id.*) Weeks later, Wood experienced issues with her Volt, and the car's check engine light illuminated. (*Id.* at PageID.1748 ¶ 296.) Wood took her Volt, now with 100,787 miles on it, back to the GM dealership, which reprogrammed the Volt's engine control module at Wood's expense. (*Id.* at ¶¶ 296–297.) In August 2022, Wood's Volt continued to experience issues: the hybrid drive system turned off while the vehicle was in motion, the vehicle would not accelerate, and only the internal combustion engine would engage. (*Id.* at PageID.1748–1749 ¶¶ 298–299.) Wood took her Volt back to the GM dealership, and it informed Wood that her Volt's BECM

had failed. (*Id.* at PageID.1749 ¶¶ 300–301.) In November 2022, the dealership completed a repair of the Volt. (*Id.* at PageID.1750 ¶ 302.)

## III.  LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. Accepting all factual allegations as true, the Court will review the complaint in the light most favorable to the plaintiff. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must comply with Rule 8(a)(2), which requires a short and plain statement of the claim showing that the pleader is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must demonstrate more than a sheer

20

possibility that the defendant's conduct was unlawful. *Id.* Although a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Id.* (citations omitted); *Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). The Court will typically only rely on the facts stated in the complaint. *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citations omitted). The Court can consider exhibits attached to the complaint or to the defendant's motion as long as the exhibits are referred to in the complaint and are central to the claims. *Id.* at 680–681.

## IV.   ANALYSIS

### A.   Standing to assert claims on behalf of a nationwide class

Plaintiffs bring this action on behalf of a nationwide class and 20 state-specific sub-classes. (ECF No. 38, PageID.1816–1818; ECF No. 27-2, PageID.1218–1221.) There are three nationwide claims: one for a violation of the Magnusson-Moss Warranty Act ("MMWA"), one for

breach of contract, and one for unjust enrichment.[2] (ECF No. 27-2, PageID.1218.) The first issue is whether plaintiffs may pursue claims on behalf of a nationwide class. General Motors argues that plaintiffs lack standing to assert claims under the laws of states in which they do not reside or in which they have not suffered an injury. (ECF No. 26, PageID.1070–1071.) The Court agrees.

Courts in this district are split on the question of when a court should decide whether a named plaintiff in an automobile defect action can maintain claims under the laws of states in which the plaintiff neither resides nor suffered an injury. Some courts have declined to dismiss nationwide class claims for lack of Article III standing at the motion to dismiss stage, often deferring the issue to the class-certification stage. *Fisher v. FCA US LLC*, 712 F. Supp. 3d 930, 941 (E.D. Mich. 2024) (Leitman, J.); *Kiriacopoulos v. Gen. Motors LLC*, No. 22-10785, 2023 WL 2789622, at *17 (E.D. Mich. Apr. 5, 2023)

---

[2] There may be a fourth nationwide claim, but it is unclear. The complaint states that plaintiffs bring a claim for fraudulent misrepresentation "on behalf of themselves and the Nationwide Class" but the subtitle for the count in the complaint as well as the plaintiffs' list of remaining claims indicates that the claim is brought as to specific states. (ECF No. 38, PageID.1832; ECF No. 27-2, PageID.1218.) Nevertheless, regardless of whether the fraudulent misrepresentation claim is brought as to specific states or as a nationwide claim, the Court's analysis remains the same.

(Goldsmith, J.); *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 647 (E.D. Mich. 2021) (Tarnow, J.) Other courts have dismissed nationwide class claims for lack of Article III standing at the motion to dismiss stage. *Norman v. FCA US, LLC*, 696 F. Supp. 3d 359, 375 (E.D. Mich. 2023) (Berg, J.); *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *9–11 (E.D. Mich. June 21, 2021) (Michelson, J.); *Ambrose v. Gen. Motors LLC*, No. 19-13449, 2022 WL 3701946, at *8 (E.D. Mich. Aug. 26, 2022) (Cox, J.). Neither the Sixth Circuit nor the Supreme Court have directly addressed the issue of when the Court should consider whether named plaintiffs may assert claims under the laws of states in which they neither reside nor have suffered injury.

A plaintiff bears the burden of establishing Article III standing for each claim that they assert. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 352 (2006). To establish standing, a plaintiff must show that they (1) "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "that the injury was likely caused by the defendant;" and (3) "that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423.

Here, plaintiffs assert at least three nationwide class claims, all of which are based on state law. Even though the MMWA is a federal statute, it "provides a cause of action only for consumers who claim injury as a result of a defendant's failure to comply with obligations under a written or implied warranty." *Norman*, 696 F. Supp. 3d at 375 (citing 15 U.S.C. § 2310(d)). State law determines what constitutes a breach of warranty, so MMWA claims "stand or fall with . . . express and implied warranty claims under state law." *Id.* (internal quotation marks omitted) (citing *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1017 (E.D. Mich. 2017)).

Additionally, there is no federal general contract law, so the breach of contract and unjust enrichment claims are also rooted in state law. Plaintiffs allege that they reside in and/or have suffered injury in 20 states. Plaintiffs can show an injury under the laws of those states and thus have standing with respect to those claims. But how can plaintiffs show an injury under the laws of the other 30 states? Mansell, the named Georgia plaintiff, cannot maintain Washington state law breach of warranty claims against GM for allegedly inadequate repair work completed in Georgia. Likewise, Colley, the named New York

24

plaintiff, cannot maintain a New Jersey state law breach of contract claim against GM for a purchase—of an allegedly defective vehicle—that occurred in New York. The Court finds that plaintiffs lack standing to sue under the laws of states where they neither reside nor suffered an injury. *Norman*, 696 F. Supp. at 375; *Withrow*, 2021 WL 2529847, at *9; *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011).

Plaintiffs do not argue that they have standing to assert claims under the laws of states in which they neither reside nor suffered injury. Instead, plaintiffs argue that the ability to maintain nationwide claims is an issue for the class certification stage, not a standing issue. (ECF No. 27, PageID.1210.) The Court is not persuaded. Plaintiffs' ability to maintain certain claims against GM is an issue of standing, and the Sixth Circuit's analysis in *Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023) guides this Court toward addressing standing now rather than later. In that case, Fox failed to pay taxes on his Gratiot County property. *Fox*, 67 F.4th at 290. The county treasurer took Fox's property pursuant to Michigan law and sold it at an auction to satisfy the tax delinquency. *Id.* According to Fox, the property sold for an

25

amount above the tax that Fox owed, and the county did not pay Fox the difference. *Id.* Fox filed a putative class action against 27 counties and their treasurers, including Gratiot County, Michigan and its treasurer, alleging that they had a common practice of keeping surplus funds from tax sales. *Id.* at 290–291. The district court certified the class, and the counties appealed, arguing, in part, that Fox lacked standing to sue most of them. *Id.* at 291–292. To establish standing to sue the 26 counties and treasurers that did not injure him, Fox relied on the juridical link doctrine which "allows a named plaintiff in a putative class action to sue defendants who have not injured the plaintiff if these defendants have injured absent class members." *Id.* at 288, 293. Fox also argued that the question of whether he could sue defendants other than Gratiot County and its treasurer turned on Federal Rule of Civil Procedure 23, not Article III. *Id.* at 293.

In rejecting the juridical link doctrine, the court rejected Fox's argument for deferring the issue of standing:

> [Fox] initially cites two cases stating that class-certification issues are "logically antecedent" to standing concerns. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Fox suggests that this statement permits a court to delay all

26

standing questions until it certifies a class. *See Payton [v. County of Kane, 308 F.3d 673, 680 (7th Cir. 2002)].* He overlooks the context of the statement. *See Mahon [v. Ticor Title Ins. Co., 683 F.3d 59, 64–65 (2d Cir. 2012)].* Unlike Fox's case, *Amchem* and *Ortiz* did not concern standing challenges to *named plaintiffs*; they concerned standing challenges to *class members. See Ortiz*, 527 U.S. at 831, 119 S.Ct. 2295; *Amchem*, 521 U.S. at 612–13, 117 S.Ct. 2231. It makes sense to consider certification ahead of standing for that type of challenge. Because class members are not parties before class certification, *Smith* [*v. Bayer Corp.*, 564 U.S. 299, 313 (2011)], a court need not worry about their standing until it certifies the class, *see Amchem*, 521 U.S. at 612–13, 117 S.Ct. 2231. So a class-certification denial will make a class member's standing problem irrelevant. But the opposite is not true. Named plaintiffs are parties from the start. A court thus must immediately concern itself with their standing because jurisdictional issues precede the merits. *See Steel Co.*, 523 U.S. at 93–101, 118 S.Ct. 1003.

*Fox*, 67 F.4th at 296–297 (emphasis in original). Here, GM challenges the named plaintiffs' ability to assert claims under the laws of states in which they neither reside nor suffered an injury. As such, *Fox* instructs this Court to "immediately concern itself" with the standing of named plaintiffs because jurisdictional issues precede the merits. *Id.* at 297. Granted, *Fox* is not exactly analogous to the instant case. Fox filed an action against 50+ defendants who did not injure him but rather injured putative class members. Here, plaintiffs only sued GM, and they all allege that GM injured them and putative class members. Despite the

27

factual differences, *Fox* is at least instructive on when the Court should address the standing of named plaintiffs. Moreover, at least one other court in this district has interpreted *Fox* to require courts to address the issue of standing at the motion to dismiss stage rather than at class certification. *Norman*, 696 F. Supp. 3d at 374–375 (Berg, J.); *Chapman v. Gen. Motors LLC*, No. 19-CV-12333, 2024 WL 698789, at *9–10 (E.D. Mich. Feb. 14, 2024) (Berg, J.).[3] Therefore, GM's motion to dismiss the nationwide class claims for lack of standing is **GRANTED**. Accordingly, plaintiffs may only assert Counts I, IV, VI, and all other Counts on behalf of themselves and their respective state subclasses.

---

[3] In *Fisher v. FCA US LLC*, the court concluded that "the Sixth Circuit's rejection [of] the juridical link doctrine in *Fox* does not compel the conclusion that a named plaintiff necessarily lacks Article III standing to assert claims on behalf of a nationwide class that arise under the laws of different states." 712 F. Supp. 3d 930, 941 (E.D. Mich. 2024) (Leitman, J.). The court's conclusion was based, in part, on the Second Circuit's reasoning in *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88 (2d Cir. 2018). *Id.* In *Langan*, the court held that "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III." *Langan*, 897 F.3d. at 96. In reaching its conclusion, the *Langan* court rejected the defendant's argument that another Second Circuit case rejecting the juridical link doctrine required a different result: "[B]ecause the redressability and fundamental fairness concerns that arise when a plaintiff attempts to haul a non-injurious defendant into court are not present when a plaintiff initiates a class action under various state laws prohibiting similar conduct by the same defendant, this case is distinguishable." *Id.* at 96 n.3. *Fox*'s rejection of the juridical link doctrine does not compel this Court to find that plaintiffs lack standing to assert nationwide class claims. Rather, *Fox*'s statement that a court must immediately concern itself with the standing of named plaintiffs persuades this Court to consider standing at the outset.

### B.    Fraud-Based Claims

#### 1.    Rule 9(b) Pleading Standard and Actionable Fraud

General Motors argues that plaintiffs' misrepresentation and concealment claims are not pleaded with particularity in accordance with Federal Rule of Civil Procedure 9(b). (ECF No. 26, PageID.1081–1085.) General Motors further argues that certain alleged misrepresentations are non-actionable puffery. (*Id.* at PageID.1081.) The Court agrees with General Motors with respect to plaintiffs' misrepresentation claims but disagrees with respect to plaintiffs' concealment claims. The Court begins with the misrepresentation claims.

#### a.    Fraudulent and Negligent Misrepresentation

Fraud claims are governed by Rule 9(b), which places a heightened pleading standard on the plaintiff. Fed. R. Civ. P. 9(b). For affirmative fraud claims, Rule 9(b) requires that a plaintiff (1) specify the fraudulent statements, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain their fraudulent nature. *New London Tobacco Mkt, Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 411 (6th Cir. 2022) (citation omitted). The plaintiff must specify the

"who, what, when, where, and how" of the alleged fraud. *Id.* (internal quotation marks and citation omitted). The plaintiff must also "describe 'the fraudulent scheme' and the 'resulting injury.'" *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011)). Further, puffery, which is defined as "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying," is not actionable. *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 506–507 (E.D. Mich. 2021) (internal quotation marks omitted) (quoting *Pizza Hut, Inc. v. Papa John's Int'l Inc.*, 227 F.3d 489, 497 (5th Cir. 2000)).

Plaintiffs argue that GM made unqualified promises regarding the Class Vehicles' electric battery range. (ECF No. 27, PageID.1192.) Plaintiffs cannot maintain an affirmative fraud claim for the alleged unqualified promises because plaintiffs have not established that GM knew the statements were fraudulent before it sold the Class Vehicles. As plaintiffs indicate, GM highlighted that the Class Vehicles had an estimated driving range of over 400 miles, 50 to 53 of which could be achieved without gas power. (*See* ECF No. 24-2, PageID.1004–1010.) GM claimed that these figures were based on GM's own estimates. (*Id.*

at PageID.1006.) Generally, a manufacturer's estimates of fuel efficiency and range that go beyond Environmental Protection Agency estimates are actionable. *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 960 (E.D. Mich. 2022). However, these estimates are not actionable because plaintiffs have not shown that GM knew the Class Vehicles could not obtain 50 miles of range in all-electric mode. If plaintiffs are relying on GM's knowledge of the BECM-related defect to show that GM knew of the Class Vehicles inability to achieve the 50+ miles of electric vehicle range, plaintiffs' argument also fails. That is because, as GM argues, plaintiffs do not say how the alleged defect is related to a reduction in electric vehicle range. (ECF No. 26, PageID.1082.) Because plaintiffs have not explained the fraudulent nature of GM's electric-only range estimates, the estimates cannot form the basis of an affirmative misrepresentation claim.

Next, plaintiffs argue that GM falsely promised Courtesy Transportation. (ECF No. 27, PageID.1192.) The statements that plaintiffs identify cannot support an affirmative misrepresentation claim because plaintiffs fail to explain the fraudulent nature of the statements. First, plaintiffs reproduced the following sentence about the

Courtesy Transportation program from the Class Vehicles' warranty booklets: "If your vehicle requires warranty repairs during the Limited Powertrain Warranty coverage period (8 years/100,000 miles for repairs warrantable under the Hybrid/Electric Propulsion Limited Warranty), alternate transportation and/or reimbursement of certain transportation expenses **may** be available under the Courtesy Transportation Program. Several transportation options are available." (*See* ECF No. 24-2, PageID.1008.) (emphasis added). A plain reading of the sentence makes clear that GM did not guarantee courtesy transportation; it only stated the program **may** be available.

Second, plaintiffs cite the following bullet point from a Chevrolet website discussing Chevrolet Complete Care, a benefit program for owners: "Courtesy Transportation or expenses reimbursed if a vehicle requires warranty repairs." (*Id.* at PageID.1010.) Again, the statement does not guarantee courtesy transportation; it says that those requiring warranty repairs could receive either courtesy transportation or expense reimbursement.

Finally, plaintiffs reference a warranty administration service bulletin, which states the following: "Courtesy Transportation can be

32

made available for warranty repairs for all GM vehicle purchase/lease customers and GM company-owned vehicle drivers within the Bumper-to-Bumper, Powertrain and/or Hybrid specific (8 year/100,000) and Federal Emissions coverage of the New Vehicle Limited Warranty (excluding Medium Duty trucks)." (ECF No. 24-2, PageID.1013.) GM's statement that Courtesy Transportation "can be made available" is not a promise of courtesy transportation. More importantly, the bulletin begins with a disclaimer about the Courtesy Transportation program which states that (1) the program is not part of the warranty, (2) GM considers requests for reimbursement under the program on a case-by-case basis, and (3) GM reserves the right to modify or discontinue the program at any time. (*See id.*) In sum, plaintiffs fail to state how GM's statements about the Courtesy Transportation program are fraudulent. Therefore, these statements cannot support an affirmative misrepresentation claim.

Plaintiffs further argue that GM made false representations about the Class Vehicles' ability to maintain thermal control and the maintenance of propulsion through the vehicle's life. (ECF No. 27, PageID.1192.) Again, plaintiffs fail to explain how the statements are

fraudulent. First, GM stated that "[t]he improved battery system continues to use the Volt's industry-leading active thermal control system that helps maintain electric range." (ECF No. 24-2, PageID.1005.) Second, GM highlighted that the second-generation Volt would feature an all-new extended range electric vehicle propulsion system that would provide greater range, efficiency, and acceleration. (ECF No. 24-2, PageID.1004–1005.) The complaint does not allege that the Class Vehicles did not include an active thermal control system or a new propulsion system. The complaint also does not allege that the active thermal control system did not work as intended or that the propulsion system did not provide greater range, efficiency, and acceleration compared to the first-generation Volt. To the extent plaintiffs argue that calling the thermal control system "industry-leading" is fraudulent, this statement is puffery which is not actionable. *See Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626, 649 (E.D. Mich. 2019) ("Defendants' individual statements along the lines that the trucks are the cleanest or best in the world are nonactionable puffery."). Accordingly, plaintiffs cannot maintain an affirmative fraud claim

based on GM's statements about the active thermal control or propulsion systems.

Plaintiffs next argue that GM falsely represented the reliability and safety of the Class Vehicles. (ECF No. 27, PageID.1192.) Plaintiffs allege that GM marketed the Class Vehicles as safe and reliable, but plaintiffs do not identify a statement made by GM indicating that the Class Vehicles were safe and reliable. Neither the words "safe," "safest," nor "safety" appear in plaintiffs' Exhibit B, which contains selected statements that GM made about the second-generation Volt. (ECF No. 24-2.) The word "reliable" also does not appear in Exhibit B. "Reliability" appears once in Exhibit B in the context of describing the "liquid-cooled battery," which a GM executive said was "key to the first-gen Volt's battery pack reliability and performance." (*Id.* at PageID.1007.) Because plaintiffs fail to specify fraudulent statements that GM made about the safety and reliability of the Class Vehicles, plaintiffs' unsupported references to GM's marketing cannot support an affirmative fraud claim.

Plaintiffs further argue that GM falsely stated that it had a sufficient network of adequately trained dealers to service BECM-

related repairs. (ECF No. 27, PageID.1192.) Plaintiffs identify a statement that GM made in 2023 about its technicians and nationwide dealer network: "Thanks to our expert technicians and our nationwide dealership network, finding the best service for your EV is both easy and convenient." (ECF No. 24-2, PageID.1014.) Besides the fact that this statement postdates every plaintiffs' Volt purchase, plaintiffs do not allege that GM does not have expert technicians or a nationwide dealership network. Plaintiffs also identify a statement that GM made in the context of the Class Vehicles' warranty: "Chevrolet has a network of certified dealers who are trained to perform repairs on Volt, Bolt EV, and Malibu Hybrid, if your vehicle needs battery service." (*Id.* at PageID.1009.) However, that statement does not indicate that GM has a **sufficient** network of certified dealers nor that the dealers are **adequately** trained. Further, plaintiffs have not alleged that GM does not have a network of certified dealers trained to perform repairs on Volt batteries. Thus, these statements cannot support an affirmative misrepresentation claim.

Next, plaintiffs argue that GM made false representations about how the second-generation Volt would perform relative to the first-

generation Volt or competitor hybrid vehicles. (ECF No. 27, PageID.1192.) The Court summarizes the representations as follows: the second-generation Volt would (1) have greater electric vehicle range, fuel economy, and battery technology compared to the first-generation Volt; (2) include improvements in efficiency and performance; and (3) feature increased acceleration and a new propulsion system. (ECF No. 24-2, PageID.1004–1005.) First, these representations compare the second-generation Volt to the first-generation Volt, not the second-generation Volt to competitor vehicles. Second, plaintiffs fail to explain the fraudulent nature of the comparisons between the first- and second-generation Volts. The complaint does not allege that the second-generation Volt has the same or worse electric vehicle range, fuel economy, battery technology, efficiency, performance, or acceleration as the first-generation. Third, GM's statements about battery technology, efficiency, performance, and acceleration did not provide any metric for consumers to compare the two generations of the Volt. No reasonable buyer would be justified in relying on these sorts of exaggerated, boasting statements, so they are non-actionable puffery. *Johnson*, 555. F. Supp. 3d at 506. *See also Raymo v. FCA US LLC*, 475 F. Supp. 3d

680, 706 (E.D. Mich. 2020) ("Statements such as 'leading fuel economy,' 'unprecedented performance and fuel economy,' 'environmentally clean,' 'low-cost of ownership' and 'built to last for years' are general and nonquantifiable. The Court therefore considers them nonactionable puffery."). Thus, GM's comparisons between the two generations of Volts cannot form the basis of an affirmative fraud claim.

Finally, plaintiffs argue that GM falsely told plaintiffs that it repaired their Volts or that their Volts were safe to drive. (ECF No. 27, PageID.1192.) First, while Miller plausibly alleges that GM told him that his car was safe to drive even though it had an unrepaired defective BECM, Miller does not describe the injury resulting from the statement. Therefore, the statement cannot support an affirmative misrepresentation claim. *New London*, 44 F.4th at 411. More generally, plaintiffs allege that different dealerships and/or repair shops told them that their Volts were fixed and safe to drive. However, plaintiffs do not allege that the dealerships and/or repair shops knew that (1) the cars were unsafe to drive, (2) the cars were not repaired, or (3) the applied fix was ineffective. Plaintiffs do not explain the fraudulent nature of the statements even though they allege that the statements later turned

out to be untrue. Therefore, these statements cannot support an affirmative misrepresentation claim.

Because plaintiffs have not pleaded the "how" of alleged fraudulent misrepresentations, plaintiffs have not met their burden under Rule 9(b). Accordingly, the Court **DISMISSES** Counts III and V. Additionally, the following state statutory claims may not proceed on a misrepresentation theory: California Consumer Legal Remedies Act ("CCLRA"), Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), Kansas Consumer Protection Act ("KCPA"), Maryland Consumer Protection Act ("MCPA"), Pennsylvania Unfair Trade Practices & Consumer Protection Act ("PUTPA"), South Carolina Unfair Trade Practices Act ("SCUTPA"), Tennessee Consumer Protection Act ("TCPA"), Utah Consumer Sales Practices Act ("UCSPA"). *See Squeo v. Campbell Soup Co.*, No. 24-cv-02235, 2024 WL 4557680, at *3 (N.D. Cal. Oct. 22, 2024) (finding that Rule 9(b) applies to CCLRA claims that sound in fraud); *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 718 (N.D. Ill. 2020) ("Where an ICFA claim rests on allegations of deceptive conduct, Rule 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud."); *Thompson v. Jiffy*

*Lube Int'l, Inc.*, 505 F. Supp. 2d 907, 932 (D. Kan. 2007) (applying Rule 9(b) to plaintiff's KCPA claims that sound in fraud); *Wash. Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 710 (D. Md. 2020) (stating that fraud-based claims under the MCPA are subject to the Rule 9(b) heightened pleading standard); *Dolan v. PHL Variable Ins. Co.*, No. 15-cv-01987, 2016 WL 6879622, at *5 (M.D. Pa. Nov. 22, 2016) (concluding that plaintiffs' PUTPA claims that sound in fraud are subject to Rule 9(b)); *Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 538 (D.S.C. 2021) (finding that Rule 9(b) applies to plaintiff's SCUTPA fraud claim); *McKee Foods Corp. v. Pitney Bowes, Inc.*, No. 06-CV-80, 2007 WL 896153, at *5 (E.D. Tenn. Mar. 22, 2007) (citations omitted) ("Plaintiff's claims under the TCPA are subject to Rule 9(b)'s specific pleading requirements."); *Callegari v. Blendtec, Inc.*, No. 18-cv-308, 2018 WL 5808805, at *4 (D. Utah Nov 6, 2018) (applying Rule 9(b) to plaintiff's UCSPA claims that sound in fraud).

### b.   Fraudulent Concealment

For fraudulent concealment/omission claims, Rule 9(b) requires plaintiffs to plead "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the

manner in which the omission was misleading; and (4) what [General Motors] obtained as a consequence of the alleged fraud." *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012) (citation omitted). Like fraudulent misrepresentation claims, plaintiffs "must specify the 'who, what, when, where, and how' of the alleged omission." *Id.* (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006). A complaint for fraudulent omission may satisfy Rule 9(b) if it "alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Wozniak v. Ford Motor Co.*, No. 17-cv-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) (citation omitted).

Here, plaintiffs plead precisely what was omitted (information that the Class Vehicles contained a BECM-related defect which could cause the Class Vehicles to lose power and not start), who should have made the representation (GM), the content of the alleged omission and the manner in which the omission was misleading (GM knew but did not disclose that the vehicles contained a defective BECM and that the

41

defect could cause the Class Vehicles to lose power), and what GM obtained as a consequence of the alleged fraud (the ability to sell more Class Vehicles, sell them at a higher price than consumers might otherwise pay, and avoid negative publicity). (ECF No. 38, PageID.1828–1831, ¶¶ 520–525, 530, 533.) That covers the "who," "what," and "how" of the alleged omission. Plaintiffs further allege the "when" (GM omitted the information before plaintiffs purchased their vehicles). (*See id.* at PageID.1829 ¶ 524.) Plaintiffs do not exactly plead the "where" of the alleged omission, but it is reasonable to infer that GM failed to disclose the defect in-person when plaintiffs went to purchase their vehicles or virtually when GM marketed and highlighted aspects of the Class Vehicles. (*See id.* at PageID.1829 ¶ 524; *id.* at PageID.1777 ¶ 379.)

On similar facts, courts in this district have held that plaintiffs satisfied Rule 9(b). In *Beck v. FCA US LLC*, Beck alleged that FCA knew about a defect in the class vehicles' rotary shifter system and failed to disclose that defect when it first placed the vehicles on the market. 273 F. Supp. 3d 735, 751–752 (E.D. Mich. 2017) (Goldsmith, J.). Beck also alleged that there were various channels through which FCA

42

sold the class vehicles, including the dealership where Beck purchased his vehicle. *Id.* Beck claimed that if he knew about the defect, he would not have purchased or leased the class vehicle or he would have paid less. *Id.* at 752. The court found that Beck adequately pleaded these allegations and thus satisfied Rule 9(b). *Id.* Similarly, in *Chapman v. Gen. Motors, LLC*, the court declined to dismiss fraudulent omission claims on Rule 9(b) grounds where plaintiffs alleged that (1) GM did not provide relevant and needed information about the class vehicles' compatibility with U.S. diesel or the issues with the vehicles' fuel injector pump, (2) GM should have done so as a manufacturer with superior knowledge, (3) the omission caused plaintiffs to buy vehicles they otherwise would not have, and (4) plaintiffs paid a premium that GM subsequently retained. 531 F. Supp. 3d 1257, 1287–1288 (E.D. Mich. 2021) (Berg, J.).

General Motors argues that plaintiffs do not explain what disclosure would have been sufficient, and it compares the allegations in the complaint to the allegations in *Sims v. Kia Motors Am., Inc.*, No. SACV 13-1791 AG (DFMx), 2014 WL 12558251, at *1 (C.D. Cal. Oct. 8, 2014). (ECF No. 26, PageID.1084.) The Court disagrees, as *Sims* is

43

distinguishable. In *Sims*, the court characterized plaintiffs' omission allegations as "bare." *Id.* at *4. The court noted that plaintiffs alleged that defendants "had a duty to disclose '[t]he gas tank defects described herein'" but found that plaintiffs did not describe what defendants should have disclosed. *Id.* Here, plaintiffs allege that GM failed to disclose that the Class Vehicles contained a BECM-related defect and that GM should have disclosed the possibility of the Volt losing power and stranding its driver and passengers. (ECF No. 38, PageID.1828, ¶¶ 520–521.) General Motors also seems to imply that its warranty language disclosed the defect. (ECF No. 29, PageID.1248.) However, providing a warranty that generally says parts can fail is not the same thing as disclosing that a vehicle has a defect which could cause the vehicle to lose power. Plaintiffs have satisfied Rule 9(b) with respect to their fraudulent concealment/omission claims.

## 2.    Pre-Sale Knowledge of the Alleged Defect

General Motors argues that plaintiffs' fraudulent concealment, fraudulent and negligent misrepresentation, and statutory fraud claims fail because plaintiffs do not plausibly allege that GM had pre-sale knowledge of the BECM defect. (ECF No. 26, PageID.1071–1072.) GM

44

contests each possible source of pre-sale knowledge and argues that none of them are sufficient. (*Id.* at PageID.1072–1079.) Plaintiffs argue that they have shown pre-sale knowledge by pointing to the following: GM's knowledge of a defect in a prior similar design of a particular part, a 2015 PISB, a 2018 TSB, online complaints, and GM's "attempts over at least the last 8 years to conceal the defect or minimize its significance." (ECF No. 27, PageID.1185–1190.) The Court finds that plaintiffs have adequately pleaded GM's knowledge of the alleged defect prior to the sale of a 2016–2018 Class Vehicle around and after June 24, 2018 and prior to the sale of a 2019 Class Vehicle around and after March 9, 2022.

Fraud claims are governed by Rule 9(b), which places a heightened pleading standard on the plaintiff. However, a plaintiff may plead knowledge "generally." *Bolt*, 633 F. Supp. 3d at 956 (quoting *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018)); Fed. R. Civ. P. 9(b).

The TSB establishes knowledge of the alleged defect prior to sales of 2016–2018 Class Vehicles around and after June 24, 2018 and prior to sales of 2019 Class Vehicles around and after March 9, 2022. "[W]hen

GM 'issues a service bulletin about the precise issue in the precise vehicle that a plaintiff complains of, it is common sense to infer that [GM] had knowledge of that issue at the time of, and prior to, the service bulletin.'" *Harrison v. Gen. Motors, LLC*, No. 21-12927, 2023 WL 348962, at *5 (E.D. Mich. Jan. 19, 2023) (alteration in original) (quoting *Gregorio v. Ford Motor Co.,* 522 F. Supp. 3d 264, 282 (E.D. Mich. 2021)). GM issued a TSB on June 24, 2018 (ECF No. 24-2, PageID.1011.) The TSB was intended for use by professional technicians, and GM wrote it to inform said technicians of conditions that may occur on some vehicles or to provide information that could assist in servicing a vehicle. (*See id.*) The TSB stated the precise issue—vehicle not starting, malfunction indicator lamp illuminating, or a diagnostic trouble code indicating that the BECM lost communication with the Hybrid/EV Battery Interface Control Module—in the precise vehicle—2016–2018 Chevy Volts. (*See id.*) The TSB indicates that the possible issues with the vehicle "may be caused by an internal issue within the Battery Engine Control Module." (*See id.*) To fix the issues, the TSB instructs technicians to replace and reprogram the BECM. (*See id.*) GM updated the TSB on March 9, 2022 to include the 2019 Chevy Volt. (*Id.* at PageID.1014.) The 2018 TSB

establishes that GM had pre-sale knowledge of the alleged defect in 2016–2018 Class Vehicles purchased around or after June 24, 2018 and 2019 Class Vehicles purchased around or after March 9, 2022.

GM argues that the TSB does not establish pre-sale knowledge of the alleged defect because (1) it postdates many of plaintiffs' purchases, and (2) it does not refer to the specific alleged safety risk. The Court agrees that plaintiffs who purchased their Chevy Volt well before the release of the TSB cannot rely on the TSB to support an inference of pre-sale knowledge. However, the Court disagrees that the TSB does not refer to the specific alleged safety risk. GM cites *Bolt*, 633 F. Supp. 3d at 957 and *Hall v. Gen. Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *6 (E.D. Mich. Mar. 18, 2020) to support their argument, but both cases are distinguishable.

In *Bolt*, plaintiffs sued GM, claiming that a battery defect in their all-electric vehicles caused the vehicles to spontaneously combust. 633 F. Supp. 3d at 937, 939–941. Plaintiffs pleaded fraud-based claims and pointed to multiple service bulletins about a possible low-voltage condition in the class vehicles to support an inference of pre-sale knowledge. *Id.* at 956–957. The court concluded that the service

bulletins did not establish pre-sale knowledge because (1) the bulletins did not mention the fire risk that plaintiffs complained of, and (2) the two allegations in the complaint connecting the low-voltage condition to the risk-of-fire defect were insufficient. *Id.* at 956–957. In *Hall*, plaintiffs alleged that a defect in a traction control system caused class vehicles to pull to one side, hesitate, jerk, brake/lock wheels, lose power, and/or stall. 2020 WL 1285636, at *1. Plaintiffs referenced technical service bulletins to establish pre-sale knowledge. *Id.* at *5. The court held that the bulletins did not support a plausible inference of pre-sale knowledge because they did not "identify or mention any of the core features" of the defect as defined by plaintiffs. *Id.* at *7. The bulletins did not mention any of the safety hazards—the vehicle pulling to one side, hesitating, losing power, etc.—that plaintiffs defined as part of the defect. *Id.* at *6.

Here, the TSB mentions a "core feature" of the BECM defect as defined by plaintiffs in their complaint. The "Conditions" section of the TSB indicates that customers may report that their cars do not start or that a malfunction indicator lamp is illuminated. (*See* ECF No. 24-2, PageID.1011.) The section also mentions that a technician may find

that one or more diagnostic trouble codes related to the BECM are set. (*See id.*) The TSB attributes these possible conditions to "an internal issue" with the BECM. (*See id.*) Likewise, plaintiffs allege that a BECM-related defect in the Class Vehicles caused the vehicles to lose propulsion and fail to start. (ECF No. 38, PageID.1681.) Plaintiffs' allegations are partially substantiated by GM's responses to an information request from NHTSA, which indicate the following: (1) the BECM in the Class Vehicles can malfunction due to a failure mechanism on the subcomponent and (2) if the BECM fails, the Volt may enter a reduced propulsion state, display a reduced propulsion message, illuminate a malfunction indicator lamp, not start, and not charge. (ECF No. 38-1, PageID.2036–2037, 2044.) Thus, unlike the service bulletins in *Bolt* and *Hall*, the TSB explicitly mentions a possible no start condition, a symptom of the alleged defect as identified by plaintiffs. Therefore, the TSB supports an inference of pre-sale knowledge for the following plaintiffs because they purchased a 2016–2018 Chevy Volt around or after June 24, 2018 or a 2019 Chevy Volt

around or after March 9, 2022: Miller, Willhite, Gustafson, Hogan, Ewer, Campanis, Barnes, Wood, and Blanke.[4]

The remaining plaintiffs—Varadarajan, Urs and Laurie Zuger, Mansell, Broennan, Colley, Graham, Amy and Halee Stewart, O'Neill, and Collins—have not adequately pleaded that GM had pre-sale knowledge of the alleged defect. Plaintiffs argue that the 2015 PISB, in combination with the 2018 TSB, supports a reasonable inference that GM knew of the alleged defect as early as 2015. (ECF No. 27, PageID.1188.) But for all the reasons that the TSB establishes pre-sale knowledge, the PISB does not. The PISB only covers the 2016 and 2017 Chevy Volts. (*See* ECF No. 24-2, PageID.1009.) Plaintiffs Graham, Amy Stewart, and Halee Stewart purchased 2018 Chevy Volts, so they cannot rely on the PISB. Additionally, the PISB does not cover the precise issue of which plaintiffs have complained. Unlike the TSB, the

---

[4] Plaintiff Graham, who purchased his Volt in 2018, cannot rely on the TSB to support an inference of pre-sale knowledge because he does not plead the month that he purchased his Volt. Plaintiffs Mansell, Amy Stewart, and Halee Stewart purchased their Volts six months before the publication of the TSB, but they too cannot rely on it to support an inference of pre-sale knowledge. While it is "common sense" to infer that GM had knowledge of the issue before it published the TSB, it is not reasonable to infer that GM had knowledge of the issue six months before. *See Fisher*, 712 F. Supp. 3d at 944 n.3 (concluding that a plaintiff who purchased a vehicle seven months before publication of a TSB could not rely on the TSB to support an inference of pre-sale knowledge because he purchased it too long before FCA published the TSB).

PISB does not enumerate conditions that customers or technicians may experience with the 2016 and 2017 Chevy Volts. The PISB does not mention the core features of the defect as identified by plaintiffs—loss of propulsion or failure to start—nor does it attribute a specific issue with the 2016 and 2017 Chevy Volt to an issue with the BECM. Granted, the PISB placed the BECM on a restricted parts list as part of an exchange program, but the purpose of the exchange program was to allow GM to collect information for engineering improvements and gain feedback on the drive motor battery assembly. (*See id.* at PageID.1008.) The PISB does not identify an issue with the BECM prompting its placement on the restricted parts list. Thus, the PISB cannot support a reasonable inference that GM had knowledge of the alleged defect.

Plaintiffs argue that issues with the 2013 Chevy Volt establish knowledge of the alleged defect in the Class Vehicles. (ECF No. 27, PageID.1187.) The Court disagrees. Plaintiffs rely on *Milisits v. FCA US LLC*, No. 20-cv-11578, 2021 WL 3145704, at *9 (E.D. Mich. July 26, 2021), but *Milisits* is distinguishable.

In *Milisits*, plaintiffs alleged that FCA designed a transmission for 2014 model year and later vehicles, publicly commented about ongoing

struggles with the transmission, shipped 2014 and 2015 model year vehicles with the same transmission despite ongoing problems, and subsequently shipped the class vehicles with the same struggling transmission. 2021 WL 3145704, at *8–9. The court held that plaintiffs plausibly alleged pre-sale knowledge of the defect. *Id.* at *9. The court stated, "where an automaker has knowledge of a defect in a 'prior similar design' of a particular part, that 'accretion of knowledge' can be used to show that the automaker had pre-sale knowledge of the same defect in the at-issue part." *Id.* (citing *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 685 (E.D. Mich. 2020)).

Here, plaintiffs allege that "GM issued a safety recall for the 2013 Chevy Volt due to a defect that caused the vehicle to enter low propulsion mode, which increased the risk of injury in a crash." (ECF No. 38, PageID.1764.) (citation and internal quotation marks omitted). While the 2013 Chevy Volt may have experienced similar issues as the Class Vehicles, plaintiffs do not allege that the issues are attributable to the same cause. According to the NHTSA Safety Recall Report, an error in a software update may have prevented the 2013 Volts from balancing the voltage among individual battery cells. (*See id.* n.16.)

However, for the Class Vehicles, plaintiffs allege that a defective BECM reduces propulsion. Unlike *Milisits*, plaintiffs fail to allege that GM installed the same loss-of-propulsion-causing component in both the 2013 Chevy Volt and the 2016–2019 Chevy Volt. Similarly, plaintiffs' allegations that one company supplied battery packs for both the 2013 Chevy Volt and the Class Vehicles are unavailing. (ECF No. 38, PageID.1764–1765.) Plaintiffs fail to allege that (1) the battery packs were similar and (2) the 2013 Chevy Volt battery pack was defective. Thus, GM's awareness of issues with the 2013 Chevy Volt are insufficient to support an inference of pre-sale knowledge of the alleged BECM defect.

Next, plaintiffs argue that GM monitors customer complaint forums and thus became aware of the alleged defect through these forums. (ECF No. 27, PageID.1189.) The Court finds that GM did not become aware of the defect through customer complaint forums. Customer complaints made before a plaintiff first purchased their vehicle and/or before a plaintiff's vehicle was first sold may establish pre-sale knowledge. *See Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 508–509 (E.D. Mich. 2021). The complaints must both inform the

manufacturer about the safety implications of the defect and be frequent enough that they are not "lost in a sea of complaints and repairs amassing by the dozens each day." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (citing *Roe v. Ford Motor Co.*, No. 18-cv-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019)).

Here, plaintiffs allege that NHTSA received over 500 complaints about the Class Vehicles and that most of the complaints were "relate[d] to vehicle functions affected by the BECM." (ECF No. 38, PageID.1785.) However, an NHTSA Office of Defects Investigation ("ODI") Resume, which plaintiffs cite to in the second supplement to the second amended complaint, indicates that ODI only received 61 complaints and multiple TREAD field reports alleging a loss of motive power, reduced power state, and/or a no-start condition due to the BECM in the Class Vehicles. (*See* ECF No. 38, PageID.2025 n.69.) The complaints and field reports that NHTSA mentioned in the Resume are the relevant pool of complaints because they inform GM about BECM defects and their safety implications.

Plaintiffs further allege that most complaints were filed shortly after the release of the 2016 Volt. (ECF No. 38, PageID.1785.) However,

plaintiffs do not allege that all of the complaints predated the purchase or first sale of the Class Vehicles for Varadarajan, Urs and Laurie Zugers, Mansell, Broennan, Colley, Graham, Amy and Halee Stewarts, O'Neill, and Collins. For example, plaintiffs include a sample of complaints that NHTSA received about the 2016 Chevy Volt. (ECF No. 24-1, PageID.1000–1001.) The earliest complaint in the sample is from June 11, 2019, which postdates the time that the aforementioned plaintiffs purchased Class Vehicles. But even if the complaints did predate the purchase of the plaintiffs' vehicles, plaintiffs have not shown that the complaints were sufficiently numerous. If NHTSA began receiving complaints about the Class Vehicles shortly after GM released the 2016 Chevy Volt, it is reasonable to infer that customers began filing complaints in mid to late 2015. Moreover, the most recent NHTSA complaint that plaintiffs cite is from September 2022. It is reasonable to infer that NHTSA received 61+ complaints and field reports about the BECM defect in the Class Vehicles in at least a 6-year period, or an average of more than 10 complaints and field reports a year. Taking as true plaintiffs' allegations that GM was aware of these complaints due to their duties under the TREAD Act (ECF No. 38, PageID.1784 n.47;

*Cunningham v. Ford Motor Co.*, 641 F. Supp. 3d 400, 407 (E.D. Mich. 2022)), nothing shows that these 10+ complaints and field reports per year were more than "'a blip on [GM's] complaints-and-repairs radar' considering the millions of [GM] cars in use." *Smith*, 988 F.3d at 885 (quoting *Roe*, 2019 WL 3564589, at *7). That is, plaintiffs do not give the Court a sense of the fraction of complaints GM received about the Class Vehicles relative to complaints GM received about other GM vehicles. *Roe*, 2019 WL 3564589, at *7.[5]

Next, plaintiffs argue that GM had pre-sale knowledge of the defect based on pre- and post-production testing, early consumer complaints made to GM and its network of dealers, repair orders and parts data, and aggregate warranty data. (ECF No. 27, PageID.1188 (citing ECF No. 38, PageID.1755).) This list of allegations is based on information and belief and plaintiffs do not set forth a factual basis for such belief. (ECF No. 38, PageID.1755.) "Evidence showing the requisite knowledge for fraud cannot escape a motion to dismiss by resting on

---

[5] Plaintiffs also reference complaints posted to Volt-specific message boards and other internet forums. (ECF No. 38, PageID.1787.) However, plaintiffs do not (1) allege that GM saw or had a duty to be aware of these complaints, (2) approximate the number of these complaints, or (3) identify when complainants made these complaints. Plaintiffs include screenshots of two Facebook posts related to the Class Vehicles (ECF No. 38, PageID.1788–1789), but the posts are from 2022, which post-dates when the plaintiffs in question purchased their vehicles.

information and belief without supporting facts." *Smith*, 988 F.3d at 885 (citation omitted). Thus, these allegations cannot support a reasonable inference that GM had pre-sale knowledge of the alleged defect.

Finally, plaintiffs also argue that a February 2021 customer satisfaction program by GM establishes pre-sale knowledge of the alleged defect. (ECF No. 27, PageID.1189–1190 (citing ECF No. 38, PageID.1780–1781).) However, the program postdates the purchase or first sale of the Class Vehicles for Varadarajan, Urs and Laurie Zuger, Mansell, Broennan, Colley, Graham, Amy and Halee Stewart, O'Neill, and Collins. Thus, the customer satisfaction program cannot support a reasonable inference of pre-sale knowledge of the alleged defect for those plaintiffs. Accordingly, Varadarajan, Urs and Laurie Zuger, Mansell, Broennan, Colley, Graham, Amy and Halee Stewart, O'Neill, and Collins have failed to plausibly allege that GM had pre-sale knowledge of the alleged defect.

### 3.    Pre-Sale Knowledge regarding Warranty Repairs, Roadside Assistance, and Courtesy Transportation

GM next argues that plaintiffs' fraud and misrepresentation claims based on GM's alleged inability to perform warranty repairs or provide roadside assistance and courtesy transportation fail because plaintiffs do not plausibly allege that GM had pre-sale knowledge of its alleged inability to provide those services. (ECF No. 26, PageID.1071–1072.) Plaintiffs acknowledge GM's argument, but they only argue that GM had pre-sale knowledge of the alleged defect. (ECF No. 27, PageID.1185.) Plaintiffs do not argue that GM had pre-sale knowledge of its alleged inability to perform warranty repairs or provide roadside assistance or courtesy transportation. Plaintiffs have conceded GM's arguments on this point. Therefore, plaintiffs' fraud-based claims cannot proceed based on GM's alleged inability to perform warranty repairs or provide roadside assistance or courtesy transportation.

Accordingly, the Court **DISMISSES** the common law fraudulent concealment claims under the laws of California, Colorado, Georgia, New Mexico, Illinois, New York, South Carolina, Alabama, Michigan (with respect to Amy and Halee Stewart), Maryland, and Connecticut.

The Court further **DISMISSES** the Alabama Deceptive Trade Practices Act, Colorado Consumer Protection Act, New Mexico Unfair Practices Act, and South Carolina Regulation of Manufacturers, Distributors, and Dealers Act claims. *See Sam v. Beaird*, 685 So. 2d 742, 744 (Ala. Civ. App. 1996) ("[T]he [Alabama Deceptive Trade Practices Act] is generally written to require some knowledge of false or deceptive conduct on the part of the wrongdoer."); Colo. Rev. Stat. Ann. § 6-1-105(1)(e), (g), and (i) (West 2024) (requiring actual knowledge or recklessness to show false representation or deceptive intent under the statute); *Diversey Corp v. Chem-Source Corp.*, 965 P.2d 332, 338 (N.M. Ct. App. 1998) ("The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services.").[6] *See also Brockman v. Am. Suzuki Motor Corp.*, No. 11-3381,

---

[6] Broennan also argues that she has a New Mexico Unfair Practices Act (NMUPA) claim based on insufficient warranty repairs and expenses that she incurred while her Volt was inoperable. (ECF No. 27, PageID.1206.) The Court disagrees. A "plaintiff sustains an actual injury under the NMUPA each time the plaintiff 'suffers any loss of money . . . as a result of [an unfair or deceptive trade practice].'" *Porcell v. Lincoln Wood Prods., Inc.*, No. CIV-08-0617 MCA/LFG, 2010 WL 1541264, at *5 (D.N.M. Mar. 31, 2010) (quoting N.M. Stat. Ann. § 57-12-10(B) (West)). Suffering a loss of money in relation to a post-sale warranty service is actionable under the statute so long as the loss is the result of reliance on alleged unfair or deceptive trade practices. *Id.* Here, General Motors did not have pre-sale knowledge of the defect, its ability to perform warranty repairs, or its ability to provide courtesy transportation and roadside assistance. So, GM did not knowingly misrepresent or omit material information. Therefore, GM's conduct before or

2012 WL 3264995, at *6 (D.S.C. 2012) (finding that defendant engaged in false or misleading advertising in violation of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act where plaintiffs alleged that defendant knew or should have known that its marketing campaign was deceptive, misleading, and/or fraudulent). Further, the CCLRA, MCPA, and SCUTPA claims may not proceed on an omission theory. *See Castillo v. Prime Hydration LLC*, No. 23-cv-03885, 2024 WL 4133815, at *7 (N.D. Cal. Sept. 9, 2024) (holding that plaintiff's California Consumer Legal Remedies Act claim could not proceed on an omission theory because plaintiff failed to show that defendant had knowledge of a defect in the product); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 548 (D. Md. 2011) (finding that under Maryland law, a manufacturer must merely know or have reason to know of the defect to be held liable for failure to disclose the defect); *Harrell*, 517 F. Supp. 3d at 539 (declining to dismiss plaintiff's South Carolina Unfair Trade Practices Act claims under Rule 9(b) where plaintiff alleged that BMW knew of and concealed a vehicle defect).

during the sale does not constitute an unfair or deceptive trade practice under the NMUPA. Accordingly, the monetary losses that Broennan sustained when the GM dealership serviced her vehicle are not losses sustained "as the result" of an unfair or deceptive trade practice.

### 4.    Duty to Disclose

General Motors argues that the Court should dismiss some of plaintiffs' fraudulent concealment claims for failing to plausibly allege that GM had a duty to disclose the BECM-related defect. (ECF No. 26, PageID.1085.) Plaintiffs generally argue that GM had a duty to disclose the defect because it had superior knowledge of the defect. (ECF No. 27, PageID.1193–1194.) With respect to the Michigan plaintiffs, plaintiffs argue that the duty to disclose arose after (1) plaintiffs made specific inquiries about the allegedly defective component and (2) GM provided a misleading or incomplete response. (*Id.* at PageID.1194.) The Court finds that only Miller has plausibly alleged a duty to disclose; Willhite, Barnes, Gustafson, Blanke, Ewer, Campanis, Hogan, and Wood have not. The Court addresses each plaintiff in turn.

Miller asserts claims under both Pennsylvania and Kansas law. (ECF No. 27-2, PageID.1219–1220.) Miller purchased his Volt in Pennsylvania and arranged delivery to his home in Kansas. (ECF No. 38, PageID.1696.) Theoretically, the alleged concealment could have happened both while Miller was shopping around for a new vehicle from his home in Kansas and when Miller went to purchase his Volt in

Pennsylvania. Moreover, the parties do not adequately brief the choice of law issue. The Court will analyze whether Miller has plausibly alleged a duty to disclose under both Kansas and Pennsylvania law.[7]

### a. Kansas

Under Kansas law, a duty to disclose may arise where one party has superior knowledge and where the parties are in a relationship where "there is . . . a disparity in bargaining power or expertise" between the two contracting parties. *Great Plains Christian Radio, Inc. v. Cent. Tower, Inc.*, 399 F. Supp. 2d 1185, 1195 (D. Kan. 2005). The duty arises at the time of contracting. *Kestrel Holdings I, L.L.C. v. Learjet, Inc.*, 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004). Here, Miller plausibly alleges that GM had superior knowledge of the defect; GM had pre-sale knowledge of the defect, and Miller claims that GM never disclosed, and he could not have learned about, the existence of the defect, the prevalence of BECM failures, or the risks associated with BECM failures. (ECF No. 38, PageID.1700, ¶ 61; PageID.1828, ¶¶ 520–521.) Miller also plausibly alleges that he was in a relationship with GM; he alleges that he purchased his vehicle from a GM dealership. (*Id.*

---

[7] This discussion is equally relevant to Barnes, who asserts a fraudulent concealment claim under both Arkansas and Oklahoma law.

at PageID.1696 ¶ 44.) It is reasonable to assume that the dealership knew more about the Volt than Miller did. Therefore, Miller has plausibly alleged a duty to disclose under Kansas law. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160, at \*19 (D.N.J. May 8, 2017) (finding that a Kansas plaintiff, who bought an allegedly defective Volkswagen from an authorized Volkswagen dealer, alleged a duty to disclose where plaintiff pleaded that Volkswagen had superior knowledge of the defect). General Motors' cites *Bolt* to support its argument that it did not have a duty to disclose relative to Miller. (ECF No. 26, PageID.1085–1086 n.11.) But *Bolt* does not change the outcome because there, unlike here, there was no direct transaction between any plaintiff and any defendant. *Bolt*, 633 F. Supp. 3d at 964.

### b.   Pennsylvania

Under Pennsylvania law, in the context of a business transaction between a seller and an ordinary non-business consumer, a duty to disclose exists "when the seller has superior knowledge of a material fact that is unavailable to the consumer." *Zwiercan v. Gen. Motors Corp.*, No. 3235 JUNETERM 1999, 2002 WL 31053838, at \*4 (Pa. Ct.

63

Com. Pl. Sept. 11, 2002). The duty as articulated in *Zwiercan* applies only to known serious and life-threatening defects. *Zwiercan v. Gen. Motors Corp.*, No. 3235 JUNE.TERM 1999, CONTROL 112612, 2003 WL 1848571, at *2 (Pa. Ct. Com. Pl. Mar. 18, 2003). Here, Miller alleges that he purchased a Chevy Volt from a GM dealer, that the Volt had a defect which could cause the vehicle to lose propulsion, that the dealership did not disclose the defect despite having knowledge of it, and that Miller could not have discovered the defect with reasonable diligence. (ECF No. 38, PageID.1696 ¶ 44; PageID.1700, ¶ 61; PageID.1828, ¶¶ 519–521.) Miller further alleges that the defect is serious because, as Hogan and Ewer allege, the Class Vehicle could suddenly lose power while traveling at speed on a busy road or interstate and cause an accident. (*Id.* at PageID.1681–1682, ¶ 8; PageID.1717, ¶ 143; PageID.1728, ¶ 197.) Further, an accident involving the BECM-related defect could be serious and life threatening if, for example, a Class Vehicle lost power while traveling in the middle lane on a high-speed interstate and the driver could not pull off to the emergency lane.

64

General Motors cites *Matanky v. GM LLC*, 370 F. Supp. 3d 772 (E.D. Mich. 2019) for the proposition that the BECM-related defect is not serious or life-threatening. (ECF No. 29, PageID.1248.) The powertrain defect in *Matanky* caused the class vehicles to substantially reduce speed and lose power, increasing the risk of a collision. *Matanky*, 370 F. Supp. 3d at 782. However, the *Matanky* court found that the Pennsylvania plaintiff did not allege a serious and life-threatening defect because he did not allege that the defect had caused or was likely to continue to cause serious bodily injury or death. *Id.* at 796. Here, even though the BECM-related defect has not caused accidents or injuries, Miller has alleged, and the Court finds, that the defect is serious and life-threatening because of the harm it could cause. Accordingly, Miller has plausibly alleged a duty to disclose under Pennsylvania law.

Willhite, Barnes, Gustafson, Blanke, Ewer, Campanis, Hogan, and Wood have not plausibly alleged a duty to disclose because they have not alleged that they were in a fiduciary relationship or parties to a transaction with GM. The Court starts with Willhite and Barnes, who both assert claims under Arkansas law.

### c.   Arkansas

In Arkansas, a duty to disclose may arise "where the parties have a relation of trust or confidence, where there is inequality of condition and knowledge, or where there are other attendant circumstances." *Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*, 382 S.W.3d 6, 12 (Ark. Ct. App. 2011). The duty is not limited to confidential or fiduciary relationships. *Id.* A special relationship between the parties or special circumstances may also give rise to a duty to disclose, and the Court can consider the events surrounding the parties' transaction in determining the existence of such relationship or circumstances. *Id.* In *Garrett v. Cassity*, the court interpreted *Holiday Inn* to stand for the proposition that a duty to disclose only exists in transactions where plaintiff and defendant are dealing directly with one another. No. 09CV01252, 2011 WL 3235633, at *7 (E.D. Mo. July 28, 2011). The Court agrees which means that Willhite and Barnes must show that they dealt directly with GM to establish a duty to disclose. They have not. Willhite purchased his Volt from Carvana and Barnes purchased his Volt from a Toyota dealership. (ECF No. 38, PageID.1701, ¶ 63; PageID.1737, ¶ 244.) Neither plaintiff alleges that GM controlled or otherwise had a

relationship with their respective vehicle sellers. Therefore, Willhite and Barnes have not plausibly alleged a duty to disclose under Arkansas law.

The authority that Willhite and Barnes cite, *Camp v. First Fed. Sav. And Loan*, 671 S.W.2d 213 (Ark. Ct. App. 1984), does not change the result. (ECF No. 27, PageID.1201 n.123.)[8] In *Camp*, First Federal loaned money to a builder who then constructed a house for Camp. 671 S.W.2d at 215. Camp's house flooded, and she claimed that First Federal had a duty to disclose information about the house's potential for flooding. *Id.* Even though First Federal did not sell the house to Camp, the court found that a jury should have the opportunity to consider whether it owed Camp a duty to disclose because (1) the bank made its offices available for closing the house's sale, (2) the bank had representatives present at closing to protects its own interests in the sale, and (3) Camp testified that she relied considerably on the integrity of the bank throughout negotiations. *Id.* at 216. Unlike *Camp*, Willhite and Barnes do not allege that they purchased their Volts at a GM

---

[8] Plaintiffs cite *Camp* when discussing the duty to disclose under the Arkansas Deceptive Trade Practices Act. The Court has no reason to think that the duty to disclose under Arkansas common law is different than the duty to disclose under the Arkansas statute. Thus, it is appropriate to address the case here.

location or in the presence of GM representatives. Further, Willhite and Barnes do not allege that they had any direct contact with GM prior to purchasing their cars; they only allege that they were enticed by and relied upon the Class Vehicles' warranty and the Roadside Assistance and Courtesy Transportation programs. (ECF No. 38, PageID.1701, 1738, ¶¶ 66, 247.) Despite quoting a number of statements that GM made about the Class Vehicles in Exhibit B, Willhite and Barnes do not allege that they saw any of those statements. Therefore, *Camp* is not persuasive. Accordingly, the Court **DISMISSES** the Arkansas fraudulent concealment claim and the Arkansas Deceptive Trade Practices Act, which is based on an omission/concealment theory. *See Perez v. Volkswagen Grp. of Am., Inc.*, No. 12-CV-02289, 2013 WL 1661434, at *9–10 (W.D. Ark. Apr. 17, 2013) (dismissing plaintiff's Arkansas Deceptive Trade Practices Act claim for fraudulent omission and concealment because plaintiff failed to establish a duty to disclose).

### d.    Oklahoma

Barnes also asserts claims under Oklahoma law, but the result is the same. Absent a fiduciary relationship, a duty to disclose "may arise out of the situation of the parties, the nature of the subject matter of the

contract, or the particular circumstances surrounding the transaction." *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 854 (Okla. 2020). The Oklahoma Supreme Court has "consistently found the existence of the requisite circumstances . . . to create a duty to disclose" where the offending party creates a false impression concerning material facts and the other party relies on the false impression to their detriment and to the offending party's benefit. *Id.* In *Garrett*, the court interpreted *Barry v. Orahood*, 132 P.2d 645 (Okla. 1942)—a case cited in *Sutton*—to limit the duty to disclose to transactions where plaintiff and defendant are dealing directly with one another. 2011 WL 3235633, at *7. The Court reads *Sutton* in the same way, which means Barnes must allege that he dealt directly with GM to establish a duty to disclose. But Barnes alleges that he purchased his Volt from a Toyota dealer, and he does not allege any relationship between GM and the Toyota dealer. (ECF No. 38, PageID.1737, ¶ 244.) Thus, Barnes has not plausibly alleged a duty to disclose under Oklahoma law, and the Court **DISMISSES** the Oklahoma fraudulent concealment claim.

### e.   Florida

Turning to Gustafson, under Florida law, a duty to disclose arises "when one party has information that the other party has the right to know because of the fiduciary or other relationship of trust or confidence between them." *Temurian v. Piccolo*, No. 18-cv-62737-BLOOM/Valle, 2019 WL 1763022, at *6 (S.D. Fla. Apr. 22, 2019) (internal quotation marks and citations omitted). Absent a fiduciary relationship, a fraudulent omission in an arms-length transaction may be actionable where "some artifice or trick has been employed to prevent the representee from making further independent inquiry" or "where the other party does not have an equal opportunity to become appraised of the facts." *Taylor v. Am. Honda Motor Co., Inc.*, 555 F. Supp. 59, 64 (M.D. Fla. 1982) (citation omitted). Here, Gustafson does not allege that he was in a fiduciary or other relationship of trust or confidence with GM. Moreover, he does not allege that he was in an arms-length transaction with GM as he does not allege who sold him his Volt. There is not enough information in the complaint to reasonably infer that Gustafson purchased his Volt from a GM dealership, especially considering other plaintiffs purchases their Volts from non-

GM dealerships. Because Gustafson does not allege that he was a party to a transaction with or in an arms-length relationship with GM, he has not plausibly alleged a duty to disclose under Florida law. *See Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 233 (D.N.J. 2020) (dismissing two Florida fraudulent concealment claims because those plaintiffs neither alleged the existence of a fiduciary relationship with defendants nor showed that they were parties to a transaction with defendants). Accordingly, the Court **DISMISSES** the Florida fraudulent concealment claim. Additionally, the Florida Deceptive and Unfair Trade Practices Act claim cannot proceed on an omission theory. *See In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-00428 MMM(JEMx), 2015 WL 12732461, at *14 (C.D. Cal. May 27, 2015) (citing *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012) ("Where [a Florida Deceptive and Unfair Trade Practices Act] claim is based on an omission, and the defendant had no duty to disclose the purportedly withheld information, the claim fails as a matter of law.").

### f.   Missouri

For Blanke, a duty to disclose under Missouri law arises "where there is a relation of trust and confidence between the parties or where one party has superior knowledge or information not within the fair and reasonable reach of the other party." *Andes v. Albano*, 853 S.W.2d 936, 943 (Mo. 1993). *See also Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007). Here, Blanke does not allege that he was in a relation of trust and confidence with GM. Further, the Court agrees with *Garrett*'s interpretation of Missouri law that a duty to disclose only exists in the context of transactions in which plaintiff and defendant are dealing directly with each other. *Garrett*, 2011 WL 3235633, at *7 (citing *Hess*, 220 S.W.3d at 765–767). So while Blanke plausibly alleges that GM had superior knowledge of the BECM-related defect, he was not a party to a transaction with GM; Blanke does not allege who sold him his Volt. There is not enough information in the complaint to reasonably infer that Blanke purchased his Volt from a GM dealership. Therefore, Blanke has not plausibly alleged a duty to disclose under Missouri law, and the Court **DISMISSES** the Missouri fraudulent concealment claim.

72

### g.    North Carolina

Turning to Ewer, under North Carolina law, a duty to disclose may arise in one of three situations: (1) a fiduciary relationship exists between the parties to a transaction; or (2) the parties are negotiating at arm's length and either (a) one party has taken affirmative steps to conceal material facts from the other or (b) one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence. *Harton v. Harton*, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986). Here, Ewer does not allege that he transacted or negotiated with GM; he bought his Volt from a Mazda dealership. Because Ewer was neither a party to a transaction with GM nor does he allege he negotiated at arm's length with GM, GM did not have a duty to disclose. *See Ponzio*, 447 F. Supp. 3d at 232 (dismissing a North Carolina fraudulent concealment claim in part because plaintiff neither alleged that he negotiated at arm's length with defendants nor alleged that the company that sold him his vehicle was an agent of defendants). Accordingly, the Court **DISMISSES** the North Carolina fraudulent concealment claim.

### h.   Tennessee

Regarding Campanis, under Tennessee law, in the absence of a special relationship, a duty to disclose arises in the following circumstances:

> (1) A seller must disclose enough information to prevents its statements from being misleading
> (2) A seller must give accurate answers to a buyer's questions concerning a product's condition
> (3) A seller must disclose any condition or defect that it knows or should know about that renders the product defective or dangerous; and
> (4) A seller must disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.

*Brown v. Woodbury Auto Grp. LLC*, 591 F. Supp. 3d 282, 296 (M.D. Tenn. 2022) (quoting *Patton v. McHone*, 822 S.W.2d 608, 615–616 (Tenn. Ct. App. 1991)). Here, Campanis bought his Volt from Carmax. (ECF No. 38, PageID.1732, ¶ 217.) Because GM did not sell Campanis his Volt, it did not have a duty to disclose the BECM-related defect. Campanis does not plausibly allege a duty to disclose, which undermines the Tennessee fraudulent concealment claim and a TCPA claim based on an omission theory. *See Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874, 877, 881 (Tenn. Ct.

74

App. 2004) (concluding that plaintiff did not have a TCPA claim based on a defendant's failure to disclose the practice of dealer reserve in part because defendant did not have a duty to disclose the existence an agreement between itself and a third-party financer). Even though Campanis could possibly sustain his fraudulent concealment claims without a duty to disclose, that is not the case here.[9] The Court **DISMISSES** the Tennessee fraudulent concealment claim, and the TCPA claim may not proceed on an omissions theory.

---

[9]While Campanis does not present an alternative basis for his common law and statutory fraudulent concealment claims, the Court is aware that Tennessee courts recognize a type of fraudulent concealment independent of a duty to disclose. *Odom v. Oliver*, 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009) (citing *Cont'l Land Co. v. Inv. Props. Co.*, No. M1998-00431-COA-R3-CV, 1999 WL 1129025, at *5–6 (Tenn. Ct. App. Dec. 10, 1999)). The "trick or contrivance" theory of fraudulent concealment includes "withholding information asked for" and "making use of some device to mislead." *Cont'l Land Co.*, 1999 WL 1129025, at *5 (quoting *Hall v. DeSaussure*, 297 S.W.2d 81, 87 (Tenn. Ct. App. 1956)). In *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244, 2021 WL 2115400, at *8 (N.D. Cal. May 25, 2021), GM issued technical service bulletins that instructed dealers to tell customers that an engine cleaning would remedy an oil-consumption defect, even though GM knew the cleaning would not remedy the defect. The court found that the technical service bulletins were arguably a "trick or contrivance." *Id.* (internal quotation marks omitted). Here, Campanis does not allege that GM withheld information that he asked for, nor does he allege that GM used a device to mislead. For example, Campanis does not allege that GM knew the fix that it prescribed in the 2018 TSB was inadequate. Additionally, despite quoting a number of statements that GM made about the Class Vehicles in Exhibit B, Campanis does not allege that he saw any of those statements. Accordingly, Campanis cannot maintain a common law or statutory fraudulent concealment claim.

### i.    Michigan

Turning to Hogan, the parties agree that under Michigan law, a duty to disclose arises if a party makes a specific inquiry about the allegedly defective component. (ECF No. 26, PageID.1088; ECF No. 27, PageID.1194.) The duty most commonly arises "in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 666 (6th Cir. 2013) (internal quotation marks omitted) (quoting *Hord v. Env't Rsch. Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000)). Here, Hogan purchased his Volt from Carvana. (ECF No. 38, PageID.1716, ¶ 139.) Hogan does not allege that he made specific inquiries to GM before or during his purchase. Hogan instead grounds his fraudulent omission claim in a GM dealership telling him that it repaired his car even though the car later malfunctioned. (ECF No. 27, PageID.1194.) However, as discussed above, plaintiffs have only plausibly alleged that GM had pre-sale knowledge of the defect, not pre-sale knowledge of its alleged inability to service the Volt. Moreover, claims for silent fraud require proof of reliance on the inadequate or unforthcoming

76

representation. *Hamade v. Sunoco Inc. (R&M)*, 721 N.W.2d 233, 250 (Mich. Ct. App. 2006). Hogan alleges that but for the fraudulent omission, he would not have purchased his Volt or he would have purchased it for much less. (ECF No. 38, PageID.1829, ¶ 524.) Hogan does not allege that he would have taken some other action had GM informed him post-purchase that his car contained a defect. Thus, Hogan's post-purchase inquiries are insufficient to support a fraudulent concealment claim under Michigan law. Hogan does not plausibly allege a duty to disclose, so the Court **DISMISSES** the Michigan fraudulent concealment claim.

### j.    Utah

Finally, turning to Wood, a duty to disclose may arise under Utah law where "one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike." *Elder v. Clawson*, 384 P.2d 802, 805 (Utah 1963). Here, Wood purchased her Volt from Certified Auto in Utah, and she does not allege that Certified Auto is a GM dealership. (ECF No. 38,

PageID.1747, ¶ 291.) General Motors was not a party to the contract for the sale of Wood's Volt, so it did not have a duty to disclose under Utah law. Nevertheless, Wood paid a GM dealership to perform a 150-point inspection before she purchased her vehicle from Certified Auto, and the inspection found no problems with the vehicle. (*Id.*) Despite the inspection's results, the dealership diagnosed her Volt with a BECM failure two months later. (*Id.* at PageID.1748–1749 ¶¶ 296–301.) However, Wood does not argue that the inspection forms the basis of her fraudulent concealment claim, and the Court declines to make that argument for her. Because Wood does not allege that she purchased her car from GM, GM did not have a duty to disclose the BECM-related defect. Therefore, the Court **DISMISSES** the Utah fraudulent concealment claim.

### 5.   Economic Loss Doctrine

Finally, General Motors argues that some of plaintiffs' fraud claims are barred by the economic loss doctrine, which "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Team Biondi, LLC v. Navistar, Inc.*, 665 F. Supp. 3d 633, 645 (M.D. Pa. 2023) (internal quotation

marks omitted) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)); *see also* (ECF No. 26, PageID.1089–1090.) Plaintiffs contest the applicability of the economic loss doctrine and argue that exceptions to the doctrine apply. (ECF No. 27, PageID.1195–1196.) Of the remaining fraud claims, General Motors argues that the doctrine applies to Miller's Pennsylvania fraudulent omission claim; GM does not argue that the doctrine applies to Miller's Kansas claim. The Court disagrees that the economic loss doctrine bars Miller's Pennsylvania claim.

GM cites *Team Biondi* for the proposition that the economic loss doctrine applies to fraudulent concealment claims. (ECF No. 29, PageID.1251 n.6.) *Team Biondi* relies on *Werwinski v. Ford Motor Company*, 286 F.3d 661, 681 (3d Cir. 2002) to support its application of the economic loss doctrine to fraudulent concealment claims. *Team Biondi*, 665 F. Supp. 3d at 645. *Werwinski* acknowledged that Pennsylvania law regarding the applicability of the economic loss doctrine to common law fraudulent concealment claims was unsettled, and the court affirmed the district court's prediction that the Pennsylvania Supreme Court would apply the economic loss doctrine to

common law fraudulent concealment claims. *Werwinski*, 286 F.3d at 674–681. However, it is unclear whether *Werwinski* and the district court accurately predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine to intentional fraud claims.

In *O'Keefe v. Mercedes-Benz USA, LLC*, the court cited several cases from Pennsylvania Common Pleas courts in finding that, pre-*Werwinski*, the Pennsylvania lower courts "were apparently unanimous in refusing to apply the economic loss doctrine even in common law intentional fraud claims." 214 F.R.D. 266, 276 (E.D. Pa. 2003). Post-*Werwinski* decisions support *O'Keefe*'s reading of Pennsylvania law. *Price v. Freeze & Frizz Inc.*, 11 Pa. D. & C.5th 486, 502 (Pa. Ct. Com. Pl. 2009) (citing *Ellenbogen v. PNC Bank*, 731 A.2d 175, 188 n.26 (Pa. Super. Ct. 1999)) ("However, while the economic loss doctrine applies to claims based on a defendant's negligence, the courts of this Commonwealth have declined to broaden the doctrine's scope to include tortious claims other than negligence."); *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 (Pa. 2009) ("[T]he economic loss doctrine generally precludes recovery in negligence actions for injuries which are solely economic.").

Further, other district courts applying Pennyslvania law have declined to follow *Werwinski*'s application of the economic loss doctrine. *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 435 (S.D.N.Y. 2017) (citing *O'Keefe*, 214 F.R.D. at 276) ("[T]his Court is not bound by *Werwinski* . . . . And there are good reasons to predict that, if confronted with the question, the Pennsylvania Supreme Court would hold that the economic loss doctrine does not apply to intentional torts."). *See also Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1005 (citing *Excavation Techs.*, 985 A.2d at 841 and *Price*, 11 Pa. D. & C.5th at 502) ("Similarly, the controlling Pennsylvania decisions on point have not expanded the application of the economic loss doctrine to common-law tort claims beyond limiting the damages available in actions for negligence, and lower Pennsylvania courts have resisted the invitation to do so.").

While *Team Biondi* is an example of a recent application of *Werwinski*, the *Team Biondi* court was bound by *Werwinski*. This Court is not similarly bound, and the Court finds cases declining to follow *Werwinski* more persuasive than *Team Biondi*. Accordingly, the Court declines to dismiss the Pennsylvania fraudulent concealment claim.

81

## C.   Express Warranty Claims

### 1.   The Scope of the New Vehicle Limited Warranty

General Motors argues that plaintiffs cannot maintain express warranty claims based on the Roadside Assistance and Courtesy Transportation programs because those programs are not part of the New Vehicle Limited Warranty. (ECF No. 26, PageID.1094–1095.) The Court agrees. Chevrolet's New Vehicle Limited Warranty indicates that neither the Courtesy Transportation program nor the Roadside Assistance program are part of or included in the warranty. (ECF No. 13-2, pp. 38–39.) The documents that plaintiffs cite to the contrary are not persuasive. (ECF No. 27, PageID.1185 n.73.) First, the June 2021 warranty administration service bulletin states that "Courtesy Transportation and Roadside Assistance are not part of or included in the coverage provided by the New Vehicle Limited Warranty." (*See* ECF No. 24-2, PageID.1013.) Second, the February 2023 warranty administration service bulletin outlines the conditions under which Courtesy Transportation may be available depending on whether a vehicle is within or outside of warranty coverage. (*Id.* at PageID.1015.) The bulletin does not conflict with the clear statement in the New

Vehicle Limited Warranty. Accordingly, neither Courtesy Transportation nor Roadside Assistance are part of the warranty, and plaintiffs cannot maintain breach of express warranty claims based on the programs.

### 2. Plaintiffs that have not alleged post-repair issues

General Motors argues that Willhite, Gustafson, Mansell, Broennan, Ewer, Graham, Amy and Halee Stewart, Barnes, and O'Neill cannot maintain express warranty claims because GM repaired their vehicles for free, and they do not allege that their vehicles are still experiencing issues. (ECF No. 26, PageID.1092.) The Court largely agrees, and the same analysis also applies to Wood.[10]

Chevrolet's New Vehicle Limited Warranty indicates that, for vehicles sold in the United States, General Motors will warrant certain components for each Chevrolet Volt for 8 years or 100,000 miles, whichever comes first, from the original in-service date of the vehicle.

---

[10] The parties dispute whether Wood has a valid express warranty claim. (ECF No. 26, PageID.1091–1092; ECF No. 27, PageID.1175–1176.) She presented her 2017 Volt for repair when it had 100,787 miles on it which is outside of the 8-year / 100,000-mile warranty period. (ECF No. 38, PageID.1748, ¶ 296.) In March 2024, GM issued a special coverage bulletin which extended the coverage period for BECM malfunctions in 2016–2018 Chevy Volts to 15 years / 150,000 miles. (ECF No. 38-2, PageID.2055.) Despite two rounds of supplemental briefing, neither party discusses how this time extension implicates the validity of Woods' breach of warranty claim. Therefore, the Court assumes that Woods can assert a breach of express warranty claim.

(*See e.g.*, ECF No. 24-2, PageID.1009.) This "Hybrid Component Warranty" applies to repairs to the specific electric propulsion components of the vehicle. (*See id.*) The Hybrid Component Warranty covers towing, battery repair and replacement, repairs to other hybrid vehicle components, and the brake modulator assembly. (*See id.*)

Here, as GM concedes, Willhite, Gustafson, Mansell, Broennan, Ewer, Graham, Amy and Halee Stewart, Barnes, O'Neill, and Wood experienced issues with the specific electric propulsion components of their Volts. GM repaired those plaintiffs' vehicles under the New Vehicle Limited Warranty. Plaintiffs have not alleged that following repairs to their vehicles, they continued to experience the same or similar issues like failure to start and reduced propulsion. Plaintiffs have only alleged "a proper repair is impossible because GM has no non-defective method or part with which to repair the Class Vehicles." (*See e.g.*, ECF No. 38, PageID.1702.) That allegation alone is insufficient for the Court to reasonably infer that GM breached its obligations under the New Vehicle Limited Warranty.

The authority that plaintiffs cite does not change the outcome. First, plaintiffs cite *Reynolds*, 546 F. Supp. 3d at 648–649 for the

proposition that at the motion to dismiss stage, plaintiffs need not prove the ineffectiveness of GM's repair effort. (ECF No. 27, PageID.1174–1175.) But *Reynolds* supports the Court's holding. There, the court rejected defendant's procedural argument that because it agreed to repair the alleged defect and reimburse vehicle owners for costs associated with previous defect repairs, plaintiffs' claims were moot. *Reynolds*, 546 F. Supp. 3d at 648. The Court instead analyzed defendant's argument on the merits and found that all but one plaintiff could proceed on their express warranty claims because those plaintiffs had plausibly alleged that defendant's efforts did not repair the defect. *Id.* at 649. The *Reynolds* court outlined each plaintiff's experience with the class vehicle and indicated that all but one continued to experience the alleged defect despite receiving a repair. *Id.* at 643–645. Here, like the one plaintiff in *Reynolds* whose express warranty claim could not proceed, Willhite, Gustafson, Mansell, Broennan, Ewer, Graham, Amy and Halee Stewart, Barnes, O'Neill, and Wood have not plausibly alleged that their Volts still experience the alleged defect despite a repair from GM.

Second, plaintiffs cite *Sulligan v. Ford Motor Co.*, No. 22-11668, 2023 WL 5180330, at *6 (E.D. Mich. Aug. 11, 2023) for the proposition that a jury should determine whether GM's proposed remedy fixed the BECM-related defect. (ECF No. 27, PageID.1174 n.43.) However, *Sulligan* decided to leave the question of repair effectiveness to a jury in the context of rejecting Ford's argument that because it recalled the vehicles, plaintiffs' claims were prudentially moot. Here, GM argues that plaintiffs fail to state an express warranty claim, not that their claims are prudentially moot. At the 12(b)(6) stage, the Court tests the legal sufficiency of each claim. If the claim is not legally sufficient, the Court must dismiss it. Thus, *Sulligan* does not benefit Willhite, Gustafson, Mansell, Broennan, Ewer, Graham, Amy and Halee Stewart, Barnes, O'Neill, and Wood. Finally, plaintiffs cite *Jefferson v. Gen. Motors, LLC*, 344 F.R.D. 175, 194 (W.D. Tenn. 2023), but that case resolved a summary judgment motion and involved the court finding that plaintiffs could assert breach of express warranty claims because the requisite privity of contract existed.

Willhite, Gustafson, Mansell, Broennan, Ewer, Graham, Amy and Halee Stewart, Barnes, O'Neill, and Wood do not plausibly allege that

their cars have continued to experience issues following GM's repair efforts. Thus, their express warranty claims cannot continue under a theory that GM failed to repair their vehicles. Still, plaintiffs argue that they have viable express warranty claims because GM took months to repair their vehicles. (ECF No. 27, PageID.1175.) Plaintiffs root their argument in the Emission Control Systems Warranty ("ECSW") which is included in the same warranty booklet as the New Vehicle Limited Warranty. (*Id.* n.46 (citing ECF No. 13-2, Warranty at p. 29).) As plaintiffs identify, the ECSW covers the BECM and indicates that a customer would suffer a significant inconvenience if a part was not available within 10 days or a repair was not complete within 30 days. (ECF No. 13-2, Warranty at pp. 27, 29.) However, the ECSW is an umbrella warranty for multiple different federal and state emission warranties with varying eligibility requirements and coverage periods. (*Id.* at Warranty at pp. 21–24.) Plaintiffs do not identify which warranties apply. Moreover, as GM identifies, the ECSW provides a remedy. It states that where a vehicle owner is significantly inconvenienced and an authorized dealer is not reasonably available, either the vehicle owner or any available service establishment may

perform the repair using any replacement part. (*Id.* at Warranty at p. 29.) The ECSW also indicates that Chevrolet will consider reimbursement for the expense incurred. (*Id.*) Though plaintiffs were significantly inconvenienced, they fail to allege that GM breached its obligations under the ECSW by not considering reimbursement for expenses that plaintiffs incurred in obtaining repair from a non-authorized dealer. Because Willhite, Gustafson, Mansell, Ewer, Graham, Amy and Halee Stewart, Barnes, O'Neill, and Wood assert no other theory for GM's breach of express warranty, the Court **DISMISSES** their breach of express warranty claims.

However, Broennan also alleges that the GM dealership she took her vehicle to for repairs initially lacked the ability to identify a BECM failure and thus charged Broennan over $2,800 for a repair that (1) failed to fix the symptoms of the BECM-related defect and (2) should have been covered under warranty. (ECF No. 38, PageID.1723, ¶ 174; PageID.1919, ¶ 992.) General Motors does not contest these allegations nor establish that it has reimbursed Broennan for the ineffective repair. Accepting the factual allegations as true, Broennan can maintain a

breach of express warranty claim only for payments for repairs that GM should have covered under the New Vehicle Limited Warranty.

Finally, the Court agrees that GM did not breach an express warranty with respect to Campanis because GM did not have an opportunity to repair his BECM. While the GM dealership awaited the arrival of a necessary part to repair the BECM, a vehicle struck Campanis' Volt, totaling the Volt. (ECF No. 38, PageID.1733, ¶ 224.) Campanis does not plausibly allege that an attempted fix would not have worked or that GM charged him for a warranty repair, and the Court cannot reasonably infer those facts. Accordingly, the Court **DISMISSES** Campanis' express warranty claim.

### 3.  Plaintiffs that have alleged post-repair issues

General Motors argues that Miller, Varadarajan, Urs and Laurie Zuger, Hogan, Blanke, Colley, and Collins cannot maintain express warranty claims because, despite unsuccessful repair attempts, they do not allege that GM will not repair their vehicles free of charge in the future. (ECF No. 26, PageID.1093–1094.) The Court disagrees and declines to dismiss the express warranty claims of those plaintiffs.

"[W]here a plaintiff plausibly alleges that a defendant 'has not adequately repaired [their] vehicle,' the fact that the defendant has attempted repair does not absolve it from liability under its warranty." *Reynolds*, 546 F. Supp. 3d at 649 (citing *In re GM Air Conditioning Mktg. & Sales Pracs., Litig.*, 406 F. Supp. 3d 618, 631 (E.D. Mich. 2019)). Here, Miller, Varadarajan, Urs and Laurie Zuger, Hogan, Blanke, Colley, and Collins have alleged that they experienced the BECM-related defect, that they took their vehicles to GM dealerships for repair, and that the repairs did not work. Some plaintiffs took their cars in once (Miller, Urs and Laurie Zuger), some twice (Blanke, Collins), and some more than three times (Hogan—4 times, Varadarajan—6 times). Moreover, as of the date plaintiffs filed the second amended complaint, none of their Volts were fixed, and they were awaiting repairs. General Motors argues that plaintiffs generally claim that their repairs are taking too long, but plaintiffs are not alleging a breach of express warranty based on mere inconvenience. Plaintiffs claim that after one or multiple attempted repairs, the BECM-related defect continues to affect the operation of their vehicles. The Court declines to dismiss the express warranty claims of Miller,

Varadarajan, Urs and Laurie Zuger, Hogan, Blanke, Colley, and Collins. This decision is consistent with case law. *See Reynolds*, 546 F. Supp. 3d at 649–650 (declining to dismiss plaintiffs breach of express warranty claims where plaintiffs plausibly alleged that defendant's repair efforts did not cure the alleged defect); *Harrison*, 2023 WL 348962, at *11–12 (declining to dismiss express warranty claims of plaintiffs who pleaded that they presented their vehicles for repair during the warranty period, but that the repairs failed to fix the defect).[11]

### D.    Implied Warranty of Merchantability Claims

### 1.    Timeliness

General Motors argues that the statute of limitations bars the implied warranty claims of Miller, Willhite, Varadarajan, Urs and Laurie Zuger, Mansell, Hogan, Broennan, Colley, Ewer, Amy and Halee Stewart, Barnes, O'Neill, and Collins. (ECF No. 26, PageID.1096–1099.) Plaintiffs do not argue that their claims are timely. Instead, they argue

---

[11] GM argues that plaintiffs should only be able to raise warranty claims under the laws of the state where they purchased their vehicles. Given the lack of briefing and cited authority on this point, the plaintiffs may raise warranty claims under the laws of both the state where they purchased their vehicles and their state of residence. With respect to the express warranty claims, Miller can raise express warranty claims under Kansas and Pennsylvania law, and Broennan can raise express warranty claims under Illinois and New Mexico law.

that three doctrines equitably toll the statute of limitations for their claims: (1) fraudulent concealment, (2) the discovery rule, and (3) the repair doctrine. (ECF No. 27, PageID.1180–1182.) Equitable tolling only applies to the Stewarts' Alabama claim and Varadarajan. All other implied warranty claims, except for Graham's and Blanke's, are time-barred. The Court will address each plaintiff in turn.

Many plaintiffs purchased used Class Vehicles, and they do not plead when GM first tendered delivery of their vehicles (i.e., tendered delivery to the first or original purchaser). General Motors argues that the limitations period starts to run on vehicle delivery to the original purchaser, not subsequent purchasers. (ECF No. 26, PageID.1097.) General Motors also argues that where a plaintiff does not plead when their vehicle was first purchased, the court can use the alleged model year to reasonably infer when a plaintiff's vehicle was first purchased. (*Id.* at PageID.1096 n.23 (quoting *Roe*, 2019 WL 3564589, at *13).) Plaintiffs do not challenge GM's arguments on these points, and the Court agrees. *See Roe*, 2019 WL 3564589, at *13 (analyzing the statute of limitations for implied warranty claims based on when the class vehicles were first purchased and finding that tender of delivery "was

92

when [the vehicle manufacturer] sold Plaintiffs' vehicles to one of its dealers, or at latest, when Plaintiffs' vehicles were purchased from the dealer."). Therefore, the limitations period for plaintiffs' implied warranty claims began to run when their vehicles were first purchased and not necessarily when plaintiffs purchased them. Additionally, if a plaintiff does not allege when their vehicle was first purchased, the Court will make a reasonable inference of the date of first purchase based on the vehicle's model year.

### a.  Kansas

#### (i)  *Fraudulent Concealment*

Miller argues that fraudulent concealment tolls the statute of limitations for his Kansas implied warranty claim. (ECF No. 27, PageID.1181.) The Court disagrees. Under Kansas law, fraudulent concealment only tolls the statute of limitations for fraud claims. *Freebird, Inc. v. Merit Energy Co.*, 883 F. Supp. 2d 1026, 1036 (D. Kan. 2012) (citing *Bonin v. Vannaman*, 929 P.2d 754, 762 (Kan. 1996); *Atchison, Topeka & Santa Fe Ry. Co. v. Atchison Grain Co.*, 75 P. 1051, 1052–1053 (Kan. 1904)). Miller's implied warranty claim is not a fraud claim, so fraudulent concealment does not toll the statute of limitations.

### (ii)   *Repair Doctrine*

Miller also argues that GM lulled him into a false sense of security regarding his claim by promising or attempting to make repairs, which should toll the statute of limitations for his Kansas claim. (ECF No. 27, PageID.1181–1182.) The Court disagrees. "Under Kansas law, equitable estoppel only applies if an individual, by means of an affirmative representation or course of conduct, lulls the plaintiff into a false sense of security, thus inducing the plaintiff to delay in filing the action." *COF Training Servs., Inc. v. TACS, Inc.*, No. 06-4144, 2007 WL 2264456, at *4 (D. Kan. Aug. 3, 2007). To assert the doctrine of equitable estoppel, "the plaintiff must show some detrimental change in position in reliance on the defendant's affirmative misleading conduct." *Id.* A plaintiff must also show that they justifiably "acted upon [their] belief that certain facts existed, and that such belief was induced by the defendant's acts, representations, admissions, or silence." *Id.*

Here, Miller cannot show that GM induced him to delay filing this action because the limitations period expired before GM promised or attempted a repair. Miller bought a used 2017 Volt in 2021. (ECF No. 38, PageID.1696 ¶ 44.) Someone likely first purchased the Volt in 2016

or 2017. Even if the original purchase did not occur until the end of 2017, the four-year limitations period expired before Miller first took his car to GM in February 2022. Moreover, Miller does not show that GM made an affirmative misrepresentation or engaged in a course of conduct that lulled him into a false sense of security. Miller took his Volt to a GM dealership once it started experiencing issues, and the dealership told him that his Volt's BECM was defective. (*Id.* at PageID.1696 ¶¶ 45, 46.) The dealership also told him that it could not complete the necessary repair "because the part was on backorder with no timetable for availability." (*Id.* at PageID.1696 ¶ 46.) Miller returned to the dealership two months later for a repair, but the dealership informed him that it could not complete the repair because an additional part was necessary and on backorder. (*Id.* at PageID.1697–1698 ¶¶ 49–50.) The dealership again indicated that there was no timetable for part availability. (*Id.* at PageID.1697–1698, ¶ 50.) The dealership's course of conduct did not induce Miller to delay filing his complaint. Miller does not allege that GM made any other statements regarding its ability to repair his vehicle in an attempt to prevent him from filing suit. Therefore, GM is not equitably estopped from raising

95

the statute of limitations as a defense to Miller's Kansas implied warranty claim. Because Miller's Kansas implied warranty claim is time-barred and no exception applies, the Court **DISMISSES** the Kansas implied warranty claim.

### b.    Pennsylvania

#### (i)    *Fraudulent Concealment*

Miller similarly argues that fraudulent concealment tolls the statute of limitations for his Pennsylvania claim. (ECF No. 27, PageID.1181.) The Court disagrees. Pennsylvania courts use one standard for estoppel based on fraudulent concealment. *Hurley v. BMW of N. Am., LLC*, No. 18-5320, 2020 WL 1624861, at *8 (E.D. Pa. Apr. 2, 2020). Equitable estoppel based on fraudulent concealment applies where "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry." *Id.* at *9 (internal quotation marks omitted) (quoting *Meehan v. Archdiocese of Phila.*, 870 A.2d 912, 921 (Pa. Super. Ct. 2005)). The doctrine tolls the statute of limitations until plaintiff knew or, using reasonable diligence, should have known of their claim. *Id.* Plaintiff must plead a specific tolling date and the circumstances of discovering their claim. *Id.* Here,

as discussed above, Miller purchased a preowned 2017 Volt in November 2021. (ECF No. 38, PageID.1696, ¶ 44.) If someone first purchased the Volt at the end of 2017, arguendo December 31, 2017, then the limitations period would not have expired until December 31, 2021. When Miller purchased his Volt he had, at best, two full months, before the limitations period expired. Miller plausibly alleges that GM caused him to relax his vigilance by not disclosing the existence of the defect before, during, or after he purchased his Volt. Miller also alleges that he learned of the BECM defect in February 2022 when he took his Volt to a GM dealership for repair. (*Id.* at PageID.1696 ¶¶ 45–46.) He further alleges that he did not and could not have discovered the defect through the exercise of reasonable diligence. (*Id.* at PageID.1828 ¶ 519.) Thus, fraudulent concealment tolled the statute of limitations from November 2021 to February 2022. Once Miller learned of the BECM failure in February 2022, he had, at best, two months to bring an implied warranty claim. However, Miller did not bring this action until November 2022. (ECF No. 1.) Therefore, equitable estoppel based on fraudulent concealment does not make Miller's Pennsylvania claim timely.

97

### (ii)   *Discovery Rule*

Miller next argues that the discovery rule tolls the statute of limitations for his Pennsylvania claim. (ECF No. 27, PageID.1181.) The Court disagrees. Under Pennsylvania law, "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance," the cause of action accrues when the breach is or should have been discovered. 13 Pa. Stat. and Cons. Stat. § 2725(b) (West 2024). However, the implied warranty of merchantability does not expressly extend to future performance. *Vullings v. Bryant Heating and Cooling Sys.*, No. 18-3317, 2019 WL 687881, at *3 (E.D. Pa. Feb. 19, 2019) (citing *Antz v. GAF Materials Corp.*, 719 A.2d 758, 760 (Pa. Super. Ct. 1998)). As such, the discovery rule exception does not apply to implied warranty of merchantability claims. *Id.*; *Walton v. Grammer Indus. Inc.*, No. 20-CV-12298, 2021 WL 4458761, at *7 (E.D. Mich. Sept. 29, 2021). Miller cites *Chapman*, 531 F. Supp. 3d at 1283, which relies on *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996), for the proposition that the implied warranty of merchantability extends to future performance. (ECF No. 27, PageID.1181, n.67.) However, the *Hornberger* court

98

distinguished *Nationwide Ins. Co. v. Gen. Motors Corp./Chevrolet Motor Div.*, 625 A.2d 1172 (Pa. 1993)—a case cited in *Vullings* and *Antz*—on the basis that *Nationwide* involved the purchase of a vehicle whereas *Hornberger* involved the lease of a vehicle. *Hornberger*, 929 F. Supp. at 888. Here, Miller purchased his Volt, so *Nationwide*, as cited in *Vullings*, applies and *Hornberger*, as cited in *Chapman*, does not. Therefore, the discovery rule does not toll the statute of limitations for Miller's Pennsylvania implied warranty claim.

### (iii)  *Repair Doctrine*

Miller finally argues that the repair doctrine tolls the statute of limitations for his Pennsylvania claim. (ECF No. 27, PageID.1181–1182.) The Court disagrees. Under Pennsylvania law, the repair doctrine only applies where "evidence reveals that repairs were attempted; representations were made that the repairs would cure the defects; and the plaintiff relied upon such representations." *Hurley v. BMW of N.Am., LLC*, 574 F. Supp. 3d 266, 271 (E.D. Pa. 2021) (internal quotation marks omitted) (quoting *Keller v. Volkswagen of Am., Inc.*, 733 A.2d 642, 646 (Pa. Super. Ct. 1999)). Here, Miller alleges that GM attempted a repair, GM represented that it completed the BECM

99

repair, and Miller relied on GM's representations. But the limitations period expired before Miller first brought his car to GM. Miller does not cite any authority indicating that repairs that occur after the limitations period expires can make an implied warranty claim timely or estop a party from asserting the statute of limitations defense. Therefore, the repair doctrine does not save Miller's claim. Because Miller's Pennsylvania implied warranty claim is time-barred and no exception applies, the Court **DISMISSES** the Pennsylvania implied warranty claim.

### c.   Arkansas

#### (i)   *Fraudulent Concealment*

Turning to the Arkansas plaintiffs, Willhite and Barnes argue that GM's fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. In Arkansas, fraudulent concealment generally requires some positive act of fraud, but failure to speak can constitute fraudulent concealment where a party has a duty to speak. *Floyd v. Koenig*, 274 S.W.3d 339, 342 (Ark. Ct. App. 2008). As discussed above, GM did not have a duty to speak to Willhite and Barnes because they did not purchase their Volts from GM or a GM

dealership. Further, Willhite and Barnes do not identify a positive act of fraud by GM. Therefore, Willhite and Barnes cannot rely on fraudulent concealment to toll the statute of limitations.

### (ii)   *Repair Doctrine*

Similarly, Willhite and Barnes cannot rely on the repair doctrine to save their Arkansas implied warranty claims from the statute of limitations. (*Id.* at PageID.1181–1182.) Under the repair doctrine, the statute of limitations is tolled "so long as the vendor insists that the defect can be repaired and is attempting to do so." *J&B Tankers, Inc. v. Navistar Int'l Corp.*, 539 F. Supp. 3d 955, 962 (E.D. Ark. 2021). But the four-year limitations period had already expired by the time Willhite and Barnes took their vehicles to GM for repair. Willhite purchased a preowned 2018 Volt which was likely first purchased in 2017 or 2018. (ECF No. 38, PageID.1701, ¶ 63.) Similarly, Barnes purchased a preowned 2017 Volt which was likely first purchased in 2016 or 2017. (ECF No. 38, PageID.1737, ¶ 244.) However, both plaintiffs first took their Volts in for repair in 2023. (ECF No. 38, PageID.1701, ¶ 67; PageID.1738, ¶ 248.) Neither Willhite nor Barnes can "allege specific facts indicating that [GM] forestalled initiation of this lawsuit until

expiration of the limitation period by promising [p]laintiffs that repair was possible." *J&B Tankers*, 539 F. Supp. 3d at 962. Therefore, the repair doctrine does not toll the statute of limitations. Because Willhite and Barnes' Arkansas implied warranty claims are time-barred and no exception applies, the Court **DISMISSES** the Arkansas implied warranty claims.

### d.   Oklahoma

#### (i)   *Fraudulent Concealment*

Barnes also asserts an implied warranty claim under Oklahoma law, but the result is the same. Barnes only argues that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. Under Oklahoma law, "a party who wrongfully conceals material facts and thereby prevents a discovery of his wrong, or the fact that a cause of action has accrued against him, is not allowed to take advantage of his own wrong by pleading the statute [of limitations]." *Masquat v. DaimlerChrysler Corp.*, 195 P.3d 48, 54–55 (Okla. 2008) (quoting *Waugh v. Guthrie Gas, Light, Fuel & Improvement Co.*, 131 P. 174, 174 (Okla. 1913)). Failure to disclose is not sufficient to toll the limitations period; there must be some actual

artifice, affirmative act of concealment, or misrepresentation which induces the other party to inaction or to forgo inquiry. *Id.* at 55 (quoting *Loyal Protective Ins. Co. v. Shoemaker*, 63 P.2d 960, 961 (Okla. 1936)). In *Hampton v. Gen. Motors*, the court held that fraudulent concealment tolled the statute of limitations on plaintiff's implied warranty claim where plaintiff alleged that GM knew of a vehicle defect in 2008, spoke to plaintiff before he purchased the vehicle in 2013, and did not inform plaintiff of the defect before he purchased the vehicle. 631 F. Supp. 3d 1041, 1044–1045, 1047–1048 (E.D. Okla. 2022). Here, GM did nothing more than fail to disclose a material fact. While GM knew of the defect before Barnes purchased his vehicle, Barnes does not allege that there was some actual artifice, affirmative act of concealment, or misrepresentation which induced Barnes to inaction or to forego inquiry. Moreover, Barnes purchased his Volt from a Toyota dealer, and he does not allege that he spoke with GM before purchasing his Volt. Additionally, when Barnes first brought his car to a GM dealership for repair, they informed him that his BECM failed and that he would be unable to drive it while it awaited repair. (ECF No. 38, PageID.1738, ¶ 249.) That is the opposite of fraudulent concealment. Therefore, since

GM did nothing more than fail to disclose a material fact, Barnes cannot rely on fraudulent concealment to toll the statute of limitations. Accordingly, because Barnes' claim is time-barred, and he asserts no other exception, the Court **DISMISSES** the Oklahoma implied warranty claim.

### e.   California

#### (i)   *Repair Doctrine*

Turning to Varadarajan, the repair doctrine saves his implied warranty claim. "The statute of limitations is tolled where one who has breached a warranty claims that the defect can be repaired and attempts to make repairs." *Aced v. Hobbs-Sesack Plumbing Co.*, 360 P.2d 897, 904 (Cal. 1961) (citations omitted), *superseded by statute on other grounds by* Cal. Unif. Com. Codes §§ 1101–1310. "Tolling lasts only as long as the product is being repaired." *Coronel v. Ford Motor Co.*, No. CV 19-09841 DSF (JEM), 2020 WL 550690, at *5 (C.D. Cal. Feb. 4, 2020). Here, Varadarajan purchased a new 2017 Volt in August 2016. (ECF No. 38, PageID.1703, ¶ 75.) Therefore, the limitations period began in August 2016 and ended in August 2020. He took his Volt to a GM dealership for repair in March 2020, five months before

the limitations period ended. (*Id.* at PageID.1704 ¶ 81.) The dealership told Varadarajan that his BECM failed and needed replacing. (*Id.* at PageID.1704 ¶ 82.) Varadarajan alleges that over the next two years, he took his Volt in for BECM-related repairs at least six different times and that his vehicle has undergone five different BECM replacements, none of which have worked. (*Id.* at PageID.1704–1705 ¶ 83.) Varadarajan also alleges that the latest BECM replacement took place on January 5, 2023 and that the dealership retains his Volt while it awaits another repair. (*Id.*) Varadarajan has plausibly alleged that his Volt has been in and out of the repair shop since March 2020. GM likely continued to assure Varadarajan that it could repair his Volt with each repair attempt. It is also reasonable to infer that less than five months had collectively gone by in between repairs considering other plaintiffs have alleged that they had to wait months for the dealership to receive repair parts and complete repair service. (*See e.g., id.* at PageID.1723 ¶ 174; PageID.1699 ¶ 55.) Thus, the repair doctrine applies to Varadarajan's implied warranty claim.

The authority that GM cites, *Covarrubias v. Ford Motor Co.*, No. 19-CV-01832, 2019 WL 2866046, at *4 (N.D. Cal. July 3, 2019), does not

change the outcome. In *Covarrubias*, the court held that the repair doctrine codified at California Civil Code § 1795.6(b) does not toll the statute of limitations on an implied warranty claim. 2019 WL 2866046, at *4. Some California district courts have held similarly. *See e.g., Sarkesian v. Ford Motor Co.*, No. 22-cv-00966, 2022 WL 20033381, at *4 (S.D. Cal. Nov. 1, 2022). However, others have held that the repair doctrine can toll the statute of limitations on implied warranty claims. *See e.g., Coronel*, 2020 WL 550690, at *5; *Cardenas v. Ford Motor Co.*, No. CV 18-1090 DSF (PLAx), 2018 WL 2041616, at *1 (C.D. Cal. Apr. 23, 2018); *Sheibani v. Ford Motor Co.*, No. CV 19-4349-GW-JPRx, 2019 WL 3800268, at *3 (C.D. Cal. Aug. 12, 2019) (citing California Civil Code § 1795.6 for the proposition that the repair doctrine tolls the statute of limitations for breach of implied warranty claims). More importantly, the California Supreme Court has recognized that promises and attempts to make repairs toll the statute of limitations for implied warranty claims. *Aced*, 360 P.2d at 904. General Motors does not provide authority indicating that *Aced* or similar cases are not controlling. Accordingly, the repair doctrine continues to toll the statute

of limitations for Varadarajan's implied warranty claim, so the Court declines to dismiss it as untimely.

### f.   Colorado

#### (i)   *Fraudulent Concealment*

Turning to Urs and Laurie Zuger, they first argue that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. Under Colorado law, fraudulent concealment tolling requires a plaintiff to establish the following five elements:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*White v. Gen. Motors*, No. 21-cv-0410, 2022 WL 3597161, at *5 (D. Colo. July 7, 2022) (quoting *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011)). "To satisfy the first element, the 'plaintiff must show that the defendant had a duty to disclose material information.'" *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1272 (10th Cir. 2019) (quoting *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998)). "Colorado courts look to the Restatement (Second) of Torts

§ 551 to determine whether a party has a duty to disclose." *Id.* Section 551(2) describes five situations where "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose to the other *before* the transaction is consummated." Restatement (Second) of Torts § 551(2) (emphasis added). Here, the Zugers cannot satisfy the first or second elements of fraudulent concealment tolling because GM did not have knowledge of the defect until June 2018, almost two years after they purchased their Volt. (ECF No. 38, PageID.1706, ¶ 90.) Further, any argument that GM had a duty to disclose the defect after it acquired knowledge of the defect fails. The Restatement (Second) of Torts § 551(2) does not suggest that a duty to disclose exists after a transaction is consummated, and the Zugers cite no authority to support a post-transaction duty to disclose. Because the Zugers cannot establish all requisite elements, fraudulent concealment tolling does not apply to their implied warranty claim.[12]

---

[12] The Court acknowledges that Tenth Circuit courts are "reluctant to dismiss warranty claims that could be tolled based on fraudulent concealment, especially when further development of the factual record could support such a tolling theory." *O'Connor v. BMW of N. Am., LLC*, No. 18-cv-03190-CMA-STV, 2020 WL 2309617, at *6 (D. Colo. Jan. 7, 2020), *report and recommendation adopted*, 2020 WL 1303285 (D. Colo. Mar. 19, 2020). However, at this stage, the Court does not find that fraudulent concealment tolling could apply to the Zugers' claim because the Zugers fail to allege necessary elements of fraudulent concealment tolling.

### (ii)   *Repair Doctrine*

The Zugers next argue that the repair doctrine tolls the statute of limitations, but the result is the same. (ECF No. 27, PageID.1181–1182.) Under Colorado law, promises and efforts to repair defects toll the statute of limitations on implied warranty claims. *Colorado-Ute Elec. Ass'n, Inc. v. Envirotech Corp.*, 524 F. Supp. 1152, 1155–1156 (D. Colo. 1981). Additionally, a party may be equitably estopped from taking advantage of the statute of limitations where it repeatedly assures another that it intends to stand by its warranties and takes actions to reinforce those assurances. *Id.* at 1156. Here, the Zugers purchased a new 2016 Volt in September 2016. (ECF No. 38, PageID.1706, ¶ 90.) Therefore, the three-year limitations period began in September 2016 and ended in September 2019. Colo. Rev. Stat. Ann. §§ 4-2-725(1), 13-80-101(1)(a) (West 2024). Nevertheless, the Zugers did not seek any repairs until November 2022, over three years after the limitations period expired. Therefore, there are no promises to repair, repair efforts, or assurances from GM that the Zugers can rely on to toll the statute of limitations. Accordingly, because the Zugers' claim is

time-barred and they assert no other exception, the Court **DISMISSES**
the Colorado implied warranty claim.

### g.   Georgia

#### (i)   *Fraudulent Concealment*

Turning to Mansell, she only argues that fraudulent concealment
tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court
disagrees. Fraudulent concealment tolling under Georgia statute
O.C.G.A § 9-3-36 requires a plaintiff to show that "(1) the defendant
committed actual fraud involving moral turpitude; (2) the fraud
concealed the cause of action from the plaintiff; [and] (3) plaintiff
exercised reasonable diligence to discover the fraud." *Moore v. Meeks*,
483 S.E.2d 383, 384–385 (Ga. Ct. App. 1997) (citation omitted).
Moreover, concealment must be by a positive affirmative act, not mere
silence. *Id.* at 385. Here, Mansell has not shown that GM concealed the
implied warranty claim from her by a positive affirmative act. Mansell
has not shown that GM knew of and concealed the alleged defect before
or during her Volt purchase in December 2017. (*See* ECF No. 38,
PageID.1711, ¶ 115.) Mansell also has not shown that GM engaged in a
positive affirmative act of concealment once it learned of the defect in

June 2018; Mansell has only shown that GM was silent and did not disclose the defect. Further, when Mansell took her Volt in for repair in 2022, the GM dealership informed her that her BECM failed, rather than concealing the issue from her. (ECF No. 38, PageID.1712, ¶¶ 119–120.) Therefore, fraudulent concealment tolling does not apply to Mansell's implied warranty claim. Accordingly, because Mansell's claim is time-barred and she asserts no other exception, the Court **DISMISSES** the Georgia implied warranty claim.

### h.   Michigan

#### (i)   *Fraudulent Concealment*

Turning to the Michigan plaintiffs, Hogan, Amy Stewart, and Halee Stewart, they argue that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. Under Michigan law, for fraudulent concealment tolling to apply, "the plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment and must prove that the defendant committed affirmative acts of misrepresentation that were designed to prevent subsequent discovery." *Kiriacopoulos*, 2023 WL 2789622, at *11 (internal quotation marks omitted) (quoting *Hennigan*

111

*v. Gen. Elec. Co.*, No. 09-11912, 2010 WL 3905770, at *6 (E.D. Mich. Sept. 29, 2010)). Mere silence is not enough. *Id.* Here, neither Hogan nor the Stewarts show that GM committed an affirmative misrepresentation. As discussed above, plaintiffs reference many statements that GM made about the Class Vehicles before and after release, but plaintiffs do not explain the fraudulent nature of those statements. (*See* section entitled "Fraudulent and Negligent Misrepresentation.") Moreover, plaintiffs do not show that GM's statements were designed to prevent discovery of an implied warranty claim. To the contrary, the GM dealerships' statements that Hogan's and the Stewarts' BECMs had failed might have led to the discovery of the implied warranty claim. Finally, GM's failure to disclose the alleged defect is not enough to toll the limitations period. Therefore, fraudulent concealment tolling does not apply to Hogan's or the Stewarts' respective implied warranty claims. Accordingly, because their Michigan implied warranty claims are time-barred and the Michigan plaintiffs assert no other exception, the Court **DISMISSES** the Michigan implied warranty claims.

### i.   Alabama

#### (i)   *Fraudulent Concealment*

The Stewarts also argue that fraudulent concealment tolls the statute of limitations for their Alabama implied warranty claim. (ECF No. 27, PageID.1181.) The Court agrees. Under Alabama law, fraudulent concealment tolling requires a plaintiff to "allege (1) the 'time and circumstances of the discovery of the cause of action,' (2) the 'facts or circumstances by which the defendants concealed the cause of action or injury,' and (3) 'what prevented the plaintiff from discovering the facts surrounding the injury.'" *Hurry v. Gen. Motors LLC*, 622 F. Supp. 3d 1132, 1150 (M.D. Ala. 2022) (citation omitted). Here, the Stewarts allege that they did not discover an issue with their Volt until the BECM failed in July 2022. (ECF No. 38, PageID.1736, ¶¶ 235–236.) The Stewarts also allege that GM concealed the implied warranty claim by not disclosing the existence of the BECM defect despite acquiring knowledge of the defect six months after Amy Stewart purchased the Volt. (ECF No. 38, PageID.1815, ¶ 477; ECF No. 24-2, PageID.1011.) Finally, the Stewarts allege that they could not have discovered the defect through reasonable efforts as the defect was hidden. (ECF No. 38,

PageID.1815, ¶ 478.) It is reasonable to infer that the alleged hidden nature of the defect prevented the Stewarts from discovering the facts of their implied warranty claim. Therefore, fraudulent concealment tolling applies to the Stewarts' implied warranty claim.

General Motors argues that the Stewarts must show an affirmative act of concealment to establish fraudulent concealment tolling. (ECF No. 29, PageID.1254 n.11.) The Court disagrees. The Alabama Supreme Court has held that fraudulent concealment tolling could apply where plaintiffs alleged that defendants knew of, had a duty to disclose, and failed to disclose, information material to the cause of action. *DGB LLC v. Hinds*, 55 So.3d 218, 227–228 (Ala. 2010). Further, a duty to disclose "may be found to exist when one person has superior knowledge of a material fact and the failure to disclose that fact would induce another person to take an action he or she would not take if they knew that fact." *Hines v. Riverside Chevrolet-Olds, Inc.*, 655 So.2d 909, 921 (Ala. 1994), *overruled in part on other grounds by State Farm Fire and Cas. Co. v. Owen*, 729 So.2d 834, 839 (Ala. 1998). Here, the Stewarts allege that GM had superior knowledge of the defect. (ECF No. 38, PageID.1778, ¶ 381.) Moreover, the Stewarts allege that they

114

would not have driven the Volt if they knew about the defect because doing so led them to incur "unanticipated breakdowns, inconvenience, and expense." (*Id.* at PageID.1829 ¶ 526.) GM does not contend that under Alabama law, the duty to disclose exists only before the transaction is complete. Therefore, fraudulent concealment tolling applies to the Stewarts' implied warranty claim.

The Stewarts purchased a new 2018 Volt in December 2017. (ECF No. 38, PageID.1734, ¶ 229.) Therefore, the four-year limitations period would have expired in December 2021. Ala. Code § 7-2-725(1) (2024). However, GM learned of the defect in June 2018. GM's failure to disclose the defect tolled the limitations period from June 2018 to July 2022—the time when the Stewarts discovered an issue with the BECM. (*Id.* at PageID.1736 ¶¶ 235, 236.) Once the Stewarts learned of the BECM issue, they had almost three and a half years to bring their claim; they filed their claim less than a year after discovering the defect. Accordingly, the Alabama implied warranty claim is timely.

### j.    New Mexico

### (i)    *Fraudulent Concealment*

Turning to Broennan's implied warranty claim, she only argues that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) [13] The Court disagrees. Under New Mexico law, fraudulent concealment tolling requires a plaintiff to establish that a defendant had a duty to speak. *Kern ex rel. Kern v. St. Joseph Hosp., Inc.*, 697 P.2d 135, 143 (N.M. 1985). In *Krupiak v. Payton*, the New Mexico Supreme Court discussed the duty to disclose:

> Actionable fraud is found if a party to a transaction knows of material facts, has a duty to disclose, and remains silent. A duty to disclose may arise if there is knowledge that the other party to a contemplated transaction is acting under a mistaken belief. A duty to disclose may also arise if one has superior knowledge that is not within the reach of the other party or could not have been discovered by the exercise of reasonable diligence.

561 P.2d 1345, 1346 (N.M. 1977) (citations omitted). The Court reads *Krupiak* to limit the duty to disclose to that time before or during completion of a transaction but not extending past completion of a transaction. Here, Broennan does not show that GM had knowledge of

---

[13] The Court need not address the Illinois implied warranty claim because Broennan voluntarily dismissed it. (ECF No. 28, PageID.1231.)

the BECM defect before or during the time she purchased her Volt from a GM dealership. Thus, no duty to disclose the BECM defect arose prior to or during Broennan's purchase. Broennan cites no authority—and the Court is not aware of any—suggesting that GM had a duty to disclose knowledge of the defect once it became aware of it in June 2018, almost two years after Broennan's purchase. Because Broennan does not establish that GM had a duty to disclose, she has not satisfied the elements for fraudulent concealment tolling. Therefore, the doctrine does not toll Broennan's New Mexico implied warranty claim. Accordingly, because Broennan's implied warranty claim is time-barred and no exception applies, the Court **DISMISSES** the New Mexico implied warranty claim.

### k. New York

#### (i) *Fraudulent Concealment*

Turning to Colley, she only argues that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. "Under New York law, equitable tolling is only available if 'plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'" *Orange Transp. Servs., Inc. v. Volvo*

*Grp. N. Am., LLC*, 450 F. Supp. 3d 311, 321 (W.D.N.Y. 2020) (quoting *Woods v. Maytag Co.*, No. 10-CV-559, 2010 WL 4314313, at *4 (E.D.N.Y. Nov. 2, 2010)). Mere silence or failure to disclose is not enough. *Id.* (citation omitted). Here, despite quoting a number of GM's statements about the Class Vehicles, Colley has not shown that (1) these statements amount to fraud, misrepresentation, or deception and (2) that GM used these statements to induce Colley to refrain from filing an action. Further, GM's failure to disclose the defect after Colley purchased her Volt is not enough to support fraudulent concealment tolling. Therefore, fraudulent concealment does not toll the statute of limitations for Colley's implied warranty claim. Accordingly, because the claim is time-barred and no exception applies, the Court **DISMISSES** the New York implied warranty claim.

### l.    **North Carolina**

#### (i)   *Fraudulent Concealment*

Turning to Ewer, he argues that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. Under North Carolina law, a plaintiff must establish all the elements of a claim for fraudulent concealment for the doctrine to toll the statute of

limitations. *Friedland v. Gates*, 509 S.E.2d 793, 797 (N.C. Ct. App. 1998) (citations omitted). That includes establishing that defendant had a duty to disclose. *Id.* (citation omitted). As discussed above, Ewer has not established that GM had a duty to disclose the BECM defect before, during, or after his Volt purchase. Therefore, fraudulent concealment does not toll the statute of limitations for Ewer's implied warranty claim.

### (ii)   *Repair Doctrine*

Ewer next argues that the repair doctrine tolls the statute of limitations, but the result is the same. (ECF No. 27, PageID.1181–1182.) Under North Carolina law, "a statute of limitations is tolled during the time the seller endeavors to make repairs to enable the product to comply with a warranty." *Fairchild v. Kubota Tractor Corp.*, No. 18 CV 69, 2020 WL 739353, at *5 (W.D.N.C. Feb. 13, 2020) (internal quotation marks omitted) (quoting *Haywood St. Redevelopment Corp. v. Harry S. Peterson, Co.*, 463 S.E.2d 564, 567 (N.C. Ct. App. 1995)). A plaintiff must show that they reasonably relied upon representations made by the defendant. *Id.* (citation omitted). Here, Ewer purchased a used 2017 Volt in September 2021, and he does not allege when his Volt

119

was first purchased. (ECF No. 38, PageID.1727, ¶ 193.) Someone likely first purchased the Volt in 2016 or 2017. Assuming that someone first purchased Ewer's Volt in December 2017, the limitations period expired in December 2021. *See* N.C. Gen. Stat. Ann. § 25-2-725 (2024) (stating that breach of warranty claims have a four year statute of limitations). Ewer took his Volt in for repair in October 2021, two months before the limitations period expired. (*Id.* at PageID.1728 ¶ 197.) The dealership did not release the Volt back to Ewer until January 2022, so the repair tolled the limitations period from October 2021 to January 2022. (*Id.* at PageID.1729 ¶ 200.) Ewer had two months remaining to bring his implied warranty claim (i.e., until March 2022), but he did not file this action until February 2023. (ECF No. 15.) Therefore, the repair doctrine does not save Ewer's implied warranty claim. Accordingly, because Ewer's implied warranty claim is time-barred and no exception applies, the Court **DISMISSES** the North Carolina implied warranty claim.

### m.   Maryland

#### (i)   *Fraudulent Concealment*

Turning to O'Neill, she only argues that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court

disagrees. Under Maryland law, the statute of limitations is tolled if "knowledge of a cause of action is kept from a party by the fraud of an adverse party." Md. Code Ann., Cts. & Jud. Proc. § 5-203 (West 2024). A complaint relying on fraudulent concealment "must demonstrate specific facts that support a finding of fraud or concealment, and must go beyond mere conclusory statement." *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1107 (Md. 2004) (quoting *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 643 (Md. Ct. Spec. App. 1997)). Absent a duty to disclose, nondisclosure is insufficient to toll the statute of limitations. *Dual Inc.*, 857 A.2d at 1107 (citing *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 976 n.14 (Md. 2000)). A duty to disclose arises if there is a fiduciary or confidential relationship between the parties or if a party makes a "'partial and fragmentary' disclosure that misleads because of its incompleteness." *Lubore v. RPM Assocs., Inc.*, 674 A.2d 547, 555–556 (Md. Ct. Spec. App. 1996) (quoting *Brager v. Friedenwald*, 97 A. 515, 523 (Md. 1916)).

Here, O'Neill does not demonstrate the specific facts that support an affirmative act of fraud during the four-year limitations period (here, 2016–2020). *See* Md. Code Ann., Com. Law § 2-725(1) (stating that the

statute of limitations for a breach of warranty claim is four years). Despite quoting a number of GM's statements about the Class Vehicles, as discussed above, O'Neill has not shown how the statements are fraudulent. O'Neill also has not shown that GM had a duty to disclose the BECM defect to her. O'Neill does not allege that she was in a fiduciary or confidential relationship with GM, nor does she allege that GM made a partial and fragmentary disclosure about her vehicle that was misleading. O'Neill does not identify any statement (1) made by GM after it obtained knowledge of the defect, (2) made during the limitations period, and (3) made about the 2016 Chevy Volt—the vehicle O'Neill purchased—or second-generation Volts generally.

O'Neill relies on *Francis*, 504 F. Supp. 3d at 685–686 for the proposition that GM had a duty to disclose the defect because it had superior knowledge. (*See* ECF No. 27, PageID.1193 n.94.) However, *Francis*' holding does not ultimately apply to Maryland law. *Francis* cites *Volkswagen Timing Chain*, 2017 WL 1902160, at *19-20, which cites *Dean v. Beckley*, No. CCB-10-297, 2010 WL 3928650, at *5 (D. Md. Oct. 1, 2010). Subsequently, *Dean* relies on *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999) and *Remington Rand Corp. v.*

*Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995), neither of which apply Maryland law. *Bank of Montreal* discusses the duty to disclose in the context of Virginia law and *Remington Rand* discusses the duty in the context of New York and New Jersey law. Here, Maryland law governs whether GM had a duty to disclose material information to a Maryland plaintiff. Because GM did not have a duty to disclose and O'Neill does not demonstrate the specific facts that GM engaged in affirmative fraud, fraudulent concealment does not toll the statute of limitations for O'Neill's implied warranty claim. Accordingly, because O'Neill's implied warranty claim is time-barred and no exception applies, the Court **DISMISSES** the Maryland implied warranty claim.

### n. Connecticut

#### (i) *Fraudulent Concealment*

Turning finally to Collins, he argues that fraudulent concealment tolls the statute of limitations. (ECF No. 27, PageID.1181.) The Court disagrees. Under Connecticut law, fraudulent concealment of a cause of action, not a particular defect, may toll the statute of limitations. *Giannaccio v. Jansen & Rogan Consulting Eng'rs, PC*, No.

NNHCV126029493S, 2013 WL 6334934, at *6 (Conn. Super. Ct. Nov. 7, 2013); Conn. Gen. Stat. Ann. § 52-925. Fraudulent concealment tolling generally requires a showing of affirmative acts of concealment. *Med. Device Sols., LLC v. Aferzon*, 264 A.3d 130, 161 (Conn. App. Ct. 2021). Nondisclosure may be sufficient to establish fraudulent concealment tolling but only where defendant has a fiduciary duty to disclose. *Id.* Further, fraudulent concealment tolling requires a plaintiff to show that a defendant

> (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the [plaintiff's] cause of action; (2) intentionally concealed these facts from the [plaintiff]; and (3) concealed the facts for the purpose of obtaining delay on the [plaintiff's] part in filing a complaint on their cause of action.

*Normandy v. Am. Med. Sys., Inc.*, 262 A.3d 698, 711–712 (Conn. 2021) (citation omitted). One fact necessary to establish a claim for breach of the implied warranty of merchantability is that a good is not fit for the ordinary purpose for which such goods are used. *Criscuolo v. Mauro Motors, Inc.*, 754 A.2d 810, 816 (Conn. App. Ct. 2000). Moreover, breach of the implied warranty of merchantability occurs either at the time of sale or when the good leaves the manufacturer's control. *Id.* (citations omitted).

124

Here, Collins does not show that GM had actual awareness of the facts necessary to establish his implied warranty claim during or preceding his purchase of his Volt. Collins purchased his Volt in either late 2015 or early 2016, over two years before GM knew of the BECM defect and possible breach of the implied warranty of merchantability. (ECF No. 38, PageID.1744, ¶ 278.) Even though GM learned of the defect a few years into Collins' ownership of the Volt, Collins does not show that GM engaged in affirmative acts of concealment. Despite quoting a number of GM's statements about the Class Vehicles, as discussed above, Collins has not shown how the statements are fraudulent or concealed a cause of action from him. Further, Collins does not allege that GM had a fiduciary duty to disclose information to him, so GM's nondisclosure does not support fraudulent concealment tolling. Therefore, fraudulent concealment does not toll the statute of limitations for Collins' implied warranty claim.

### (ii)   *Repair Doctrine*

Collins next argues that the repair doctrine tolls the statute of limitations, but the authority he cites is insufficient. (ECF No. 27, PageID.1182.) In *Cocchiola Paving, Inc. v. Peterbilt of S. Conn.*, the

court held that the statute of limitations did not bar plaintiff's claims for breach of express warranty and warranty failing its essential purpose because defendant continued to violate the terms of the warranty. No. CV010168579S, 2003 WL 1227557, at *2 (Conn. Super. Ct. Mar. 3, 2003). There, the warranty provided that plaintiff's sole remedy was repair or replacement of defective materials or workmanship, but defendant allegedly failed and/or refused to fix the defective goods. *Id*. First, it is unclear whether the *Cocchiola* court's holding also applies to implied warranty claims. Second, it is not apparent that GM could continuously violate the implied warranty of merchantability as breach of the implied warranty occurs at the time of sale.

Even if the repair doctrine applied, the statute of limitations expired well before Collins brought this suit. Collins purchased his Volt in late 2015/early 2016, so the limitations period was set to expire in late 2019/early 2020. (*See* ECF No. 38, PageID.1744, ¶ 278); Conn. Gen. Stat. Ann. § 42a-2-725 (West 2024) (stating that the statute of limitations for a breach of warranty claim is four years). During that time, Collins brought his Volt to a GM dealership once in February

126

2016, but he received a repair. (*Id.* at PageID.1745 ¶ 282.) Collins does not allege that he brought his Volt back for repair before June 2023. (*See id.*) Even if the February 2016 repair took one year, the repair would only toll the statute of limitations for one year, giving Collins until late 2020/early 2021 to file his complaint. However, Collins did not file his complaint until June 2023. (ECF No. 24.) Collins does not allege that between late 2020 or early 2021 and June 2023, GM refused and/or failed to repair his Volt. Therefore, the repair doctrine does not toll Collins' implied warranty claim. Accordingly, because Collins' implied warranty claim is time-barred and no exception applies, the Court **DISMISSES** the Connecticut implied warranty claim.

### 2.    Privity

General Motors next argues that the Alabama, California, Connecticut, Georgia, Illinois, New Mexico, North Carolina, and New York implied warranty claims are barred due to a lack of privity. (ECF No. 26, PageID.1099.) Plaintiffs argue that they can pursue implied warranty claims against GM because they are third-party beneficiaries of GM's agreement with the respective dealers from which they obtained their Class Vehicles. (ECF No. 27, PageID.1179.) Because the

Court has already dismissed most of those implied warranty claims as untimely, the Court need only analyze this argument in relation to the Stewarts' and Varadarajan's respective implied warranty claims. The Court agrees with plaintiffs.

"Alabama appellate courts have held that privity of contract is required for implied warranty claims where the plaintiff seeks relief for only economic injuries." *Ballard v. Gen. Motors, LLC*, 572 F. Supp. 3d 1154, 1160 (M.D. Ala. 2021) (collecting cases). However, "a third-party beneficiary can maintain a breach of implied warranty claim against the manufacturer or upstream seller." *Hurry*, 622 F. Supp. 3d at 1146 (citing *Chandler v. Hunter*, 340 So. 2d 818, 822 (Ala. Civ. App. 1976) and *Morris Concrete, Inc v. Warrick*, 868 So. 2d 429, 435 (Ala. Civ. App. 2003)). A plaintiff must show three elements to recover under a third-party beneficiary theory: (1) "that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party," (2) "that the complainant was the intended beneficiary of the contract," and (3) "that the contract was breached." *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 848 (Ala. 1993) (quoting *Sheetz, Aiken &*

*Aiken, Inc. v. Spann, Hall, Ritchie, Inc.*, 512 So. 2d 99, 101–102 (Ala. 1987)).

Similarly, under California law, privity of contract is required for a breach of implied warranty claim, and there is generally no privity between the original seller and a subsequent purchaser who was not a party to the original sale. *All West Elecs., Inc. v. M-B-W, Inc.*, 75 Cal. Rptr. 2d 509, 514 (Cal. Ct. App. 1998). However, "a third party beneficiary can enforce a contract made expressly for his benefit." *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 882 (N.D. Cal. 2019) (quoting *Aberin v. Am. Honda Motor Co.*, No. 16-cv-04384, 2018 WL 1473085, at *7 (N.D. Cal. Mar. 26, 2018)). The contract need not name the third party as a beneficiary; "the only requirement is that the party is more than incidentally benefitted by the contract." *Id.* (quoting *Aberin*, 2018 WL 1473085, at *7). An individual who purchases a vehicle from an authorized dealership can maintain a breach of implied warranty claim against the manufacturer as a third-party beneficiary. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., and Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

Here, the Stewarts and Varadarajan allege that they were intended third-party beneficiaries of GM's warranties. (ECF No. 38, PageID.1754, ¶ 316.) They also allege that GM intended its warranty agreements to benefit the ultimate consumer, not the dealership. (*Id.*) Both the Stewarts and Varadarajan allege that they purchased their Volts from a GM dealership (*Id.* at PageID.1734 ¶ 229; PageID.1703 ¶ 75) and that GM breached the implied warranty of merchantability. (*Id.* at PageID.1850 ¶ 625; PageID.1869 ¶ 731.) As GM points out, plaintiffs' allegations that they were intended third-party beneficiaries of GM's warranties could be more robust. (ECF No. 29, PageID.1255–1256.) However, it is reasonable to infer that when GM sold one of the Class Vehicles to a dealership, it intended a consumer, not a dealership, to benefit from the implied warranty that the Volt was fit for its ordinary purpose. Therefore, the Stewarts and Varadarajan have shown that they are excepted from the privity requirement, and the Court declines to dismiss their implied warranty claims on privity grounds.

### 3.   Merchantability

Finally, General Motors argues that it did not breach the implied warranty of merchantability because plaintiffs' vehicles were

merchantable. (ECF No. 26, PageID.1099–1101.) The Court disagrees because plaintiffs have adequately alleged that their vehicles were not merchantable. The Court will analyze this argument with respect to the implied warranty claims of the Stewarts, Varadarajan, Graham, and Blanke.

Under Alabama, California, South Carolina, and Missouri law, to be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." Ala. Code § 7-2-314(2)(c) (2024); Cal. Com. Code § 2314(2)(c) (West 2024); Mo. Ann. Stat. § 400.2-314(2)(c) (West 2024); S.C. Code Ann. § 36-2-314(2)(c) (2024). "[C]ars are not merchantable merely because they are able to provide transportation." *Matanky*, 370 F. Supp. 3d at 785. "Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects." *Id.*

Here, the Stewarts, Varadarajan, Graham, and Blanke sufficiently allege that their Volts did not provide safe and reliable transportation and were not substantially free of defects. Collectively, plaintiffs allege that the BECM-related defect caused their cars to display a check engine light and reduced propulsion warnings, enter a

reduced propulsion state, and fail to start. Further, plaintiffs allege that the defect required them to surrender their cars to dealerships for one or multiple repairs that sometimes took months and were not always effective. Courts in this district have held that plaintiffs plausibly alleged that vehicles with similar issues were unmerchantable. *See Matanky*, 370 F. Supp. at 786 (finding that a powertrain defect seriously impaired the class vehicles' safety, reliability, and operability where plaintiffs alleged that the defect persistently caused their vehicles to overheat, enter a forced reduced speed mode, and lose engine power); *Chapman*, 531 F. Supp. 3d at 1276 (finding that plaintiffs sufficiently alleged that their trucks were not safe and reliable where plaintiffs alleged that a fuel pump defect could cause unexpected engine stalls and could result in expensive repair costs). Therefore, plaintiffs sufficiently allege that the Class Vehicles were not merchantable.

The cases that GM cites are distinguishable. GM cites *Suddreth v. Mercedes-Benz, LLC*, No. 10-CV-05130 (DMC-JAD), 2011 WL 5240965, at *5 (D.N.J. Oct. 31, 2011), which partially relies on *Sheris v. Nissan N. Am., Inc.*, No. 07-2516, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008), for the argument that the implied warranty claims should fail

because plaintiffs' vehicles accumulated many years and tens of thousands of miles before the BECM defect manifested. (ECF No. 26, PageID.1100–1101.) In *Suddreth*, the court found it implausible that the class vehicles were not merchantable. However, key to the court's holding was the fact that the class vehicles' limited warranties covered only 4 years or 50,000 miles, and the alleged defects arose outside of that warranty period. *Suddreth*, 2011 WL 5240965, at *1, 4–5. Here, issues with the class vehicles arose during the original warranty period of 8 years or 100,000 miles. The Stewarts experienced issues with their new Volt less than five years into ownership of the vehicle and with less than 30,000 miles on the vehicle. (ECF No. 38, PageID.1734–1736, ¶¶ 229, 235.) Varadarajan experienced issues with his new Volt less than four years into ownership of his vehicle. (*Id.* at PageID.1703–1704 ¶¶ 75, 81.) Graham began experiencing issues with his pre-owned 2018 Volt in August 2022. (*Id.* at PageID.1730–1731 ¶¶ 205, 209.) The BECM in Blanke's 2019 Volt failed in October 2022, and the vehicle only had 29,000 miles on it. (*Id.* at PageID.1719–1720 ¶¶ 153, 158.) Therefore, *Suddreth* is not persuasive.

133

GM next cites *Beck* for the proposition that failure to allege that someone has been injured as a result of the alleged defect or that someone stopped driving their vehicle for safety reasons dooms the implied warranty claims. (ECF No. 29, PageID.1258 n.18.) However, the *Beck* court applied California law when it dismissed plaintiff's implied warranty claim for failure to allege that he stopped driving his vehicle. *Beck*, 273 F. Supp. 3d at 762. That portion of *Beck* would only apply to Varadarajan, and he has alleged that his Volt is at the dealership awaiting repair, that he plans to dispose of it once he gets it back, and that he drives a different vehicle now. (ECF No. 38, PageID.1706 ¶ 87.) Therefore, *Beck* does not change the outcome with respect to Varadarajan, and the Court does not find *Beck*'s reasoning persuasive enough to apply to non-California plaintiffs. Accordingly, the Court declines to dismiss the Alabama, California, South Carolina, and Missouri implied warranty claims.[14]

---

[14] Because there are remaining express and implied warranty claims, the Court declines to dismiss the MMWA claim. *See Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 (6th Cir. 2013) (quoting *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005)) ("To state a claim under the MMWA, a plaintiff must present a 'sustainable claim for breach of warranty.'"). However, only those plaintiffs with state law warranty claims may maintain MMWA claims.

### E.    Breach of Contract

General Motors argues that the Court should dismiss plaintiffs' breach of contract count as duplicative with the breach of warranty counts. (ECF No. 26, PageID.1101–1102.) The Court disagrees. Courts may, but are not required to, dismiss duplicative claims in the same case. *Grundy v. FCA US LLC*, No. 20-cv-11231, 2020 WL 7353515, at *3 (E.D. Mich. Dec. 15, 2020). Here, plaintiffs allege that GM breached its contractual obligations, including the implied covenant of good faith and fair dealing, by failing to (1) provide notice that the Class Vehicles had a BECM-related defect, (2) perform warranty work and/or provide notice that GM lacked the ability to perform warranty work, and (3) provide roadside assistance and courtesy transportation. (ECF No. 38, PageID.1839, ¶ 570.) As GM identifies, some of these alleged instances of contractual breach—not performing warranty work and not providing notice that the Class Vehicles had a BECM-related defect—seem to overlap with plaintiffs' express and implied warranty claims. However, as plaintiffs argue, breach of contract is an alternative theory of liability. For example, plaintiffs must prove the existence of an express warranty to maintain an express warranty claim, but they need not do

so to maintain a breach of contract claim. Moreover, plaintiffs' claims for failure to provide roadside assistance and courtesy transportation are not appropriate as express warranty claims because those programs are not part of the Class Vehicles' warranty; those claims may be more appropriate under a breach of contract theory. Therefore, the Court declines to dismiss the breach of contract claims as duplicative.

### F.    Unjust Enrichment

General Motors argues that plaintiffs cannot maintain their unjust enrichment claim because either an adequate legal remedy exists or a contract governs this dispute. (ECF No. 26, PageID.1102–1104.) The Court agrees. "[C]ourts 'have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims.'" *Bolt*, 633 F. Supp. 3d at 982 (quoting *Air Conditioning*, 406 F. Supp. 3d at 634). Here, the Class Vehicles are both the subject matter of plaintiffs' unjust enrichment claims and the object of the New Vehicle Limited Warranty. Further, GM does not dispute that the New Vehicle Limited Warranty is valid, enforceable, and express. And contrary to plaintiffs' argument, pleading

136

unjust enrichment in the alternative is not permissible where there is no dispute between the parties as to whether an express agreement "governs the subject matter of [p]laintiffs' claims." *Hall*, 2020 WL 1285636, at *10. Accordingly, the Court **DISMISSES** plaintiffs' unjust enrichment claim.

### G.   Challenges to Various State Statutory Claims[15]

### 1.   Arkansas Declaratory Judgment Act (ADJA)

General Motors argues that Willhite and Barnes are not entitled to declaratory relief under the ADJA. (ECF No. 26, PageID.1105.) GM argues that because it repaired Willhite's and Barnes' vehicles at no cost to them, there is no ripe justiciable controversy. (*Id.*) The Court partially disagrees and declines to wholly dismiss the ADJA claim.

To obtain declaratory relief under the ADJA, a plaintiff must establish four elements:

> (1) a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy; in other words, a legally protectable interest;

---

[15] The Court has either dismissed or cabined the scope of many state statutory claims already. Accordingly, this section only analyzes state statutory claims to the extent that additional analysis is unique and not repetitive.

and (4) the issue involved in the controversy must be ripe for judicial determination.

*Palade v. Bd. of Trs. of Univ. of Ark. Sys.*, 645 S.W.3d 1, 5 (Ark. 2022) (citation omitted). "A declaratory judgment will not be granted unless the danger or dilemma of the plaintiff is present, not contingent on the happening of hypothetical future events; the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote." *Id.* at 6 (quoting *Nelson v. Ark. Rural Med. Prac. Loan & Scholarship Bd.*, 385 S.W.3d 762, 769 (Ark. 2011)).

Here, Willhite and Barnes seek two declarations about the warranty's validity: that the New Vehicle Limited Warranty is unconscionable and that it fails its essential purpose. (ECF No. 38, PageID.1861–1862, ¶ 691.) First, Willhite and Barnes have not alleged facts that would allow the Court to infer that the warranty is procedurally and substantively unconscionable. *See Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1082 (E.D. Ark. 2013) (citation omitted) ("Plaintiff must prove both procedural and substantive unconscionability for an agreement to be unenforceable."). Second, Willhite and Barnes have not plausibly alleged that the warranty fails it essential purpose. A warranty fails its essential purpose where a

buyer is deprived of the substantial value of their bargain. *Caterpillar Tractor Co. v. Waterson*, 679 S.W.2d 814, 820 (Ark. Ct. App. 1984). While some plaintiffs have experienced issues with their Volts following repairs by GM, Willhite and Barnes have not. Whether the warranty fails its essential purpose with respect to Willhite and Barnes is contingent on (1) their Volts experiencing BECM-related issues again within the warranty period and (2) GM not repairing the vehicles under warranty. The danger to plaintiffs of deprivation of the substantial value of their bargain is speculative and contingent on possible but not guaranteed events. Therefore, this is no justiciable controversy regarding the warranty's validity.

Plaintiffs also seek a declaration regarding the effect of implied warranties on their other claims: that "all implied warranties are limited only as to the duration of the express warranty and have no limitation on remedies available to Plaintiffs and the Class." (ECF No. 38, PageID.1862, ¶ 691.) Here, if the implied warranty of merchantability limits the available remedies for Willhite and Barnes, they may not be able to maintain some of their claims or seek certain relief. Therefore, the dilemma that Willhite and Barnes are in is

139

present and thus justiciable. General Motors cites authority indicating that parties to an agreement may limit a buyer's remedies to the repair and replacement of nonconforming goods. (ECF No. 26, PageID.1106.) While the express warranty may limit Willhite's and Barnes' remedies, it is unclear that an implied warranty has the same effect. Accordingly, Willhite and Barnes may only seek ADJA declaratory relief on the questions of whether the implied warranties are limited only as to the duration of the express warranty and whether the implied warranties limit remedies available to Willhite, Barnes, and the Arkansas subclass.

### 2.   California False Advertising Law (FAL) and Unfair Competition Law (UCL)

General Motors argues that the availability of adequate legal remedies bars Varadarajan's FAL and UCL claims. (ECF No. 26, PageID.1107.) The Court agrees. A federal court cannot grant relief under the FAL or UCL if a plaintiff has an adequate remedy at law because FAL and UCL claims "necessarily seek equitable relief" which "is not appropriate where an adequate remedy exists at law." *Williams v. Apple, Inc.*, No. 19-CV-04700, 2020 WL 6743911, at *9–10 (N.D. Cal. Nov. 17, 2020) (internal quotation marks omitted) (quoting *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009)). "Monetary damages

are a[n adequate] remedy at law." *Id.* at \*9 (citation omitted). Here,

Varadarajan does not argue that his legal remedies are inadequate.

Instead, he argues that he can plead equitable claims as an alternative

to his legal remedies. (ECF No. 27, PageID.1201.) However, the

authority that he cites is distinguishable.

In *In re JUUL Labs, Inc. Mktg. Sales Pracs. & Prod. Liab. Litig.*,

609 F. Supp. 3d 942, 998–999 (N.D. Cal. 2022), plaintiffs alleged

inadequate remedies at law. Additionally, the court stated that it could

not determine whether plaintiffs' equitable claims fully overlapped with

their damages claims "especially because each set of defendants

repeatedly argue[d] that they [were] differently situated with respect to

the timeframe of their conduct and the types or amount of

damages/restitution potentially available to the classes under the

various claims." *Id.* at 999. Here, Varadarajan has not alleged

inadequate remedies at law. Moreover, Varadarajan's equitable claims

fully overlap with his damages claims; the FAL and UCL claims are

based on GM's alleged misrepresentations and omissions related to the

Class Vehicles leading Varadarajan to purchase a Volt. (ECF No. 38,

PageID.1873–1874, ¶¶ 753–755; PageID.1880–1881, ¶¶ 790–791.)

Varadarajan's warranty claims—damages claims—are based on Varadarajan purchasing an unmerchantable vehicle and GM allegedly not honoring its warranty obligations with respect to that vehicle. (*Id.* at PageID.1867–1868 ¶¶ 718–720; PageID.1869 ¶¶ 728–731; PageID.1876–1877 ¶¶ 767–769; PageID.1878–1879 ¶¶ 776–778.) Therefore, *JUUL Labs* does not save Varadarajan's FAL or UCL claims.

In *In re Cardizem CD Antitrust Litig.*, the court found that "[p]laintiffs' ability to plead in the alternative" rendered moot the defendant's argument that "[p]laintiffs' unjust enrichment claims must be dismissed" for inadequately alleging "an adequate remedy at law". 105 F. Supp 2d 618, 671 n.25 (E.D. Mich. 2000). However, *Williams* is more persuasive as it is specific to FAL and UCL claims and cites Ninth Circuit authority. Accordingly, because Varadarajan fails to allege inadequate remedies at law, the Court **DISMISSES** the California FAL and UCL claims.

### 3.    Connecticut Unfair Trade Practices Act (CUTPA)

General Motors argues that Collins' CUTPA claim is time-barred. (ECF No. 26, PageID.1108.) The Court partially disagrees and declines to wholly dismiss the CUTPA claim. A plaintiff must bring a CUTPA

claim within three years after the CUTPA violation occurs. Conn. Gen. Stat. Ann. § 42-110g(f) (West 2024). The limitations period runs from the date of the violation, not from the date the cause of action accrues or the injury occurs. *See Fichera v. Mine Hill Corp.*, 541 A.2d 472, 475–476 (Conn. 1988). Collins argues that GM violated the CUTPA in June 2023 when one of its dealerships told Collins that it fixed his car, but the car later broke down as Collins drove it home from the dealership. (ECF No. 27, PageID.1204 n.132.) Collins filed his complaint in June 2023, within the limitations period. (ECF No. 24.) General Motors claims that allegations that a dealership violated the CUTPA cannot support a claim against GM, but it cites no authority for this claim. (ECF No. 29, PageID.1261–1262.) Moreover, Collins alleges that the dealership he dealt with was a GM dealership. (ECF No. 38, PageID.1744, ¶ 278; PageID.1745–1746, ¶¶ 282–285.) Accordingly, the Court declines to dismiss Collins' CUTPA claim related to the GM dealership's repair.

However, Collins' CUTPA claim based on deceptive practices during or preceding his purchase of his Volt are time-barred unless an exception applies. Collins alleges that but for GM's deceptive trade practices, he would not have purchased his Volt or would have paid

143

significantly less for it. (*Id.* at PageID.1895–1896 ¶ 867.) He also alleges

that he suffered diminished value of his vehicle and lost or diminished

use. (*Id.*) These damages stem from allegedly deceptive acts during or

preceding the time Collins purchased his Volt. Collins purchased his

Volt in late 2015 or early 2016. (*Id.* at PageID.1744 ¶ 278.) At best,

Collins had until late 2018 or early 2019 to bring a CUTPA claim, but

he did not bring the claim until June 2023, outside of the limitations

period (*See* ECF No. 24.) Therefore, the CUTPA claim based on GM's

alleged misrepresentations and omissions before or during Collins'

purchase of his Volt are time-barred unless an exception applies.

Collins argues that the continuing course of conduct exception

make his claim timely. The Court disagrees. The Connecticut Supreme

Court has outlined the requirements for this exception:

> To support a finding of a "continuing course of conduct" that
> may toll the statute of limitations there must be evidence of
> the breach of a duty that remained in existence after
> commission of the original wrong related thereto. That duty
> must not have terminated prior to commencement of the
> period allowed for bringing an action for such a wrong.
> . . .
>
> Where we have upheld a finding that a duty continued to
> exist after the cessation of the "act or omission" relied upon,
> there has been evidence of either a special relationship
> between the parties giving rise to such a continuing duty or

> some later wrongful conduct of a defendant related to the
> prior act.

*Fichera*, 541 A.2d at 474. A mere "vendor-vendee relationship" does not give rise to a duty on the part of a vehicle manufacturer to "expose its own deceit" after the sale of a vehicle. *Phelan ex rel. Estate of Phelan v. Daimler Chrysler Corp.*, 323 F. Supp. 2d 335, 339–340 (D. Conn. 2004) (quoting *Fichera*, 541 A.2d at 475). Thus, Collins must show some later wrongful conduct by GM related to the sale to support the exception. *See id.* at 340.

Here, Collins does not allege that after he purchased his Volt, GM engaged in wrongful conduct related to the sale. Collins alleges that shortly after he purchased his Volt, he took his vehicle to the GM dealership for service in February 2016. (ECF No. 38, PageID.1745, ¶ 282.) He alleges that the dealership reprogrammed the engine control module. (*Id.*) He also alleges that the dealership extensively overhauled the Volt's engine, but he does not allege when the overhaul occurred. (*Id.*) It is unclear whether Collins interacted with the dealership or another GM entity between February 2016 and June 2023. Moreover, Collins does not allege that GM's February 2016 repairs, the engine overhaul, or other repairs preceding the June 2023 repair violated the

145

CUTPA. Because Collins does not allege that GM engaged in some later wrongful conduct related to the sale such that GM owed a continuing duty to Collins after the sale, the continuing course of conduct exception does not save the CUTPA claim.

Collins next argues that fraudulent concealment tolls the limitations period on the CUTPA claim. (ECF No. 27, PageID.1204.) The Court disagrees. "*Fichera* stands for the proposition that an arguably fraudulent or deceptive act that is itself claimed to be a CUTPA violation that occurred more than three years before the filing of the action cannot, by itself, toll the statute of limitations." *Willow Springs Condo. Ass'n v. Seventh BRT Dev. Corp.*, 717 A.2d 77, 101 (Conn. 1998). Here, as discussed above, Collins alleges that GM fraudulently concealed the defect prior to and at the time he purchased his Volt. However, Collins' CUTPA claim is based on the same conduct, which occurred more than three years before Collins filed his claim. Therefore, under *Fichera*, alleged concealment of the defect cannot, by itself, toll the statute of limitations. To the extent that Collins alleges a CUTPA violation based on GM's concealment of the defect during the warranty period, that claim also fails. As discussed above, GM did not

have a duty to disclose its own alleged deceit, so GM's nondisclosure does not establish an independent and timely CUTPA violation. Because Collins does not identify an instance of fraudulent concealment independent from the alleged CUTPA violation, Collins' CUTPA claim for GM's alleged deceptive practices at or preceding his purchase of the Volt is time-barred. Collins may only maintain a CUTPA claim related to the GM dealership's June 2023 repair.

### 4.   Oklahoma Consumer Protection Act (OCPA)

General Motors argues that Barnes' OCPA claim fails because the statute does not apply to transactions that a state or federal regulatory body regulates or authorizes. (ECF No. 26, PageID.1110–1111.) The Court agrees. The OCPA does not apply to "[a]ctions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or officer acting under statutory authority of [Oklahoma] or the United States." Okla. Stat. Ann. tit. 15, § 754(2) (West 2024). General Motors cites numerous federal regulations that regulate the manufacture, sale, and warranting of automobiles. (ECF No. 26, PageID.1111, n.30 (citing 49 C.F.R. pt. 571, 49 U.S.C. § 30112(a), 49 U.S.C. § 30118(b)(2), 49 C.F.R. pts. 573 and 579, 15 U.S.C.

§ 2303(a)). The Court agrees; the OCPA does not apply to Barnes' purchase of his Volt. *See MacTavish v. Am. Honda Motor Co.*, No. CV 21-4289-GW-JEMx, 2022 U.S. Dist. LEXIS 104482, at *28–29 (C.D. Cal. Feb. 15, 2022) (concluding that Oklahoma law exempts the conduct upon which plaintiffs based their fraud claims against Honda because of federal regulation of automobile manufacturing and sales). Barnes only argues that Oklahoma courts have read the statutory exemption narrowly. (ECF No. 27, PageID.1208.) However, the authority that Barnes cites discusses the Oklahoma Used Motor Vehicle and Parts Commission and regulations under the Oklahoma Insurance Code. *See Conatzer v. Am. Mercury Ins. Co.*, 15 P.3d 1252, 1255 (Okla. Civ. App. 2000) (rejecting defendant's argument that because an insurer's business activities are subject to regulatory oversight and control of the state insurance commissioner, it is statutorily exempt from suit under the OCPA); *Robinson v. Sunshine Homes, Inc.*, 291 P.3d 628, 634–635 (Okla. Civ. App. 2010) (holding that licensing regulation by the Oklahoma Used Motor Vehicle and Parts Commission does not exempt a manufactured home dealer from suit under the OCPA). Neither *Conatzer* nor *Robinson* supply a reason why the aforementioned federal

148

regulations prevent the exemption from applying. Therefore, § 754(2) does not apply to Barnes' purchase of his Volt, and the Court **DISMISSES** the OCPA claim.[16]

### 5.   New York General Business Law (NY GBL)

General Motors argues that Colley's NY GBL §§ 349 and 350 claims are time-barred. (ECF No. 26, PageID.1112.) The Court agrees. NY GBL §§ 349 and 350 claims are subject to a three-year statute of limitations. *Gould v. Helen of Troy Ltd.*, No. 16 Civ. 2033, 2017 WL 1319810, at *2 (S.D.N.Y. Mar. 30, 2017). Sections 349 and 350 claims accrue when a plaintiff suffers injury from a violation of the statutes. *Id.* Accrual is "not dependent upon any date when discovery of the alleged deceptive practice is said to occur." *Id.* (internal quotation marks omitted) (quoting *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014)).

Here, Colley alleges that but for GM's unfair and deceptive acts, she would not have purchased her Volt or would have paid much less for it. (ECF No. 38, PageID.1975, 1978, ¶¶ 1296, 1310.) Thus, Colley allegedly suffered an injury when she purchased her Volt which was in

---

[16] Because the Court dismisses the OCPA claim on this ground, it need not address GM's other arguments for dismissing the claim.

March 2017. (*Id.* at PageID.1725 ¶ 181.) Therefore, the limitations period expired in March 2020, well before Colley filed her complaint in February 2023. (ECF No. 15.) Colley's NY GBL claims based on the purchase of the Volt are time-barred unless an exception applies.

Colley argues that fraudulent concealment tolls the statute of limitations.[17] (ECF No. 27, PageID.1206.) The Court disagrees. To establish equitable tolling based on fraudulent concealment, a plaintiff must establish that (1) defendant wrongfully concealed material facts which prevented plaintiff's discovery of the nature of the claim and (2) plaintiff exercised due diligence in pursuing the discovery of the claim during the period that plaintiff seeks to have tolled. *Gould*, 2017 WL 1319810, at *3. Mere nondisclosure is not enough to toll the statute of limitations; "there must be a 'later fraudulent misrepresentation . . . for the purpose of concealing the former tort.'" *Id.* (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184 (N.Y. 2012)). Here, Colley argues that GM fraudulently concealed the defect, but, as discussed above, GM did not have knowledge of the defect at the time Colley purchased her Volt. Even though GM learned of the defect after Colley

---

[17] Colley does not argue that fraudulent concealment tolls the statute of limitations on her § 350 claim. Nevertheless, the Court will also analyze tolling under Colley's § 350 claim.

purchased her Volt, Colley does not allege that GM committed a later fraudulent misrepresentation for the purpose of concealing an alleged § 349 or § 350 violation. Quite the opposite, Colley alleges that when she took her Volt to a GM dealership in July 2022, the dealership informed her that her Volt's BECM failed. (ECF No. 38, PageID.1726, ¶¶ 185–186.) Because Colley's NY GBL claims based on the purchase of the Volt are time-barred and no exception applies, the Court **DISMISSES** the NY GBL § 350 claim.[18] Additionally, the § 349 claim may not proceed based on GM's conduct during or preceding Colley's purchase of her Volt.

Colley argues that she can maintain a timely § 349 claim on two other bases. First, she argues that GM's alleged deceptive acts, such as "setting unrealistic expectations that [Colley] could not know GM would not meet until her Volt failed in July 2022," are actionable. (ECF No. 27, PageID.1206.) Colley cites *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1084 (N.Y. 2001), but that case is distinguishable. (*Id.*) *Gaidon* involved a § 349 claim based on defendants inducing plaintiffs to purchase a life insurance policy with premiums that

---

[18] Because the Court dismisses the NY GBL § 350 claim on this ground, it need not address GM's other arguments for dismissing the claim.

151

plaintiffs thought would vanish. *Id.* at 1080–1081. Plaintiffs alleged that defendants knew it was unlikely that interest rates would continue to perform at high, unprecedented rates such that premiums could be fully offset. *Id.* at 1084. The court held that plaintiffs' claim did not accrue until defendants demanded that plaintiffs pay additional premiums or lose coverage and forfeit previously paid premiums "[b]ecause the gravamen of the complaints of General Business Law § 349 violations was not false guarantees of policy terms, but deceptive practices inducing unrealistic expectations of continuing interest/dividend rate performance to fully offset premiums at the projected date." *Id.* at 1084. Here, although GM's alleged misrepresentations and omissions may have led Colley to set certain expectations about the reliability and longevity of her Volt, Colley has not alleged that GM knew it was unlikely that the Volt would prove reliable at the time of sale. Therefore, *Gaidon* is not analogous, and Colley cannot maintain a § 349 claim based on her expectations about the Volt.

Second, Colley argues that she can maintain a timely § 349 claim based on how the GM dealership handled her warranty claim. The

Court disagrees. Colley alleges that GM engaged "in post-sale unfair and deceptive practices" when it failed to provide Colley with necessary repairs. (ECF No. 38, PageID.1975, ¶ 1294.) Colley cites *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 484–485 (E.D.N.Y. 2011) to support her argument, but that case is distinguishable. (ECF No. 27, PageID.1206 n.142.) In *Statler*, the court declined to dismiss a § 349 claim based on alleged deceptive post-delivery conduct as untimely. *Id.* at 485. Statler alleged that when he reported issues with defective computers to Dell, the company "covered up" the fact that (1) the issues Statler experienced were common to a certain type of Dell computer and (2) the issues were traceable to a defective component, and Dell repair technicians replaced faulty parts with equally faulty parts. *Id.* at 478. Here, Colley does not allege that GM similarly covered up the BECM defect when she sought warranty services; when Colley brought her car to a GM dealership for service in 2022, the dealership informed her that her BECM had failed. (ECF No. 38, PageID.1726, ¶¶ 185–186.) While Colley alleges that she continues to experience issues affecting the operability of her Volt, she does not allege—and it is not reasonable to infer—that the GM dealership performed a BECM repair by swapping

one faulty BECM for another. Therefore, *Statler* is distinguishable and does not support Colley's argument. Because Colley's § 349 claim based on GM's conduct before or around the time of sale is time-barred and Colley lacks an alternative § 349 claim, the Court **DISMISSES** the NY GBL § 349 claim.

### 6. Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA)

General Motors argues that Broennan's ICFA claim fails because she does not specify an allegedly deceptive advertisement she received from GM and upon which she relied. (ECF No. 26, PageID.1112–1113.) The Court agrees. A plaintiff must establish five elements to maintain an ICFA claim:

> (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception.

*De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009) (citation omitted). A plaintiff must show that they were actually deceived by a statement or omission made by defendant. *Id.* at 316. "If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *Id.* Under

154

ICFA, an "omission" is an omission from a communication, not a general failure to disclose. *Darne v. Ford Motor Co.*, No. 13 CV 03594, 2017 WL 3836586, at *10 (N.D. Ill. Sept. 1, 2017) (citing *De Bouse*, 922 N.E.2d at 316).

Here, as discussed above, Broennan's ICFA claim cannot proceed on a misrepresentation theory because she fails to satisfy the pleading requirements of Rule 9(b). Moreover, Broennan's ICFA claim also fails under an omission theory. Broennan does not show that GM had knowledge of the defect or its alleged inability to provide warranty repairs, roadside assistance, or courtesy transportation before Broennan purchased her Volt. Therefore, even if Broennan saw or heard a communication about the Volt before she purchased it, that communication did not contain a material omission. While GM had knowledge of the BECM defect in 2020 and 2022, which was when the GM dealership repaired Broennan's Volt, Broennan does not identify a "particular direct statement" from GM or the GM dealership at the time of those repairs that contained a material omission. *O'Connor*, 477 F. Supp. 3d at 720. To the contrary, Broennan alleges that the dealership informed her that her BECM failed and that it could not provide a

timetable for repair. (ECF No. 38, PageID.1724, ¶ 175.) Because Broennan fails to specify an allegedly deceptive advertisement or communication that she received from GM, the Court **DISMISSES** the ICFA claim.

### 7.   Utah Consumer Sales Practices Act (UCSPA)

General Motors argues that Wood cannot recover monetary damages class-wide on her UCSPA claim because she fails to allege that GM's conduct violates an administrative rule, final judgment from a Utah court, or a consent judgment. (ECF No. 26, PageID.1115.) The Court agrees. Class action damages are available under the UCSPA if the act or practice that is alleged to violate the statute has been:

> (1) Specified as violating the UCSPA by a substantive rule adopted by . . . the Utah Division of Consumer Protection; (2) Declared to violate Sections 4 or 5 of the UCSPA by a final judgment of the appropriate court . . . reported . . . 10 days before the consumer transactions on which the action is based; or (3) Was prohibited specifically by the terms of a consent judgment which became final before the consumer transactions on which the action is based.

*Matchett v. BSI Fin. Servs.*, No. 21-cv-211-DAK-CMR, 2021 WL 3473062, at *2 (D. Utah Aug. 6, 2021) (internal quotation marks omitted) (quoting Utah Code Ann. § 13-11-19(4)(a) (West 2024)).

"Unless one of the three situations is present, a consumer is not permitted to pursue a class action under the UCSPA for actual or statutory damages." *Id.* (citation omitted).

Here, Wood does not allege in the complaint that one of the three situations is present. Instead, Wood argues for the first time in her opposition brief to GM's motion to dismiss that the Utah Division of Consumer Protection has promulgated multiple rules that GM arguably violated. (ECF No. 27, PageID.1209.) However, "it is axiomatic that a plaintiff may not amend [their] complaint through allegations made in a response to a motion to dismiss." *Sango v. Johnson*, No. 13-12808, 2014 WL 8186701, at *8 (E.D. Mich. Oct. 29, 2014), *report and recommendation adopted*, 2015 WL 1245969, at *1 (E.D. Mich. Mar. 18, 2015). Therefore, Wood may not recover monetary damages under the UCSPA on a class-wide basis.

## V.    CONCLUSION

Accordingly, General Motors' motion to dismiss (ECF No. 26) is **GRANTED IN PART** and **DENIED IN PART**. For convenience, the Court inserts a Table of Claims containing a breakdown of the claims that survive in whole, survive in part, and do not survive at all. The

Table of Claims is hereby incorporated in this Order by reference and specifies claims according to the count names in the second supplemental second amended complaint. (ECF No. 38.)

| Count | Claim | Status |
|---|---|---|
| General Count I | Magnuson-Moss Warranty Act | Partially dismissed. Survives only as to any plaintiff and respective sub-class with valid express warranty and/or implied warranty of merchantability claims. |
| General Count II | Fraudulent Concealment (as to AR, CA, CO, CT, FL, GA, IL, KS, MD, MI, MO, NM, NY, NC, PA, SC, TN) | Partially dismissed. Dismissed as to CA, CO, GA, NM, IL, NY, SC, AL, MI (Amy and Halee Stewart), MD, and CT for failure to allege pre-sale knowledge. Dismissed as to AR, OK, FL, MO, NC, TN, MI (Hogan), and UT for failure to allege a duty to disclose.<br><br>Only the KS and PA claims survive. |
| General Count III | Fraudulent Misrepresentation (as to AR, CA, CT, CO, FL, GA, IL, KS, MD, MI, MO, NM, NY, NC, PA, SC, TN) | Fully dismissed for failure to satisfy Rule 9(b). |
| General Count IV | Breach of Contract | Fully remains. |
| General Count V | Negligent Misrepresentation (as to CA, CT, CO, FL, GA, IL, KS, MD, MI, MO, NM, NY, NC, PA, SC, TN) | Fully dismissed for failure to satisfy Rule 9(b). |

| Count | Claim | Status |
|---|---|---|
| General Count VI | Unjust Enrichment | Fully dismissed for failure to allege inadequate remedies at law. |
| AL Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| AL Count II | Breach of Implied Warranty | Fully remains. |
| AL Count III | Alabama Deceptive Trade Practices Act | Dismissed for failure to allege pre-sale knowledge. |
| AR Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| AR Count II | Breach of Implied Warranty | Dismissed as untimely. |
| AR Count III | Arkansas Declaratory Judgment Act | Partially dismissed. The Arkansas plaintiffs may only seek declaratory relief on the questions of whether the implied warranties are limited only as to the duration of the express warranty and whether the implied warranties limit remedies available to Willhite, Barnes, and the Arkansas subclass |
| AR Count IV | Arkansas Deceptive Trade Practices Act | Partially dismissed. May not proceed under an omission theory for failure to allege a duty to disclose. |
| CA Count I | Breach of Express Warranty | Fully remains. |
| CA Count II | Breach of Implied Warranty | Fully remains. |
| CA Count III | CA Consumers Legal Remedies Act | Dismissed. May not proceed on a misrepresentation theory due to failure to satisfy Rule 9(b). May not proceed on an omission theory due to failure to allege pre-sale knowledge. |

| Count | Claim | Status |
|-------|-------|--------|
| CA Count IV | CA False Advertising Law | Dismissed for failure to allege inadequate remedies at law. |
| CA Count V | Song-Beverly Consumer Warranty Act for Breach of Express Warranties | Fully remains |
| CA Count VI | Song-Beverly Consumer Warranty Act for Breach of Implied Warranties | Fully remains. |
| CA Count VII | CA Unfair Competition Law | Dismissed for failure to allege inadequate remedies at law. |
| CO Count I | Breach of Express Warranty | Fully remains. |
| CO Count II | Breach of Implied Warranty | Dismissed as untimely. |
| CO Count III | CO Consumer Protection Act | Dismissed for failure to allege pre-sale knowledge. |
| CT Count I | Breach of Express Warranty | Fully remains. |
| CT Count II | Breach of Implied Warranty | Dismissed as untimely. |
| CT Count III | CT Unlawful Trade Practices Act | Partially dismissed. Only survives as to the GM dealership's June 2023 repair of Collins' vehicle. |
| FL Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| FL Count III[19] | Florida Deceptive and Unfair Trade Practices Act | Partially dismissed. May only proceed under a misrepresentation theory. |

---

[19] The numbering in the remaining claims chart (ECF No. 27-2, PageID.1219) and the complaint (ECF No. 38, PageID.1897–1902) jumps from Count I to Count III.

| Count | Claim | Status |
|---|---|---|
| GA Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| GA Count II | Breach of Implied Warranty | Dismissed as untimely. |
| GA Count III | GA Uniform Deceptive Trade Practices Act | Fully remains. |
| GA Count IV | GA Fair Business Practices Act | Fully remains. |
| IL Count I | Breach of Express Warranty | Partially dismissed. May only proceed with respect to being charged for a warranty repair. |
| IL Count III[20] | IL Consumer Fraud and Deceptive Trade Practices Act | Dismissed for failure to specify an allegedly deceptive advertisement received from General Motors. |
| KS Count I | Breach of Express Warranty | Fully remains. |
| KS Count II | Breach of Implied Warranty | Dismissed as untimely. |
| KS Count III | Kansas Consumer Protection Act | Partially Dismissed. May not proceed on a misrepresentation theory for failure to satisfy Rule 9(b). |
| MD Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| MD Count II | Breach of Implied Warranty | Dismissed as untimely. |
| MD Count III | MD Consumer Protection Act | Dismissed. May not proceed under a misrepresentation theory for failure to satisfy Rule 9(b). May not proceed on an omissions theory for failure to allege pre-sale knowledge. |

---

[20] Plaintiffs voluntarily dismissed Illinois Count II. (ECF No. 28.)

| Count | Claim | Status |
|---|---|---|
| MI Count I | Breach of Express Warranty | Partially dismissed. Only remains with respect to Hogan and the Michigan sub-class. |
| MI Count II | Breach of Implied Warranty | Dismissed as untimely. |
| MO Count I | Breach of Express Warranty | Fully remains. |
| MO Count II | Breach of Implied Warranty | Fully remains. |
| MO Count III | MO Merchandising Practices Act | Fully remains. |
| NM Count I | Breach of Express Warranty | Partially dismissed. May only proceed with respect to being charged for a warranty repair. |
| NM Count II | Breach of Implied Warranty | Dismissed as untimely. |
| NM Count III | NM Unfair Practices Act | Dismissed for failure to allege pre-sale knowledge. |
| NY Count I | Breach of Express Warranty | Fully remains. |
| NY Count II | Breach of Implied Warranty | Dismissed as untimely. |
| NY Count III | NY BUS GBL 349 | Dismissed as untimely. |
| NY Count IV | NY BUS GBL 350 | Dismissed as untimely. |
| NC Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| NC Count II | Breach of Implied Warranty | Dismissed as untimely. |

| Count | Claim | Status |
|---|---|---|
| OK Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| OK Count II | Breach of Implied Warranty | Dismissed as untimely. |
| OK Count III | Oklahoma Consumer Protect Act | Dismissed as inapplicable. |
| PA Count I | Breach of Express Warranty | Fully remains. |
| PA Count II | Breach of Implied Warranty | Dismissed as untimely. |
| PA Count III | PA Unfair Trade Practices & Consumer Protection Act | Partially dismissed. May not proceed on a misrepresentation theory for failure to satisfy Rule 9(b). |
| SC Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| SC Count II | Breach of Implied Warranty | Fully remains. |
| SC Count III | SC Unfair Trade Practices Act | Dismissed. May not proceed on a misrepresentation theory for failure to satisfy Rule 9(b). May not proceed on an omission theory for failure to allege pre-sale knowledge. |
| SC Count IV | SC Regulation of Manufacturers, Distributors, and Dealers Act | Dismissed for failure to allege pre-sale knowledge. |
| TN Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| TN Count II | TN Consumer Protection Act | Dismissed. May not proceed on a misrepresentation theory for failure to satisfy Rule 9(b). May not proceed on an omission theory for failure to allege a duty to disclose. |

| Count | Claim | Status |
|---|---|---|
| Utah Count I | Breach of Express Warranty | Dismissed for failure to allege breach of warranty. |
| Utah Count II | UT Consumer Sales Practices Act | Partially dismissed. May not proceed on a misrepresentation theory for failure to satisfy Rule 9(b). Wood may not seek monetary damages on behalf of the class. |

Additionally, General Motors' motion to dismiss additional specific claims is **DENIED AS MOOT** because plaintiffs have voluntary dismissed the following claims: all claims based on Indiana and Ohio law, including General Counts II, III, and VI as to Indiana and Ohio, Indiana Counts I, II, and III and Ohio Counts I and II; Illinois Count II; Maryland Count IV; and Michigan Count III. (ECF No. 28.)

  **SO ORDERED**.

          **s/Jonathan J.C. Grey**
          Hon. Jonathan J.C. Grey
Date: March 28, 2025     United States District Judge

**<u>Certificate of Service</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 28, 2025.

**<u>s/ S. Osorio</u>**
Sandra Osorio
Case Manager
